# EXHIBIT 14

# Redacted - Privileged

2021MARVEL-0068494

# Redacted - Privileged

2021MARVEL-0068495

**PURCHASE AGREEMENT**

**Dated November 20, 1986**

**Between**

**NEW WORLD PICTURES, LTD.**

**and**

**CADENCE INDUSTRIES CORPORATION**

2021MARVEL-0068496

## TABLE OF CONTENTS

**Section**                                                                                          **Page**

### ARTICLE 1

#### SALE AND PURCHASE OF ASSETS

1.1    Sale of Assets to Buyer................... 1
1.2    Excluded Assets......................... 5

### ARTICLE 2

#### PURCHASE PRICE; ESCROW ACCOUNT

2.1    Amount and Payment of Consideration...... 6
2.2    Escrow Account.......................... 6
2.3    Assumption of Liabilities............... 6
2.4    Adjustments to Purchase Price........... 8
2.5    Post-Closing Adjustments................ 9
2.6    Allocation............................. 12

### ARTICLE 3

#### CLOSING

3.1    Closing Date........................... 12
3.2    Termination............................ 13
3.3    Specific Performance................... 13

### ARTICLE 4

#### REPRESENTATIONS AND WARRANTIES OF SELLER

4.1    Seller's Organization and Authority...... 14
4.2    Subsidiaries' Organization.............. 14
4.3    Authorization of Agreement.............. 16
4.4    Consents of Third Parties............... 16
4.5    No Violation........................... 16
4.6    Taxes.................................. 18
4.7    Financial Statements................... 18
4.8    Absence of Certain Changes.............. 19
4.9    Material Agreements and Commitments...... 20
4.10   Tangible Property...................... 21
4.11   Litigation............................. 21
4.12   Agreements Regarding Employees.......... 22
4.13   Intangible Assets...................... 22

(i)

2021MARVEL-0068497

| Section | | Page |
|---|---|---|
| 4.14 | Insurance.................................. | 23 |
| 4.15 | Labor Matters............................. | 24 |
| 4.16 | Accuracy of Representations and Warranties......................... | 25 |

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF BUYER

| | | |
|---|---|---|
| 5.1 | Buyer's Organization...................... | 25 |
| 5.2 | Authorization of Agreement............... | 25 |
| 5.3 | No Violation; Consents and Approvals..... | 26 |
| 5.4 | Litigation................................ | 26 |
| 5.5 | Accuracy of Representations and Warranties......................... | 27 |

ARTICLE 6

FURTHER AGREEMENTS OF THE PARTIES

| | | |
|---|---|---|
| 6.1 | Hart-Scott-Rodino Act ................... | 27 |
| 6.2 | Operation of the Seller's Business....... | 28 |
| 6.3 | Notices................................... | 30 |
| 6.4 | Consents; Assignment of Agreements....... | 30 |
| 6.5 | Expenses.................................. | 31 |
| 6.6 | Taxes; Tax Returns....................... | 31 |
| 6.7 | Access to Information..................... | 36 |
| 6.8 | Unfulfilled Subscriptions................ | 37 |
| 6.9 | Employees; Employee Benefits and Plans... | 38 |
| 6.10 | Bulk Sales................................ | 41 |
| 6.11 | Returns................................... | 41 |
| 6.12 | Release of Letter of Credit.............. | 42 |
| 6.13 | Release as Guarantor...................... | 42 |
| 6.14 | Tax Exemption Information................ | 42 |
| 6.15 | Access with Respect to Peat Marwick Audit............................ | 43 |
| 6.16 | Computer Services......................... | 43 |
| 6.17 | Other Action.............................. | 43 |
| 6.18 | Further Assurances....................... | 44 |

ARTICLE 7

CONDITIONS PRECEDENT TO CLOSING

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Buyer.................... | 44 |
| 7.2 | Conditions Precedent to the Obligations of Seller................................ | 46 |

(ii)

2021MARVEL-0068498

Section                                                        Page

ARTICLE 8

DELIVERIES AT THE CLOSING

8.1      Deliveries by Seller.....................      47
8.2      Deliveries by Buyer......................      48

ARTICLE 9

SURVIVAL OF REPRESENTATIONS
AND WARRANTIES; INDEMNIFICATION

9.1      Survival.................................      50
9.2      Indemnification..........................      50
9.3      Conditions of Indemnification for Third
         Party Claims............................      53
9.4      Time Limitations.........................      55
9.5      Section 338 Election ....................      56

ARTICLE 10

MISCELLANEOUS

10.1     Notices..................................      57
10.2     Finders..................................      58
10.3     Entire Agreement.........................      58
10.4     Headings.................................      59
10.5     Governing Law............................      59
10.6     Severability.............................      59
10.7     Assignment...............................      59
10.8     Publicity................................      60
10.9     Third Parties............................      60
10.10    Counterparts.............................      60
10.11    Cross References Within Agreement........      60
10.12    Revisions to Schedules...................      60
10.13    Service of Process.......................      61

(iii)

2021MARVEL-0068499

List of Schedules
and Exhibits                         Subject

Exhibit A              Escrow Agreement
Exhibit B              Marvel Universe
Exhibit C              Opinion of Weil, Gotshal & Manges
Exhibit D              Opinion of Rudin, Richman & Appel
Exhibit E              Bill of Sale and Assignment
Exhibit F              Assumption Agreement
Schedule A             Description of the Business
Schedule 1.1(a)        Equipment, Furniture, Fixtures and
                          Leasehold Improvements
Schedule 1.1(b)        Inventory
Schedule 1.1(n)        Subsidiaries
Schedule 1.2(b)        Assets Used Jointly by Cadence
                          and the Business
Schedule 2.6           Allocation of Purchase Price
Schedule 4.1           Jurisdictions in which Seller is
                          qualified to do business
Schedule 4.2(a)        Jurisdictions in which Subsidiaries
                          are qualified to do business
Schedule 4.2(b)        Ownership of Capital Stock of
                          Subsidiaries
Schedule 4.4           Material Consents and Approvals
Schedule 4.5           Violations; Liens
Schedule 4.8           Changes since September 26, 1986
Schedule 4.9(a)(i)     Material Leases, Tenancies and
                          Occupancy Arrangements
Schedule 4.9(a)(ii)    Material Employment and Consulting
                          Agreements
Schedule 4.9(a)(iii)   Material License Agreements
Schedule 4.9(a)(iv)    Other Material Agreements
Schedule 4.9(b)        Defaults
Schedule 4.10          Condition of Tangible Property
Schedule 4.11          Litigation
Schedule 4.12          Agreements Regarding Employees
Schedule 4.13(a)       Registered Trademarks and
                          Applications
Schedule 4.13(b)       Copyrights through 3/21/86
Schedule 4.13(c)       Liens on Registered Trademarks
Schedule 4.14          Insurance
Schedule 4.15          Labor Matters

2021MARVEL-0068500

<u>PURCHASE AGREEMENT</u>

AGREEMENT, made as of the 20th day of November, 1986, by and between New World Pictures, Ltd., a Delaware corporation ("Buyer"), and Cadence Industries Corporation, a Delaware corporation ("Seller").

<u>W I T N E S S E T H</u>:

WHEREAS, Seller is willing to sell, and Buyer is willing to purchase, the "Marvel Entertainment Group" business, as described on Schedule A, and assets, subject to the liabilities related thereto, all upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, the parties agree as follows:

1. <u>Sale and Purchase of Assets.</u>

1.1. <u>Sale of Assets to Buyer</u>. At the Closing (as defined in section 3.1), Seller shall sell, assign and transfer to Buyer and Buyer shall purchase and acquire from Seller, all of Seller's right, title and interest in and to the rights, properties and assets which constitute the "Marvel Entertainment Group" (the "Business") (excluding only the assets referred to in section 1.2), as those assets exist on

1

2021MARVEL-0068501

the Closing Date (as defined in Section 3.1) (the "Assets"),
including, without limitation, the following:

       (a)   all equipment, furniture, fixtures and lease-
hold improvements, including, without limitation, as set
forth on Schedule 1.1(a), subject to such changes thereto as
may occur in the ordinary course of business from and after
the date hereof;

       (b)   all inventory, including, without limitation,
as set forth on Schedule 1.1(b), subject to such changes
thereto as may occur in the ordinary course of business from
and after the date hereof;

       (c)   all other tangible personal property, wherever
located;

       (d)   all characters, creative work, intellectual
properties, scenarios, situations or other similar concepts,
including, without limitation, as set forth on Schedule 4.13,
subject to such changes thereto as may occur in the ordinary
course of business from and after the date hereof;

       (e)   all trademarks, trade names, service marks,
business names, trade styles, character likenesses and logos
(including registrations and applications for registration
thereof), together with the good will of the business with
which each is used and which each symbolizes, including,
without limitation, as set forth on Schedule 4.13, subject to

2

2021MARVEL-0068502

such changes thereto as may occur in the ordinary course of business from and after the date hereof, and all rights to recover for infringements thereof that shall have occurred at any time prior to the Closing and are recovered subsequent to the Effective Date;

(f)   all copyrights (including, without limitation, any registrations, applications for registrations and any rights of renewal thereof) in all literary, musical or other intellectual properties of every kind, including, without limitation, as set forth on Schedule 4.13, subject to such changes thereto as may occur in the ordinary course of business from and after the date hereof;

(g)   all back issues of publications, all art work, including, without limitation, copies thereof, whether published or unpublished, all manuscripts and editorial material, all motion pictures (whether on film, videotape, videodisc or otherwise), including, without limitation, both negative and positive copies of films and master tapes, all audio recordings of any nature, including, without limitation, all tapes and cassettes, and all advertising and publicity materials, including, in each case, work in process;

(h)   all mailing lists and subscription lists relating to publications and all materials used for mailing

3

2021MARVEL-0068503

list development and subscription promotion fulfillment for such publications;

(i)   all records, files and other data, including, without limitation, account books of original entry and general ledgers;

(j)   all orders, contracts, leases (whether of real or personal property or both), licenses, commitments, under-standings and other agreements, including, without limita-tion, licenses pursuant to which any person is permitted to use any of the Assets or pursuant to which the Seller pos-sesses any right to use property (tangible or intangible) owned by others, including, without limitation, as set forth on Schedule 4.9, subject to such changes thereto as may occur in the ordinary course of business from and after the date hereof;

(k)   all rights to receive goods or services for which payment was made prior to the receipt of such goods or services;

(l)   all claims, causes of action, awards and judgments;

(m)   all security deposits held by third parties;

(n)   the capital stock of each of the subsidiaries of Seller listed on Schedule 1.1(n) (each a "Subsidiary" and, collectively, the "Subsidiaries);

4

(o)   all computer software;

(p)   all accounts and notes receivable, prepaid items, and securities; and

(q)   any and all increases and/or decreases in the assets and liabilities of the Business arising from the conduct of the Business from the Effective Date to the Closing Date, including any cash in the Business as of the Closing Date which had not theretofore been transferred to Seller and so reflected in the intercompany account.

1.2.   Excluded Assets.   The following assets shall be retained by Seller and shall not be sold, assigned or transferred to Buyer:

(a)   any of Seller's assets which are not used in the Business;

(b)   any of Seller's assets used jointly by Seller and the Business, as set forth on Schedule 1.2(b);

(c)   tax refunds and tax credits relating to the Business for periods through September 26, 1986 (the "Effective Date");

(d)   except as provided in section 1.1(q), all of Seller's cash, currency, currency purchase agreements, bank accounts, certificates of deposit, commercial paper, treasury bills and marketable securities, as well as any amount reflected as an intercompany receivable from Seller on the

5

2021MARVEL-0068505

Consolidated Balance Sheet (as defined in Section 2.4(a)); and

(e)   the capital stock of Hibcor Inc.

2.   Purchase Price; Escrow Account.

2.1.   Amount and Payment of Consideration.   As consideration for the Assets to be purchased by Buyer under this Agreement, Buyer shall pay to Seller the sum of Fifty Million Dollars ($50,000,000) (the "Purchase Price"), as adjusted pursuant to section 2.4.   The Purchase Price, as adjusted, shall be payable to Seller at the Closing by wire transfer of immediately available funds to an account designated by Seller.

2.2.   Escrow Account.   Simultaneously, with the Closing, Seller shall deposit with a bank or trust company organized under the laws of the United States of America or the State of California and having a combined capital and surplus of not less than $50,000,000, as escrow agent (the "Escrow Agent"), the sum of Five Million Dollars ($5,000,000) to be held and disbursed in accordance with the terms of the Escrow Agreement in the form attached hereto as Exhibit A.

2.3.   Assumption of Liabilities.

(a)   At the Closing, Buyer shall assume, perform and discharge the following obligations and liabilities arising out of the conduct of the Business:

6

2021MARVEL-0068506

(i)   all liabilities and obligations reflected on the Consolidated Balance Sheet;

(ii)   all liabilities and obligations which arise in the conduct of the Business in the ordinary course from and after the Effective Date or are otherwise approved by Buyer; provided, however, that Buyer shall not be responsible for any liability or obligation which arises as a result of the willful misconduct or gross negligence of Seller;

(iii)   all liabilities and obligations under contracts and agreements relating to the Business as in effect on the Closing Date, provided that such contracts and agreements were entered into in the ordinary course or are otherwise specifically approved by Buyer, including, without limitation, as set forth on Schedule 4.9 hereto;

(iv)   all liabilities and obligations which Buyer has specifically agreed to assume pursuant to the terms of this Agreement; and

(v)   all liabilities and obligations with respect to the litigation set forth on Schedule 4.11 hereof, as well as any and all claims, liabilities and obligations arising from and after the date hereof out of the conduct of the Business in the ordinary course, including, without limitation, all fees and expenses related thereto.

7

2021MARVEL-0068507

(b)   At the Closing, Buyer shall not assume or be responsible for (i) any obligation or liability of Seller for taxes of any kind, whether federal, state or local, or for interest and penalties thereon, or for legal or accounting expenses incurred in connection with a contest related thereto, except to the extent such liability or obligation is specifically assumed by Buyer pursuant to this Agreement, (ii) subject to the provisions of section 6.8, the unfulfilled subscription obligations of Seller relating to issues of publications of Seller to be published after the Closing Date, (iii) the payment of any obligation of Seller relating to returns of publications sold by Seller on or prior to the Effective Date, (iv) except as otherwise specifically provided herein, any claims, liabilities or obligations under any employee benefit plans, whether or not set forth on Schedule 4.12, (v) any claims, liabilities or obligations of Seller not related to the Business, and (vi) any liability with respect to California sales and use taxes of Marvel Productions, Ltd. with respect to periods prior to the Closing Date, including related legal fees, costs and expenses.

2.4.   Adjustments to Purchase Price.   At the Closing, the Purchase Price shall be adjusted as follows:

(a)   Not less than five (5) business days prior to the Closing Date, Seller shall deliver to Buyer the balance

8

sheet of the Business as at September 26, 1986 included in the Audited Statements (as defined in section 4.7) (the "Consolidated Balance Sheet"). If the Adjusted Stockholders' Equity (as hereinafter defined) as reflected on the Consolidated Balance Sheet is less than $28,903,000, the Purchase Price shall be decreased by the amount of such differential; provided, however, that in no event shall the adjustment to the Purchase Price pursuant to this section 2.4(a) exceed $3,000,000. For the purpose of this Agreement, the Adjusted Stockholders' Equity shall be the amount of the stockholders' equity reflected on the Consolidated Balance Sheet reduced by, or increased by, as the case may be, the amount of the intercompany receivable or the intercompany payable, as reflected on the Consolidated Balance Sheet.

(b)  The Purchase Price shall be increased by (i) the amount of the estimated liability for returns as reflected on the Consolidated Balance Sheet, and (ii) the amount of Seller's unfulfilled subscription obligations as reflected on the Consolidated Balance Sheet.

2.5.  Post-Closing Adjustments.

(a)  Within thirty (30) days following the Closing Date, Seller shall prepare and deliver to Buyer a statement of the balance of the intercompany accounts with respect to the Business as of the Closing Date (the "Inter-

9

2021MARVEL-0068509

company Statement").  The calculcation of the balance of the intercompany accounts on the Intercompany Statement shall be made in accordance with the past practices of Seller, provided that such intercompany balance shall either be (i) decreased in the case of an intercompany receivable due from Seller, or (ii) increased in the case of an intercompany payable due to Seller, by (A) a provision for income taxes equal in amount to the sum of (1) the provision representing income taxes reflected on the Audited Statements for the interim period ended September 26, 1986 and (2) an amount equal to fifty percent (50%) of the pre-tax income of the Business for the period from the Effective Date through the Closing Date, and (B) a provision to reflect the maximum potential California sales and use tax liability of Marvel Productions, Ltd. for the period from the Effective Date through the Closing Date.  Buyer shall pay to Seller, or Seller shall pay to Buyer, as the case may be, an amount equal to the decrease or increase, respectively, of such intercompany account from the amount of such account as reflected on the Consolidated Balance Sheet.  The amount payable pursuant to this section 2.5(a) shall be paid within five (5) days after delivery of the Intercompany Statement.

(b)  Within thirty (30) days following the Closing Date, Seller shall prepare and deliver to Buyer a

10

2021MARVEL-0068510

statement of operations of the Business for the period from the Effective Date to the Closing Date (the "Statement of Operations"). Within three (3) business days after the delivery of such statement, Buyer shall make an interest payment to Seller on the Purchase Price, as adjusted pursuant to section 2.4(a), at the rate of 1/2% per annum over the prime rate as announced from time to time by Chemical Bank, N.A., New York, New York, for the period from the Effective Date to the date of such interest payment; provided, however, that in no event shall such interest payment exceed the net before tax income of the Business for the period from the Effective Date to the Closing Date.

(c)  If Buyer disputes any item contained in the Intercompany Statement or the Statement of Operations, Buyer shall so notify Seller in writing within ten (10) business days of Buyer's receipt of the Intercompany Statement or the Statement of Operations, as the case may be, setting forth in reasonable detail, the items in dispute and the basis therefor. Buyer and Seller shall attempt to resolve the matter or matters in dispute and, if resolved, such resolution shall be final and binding on Buyer and Seller. If such dispute cannot be resolved by Buyer and Seller within twenty (20) days after the delivery of the Intercompany Statement or the Statement of Operations, as the case may be,

11

2021MARVEL-0068511

then the specific matters and amounts in dispute shall be submitted to a firm of independent certified public accountants mutually acceptable to Buyer and Seller, which firm shall make a final and binding determination as to such matter or matters. The fees of such accounting firm shall be borne equally by Buyer and Seller.

2.6.  Allocation.  The Purchase Price, as adjusted, shall be allocated among the Assets in accordance with Schedule 2.6.

3.  Closing.

3.1.  Closing Date.  The closing under this agreement (the "Closing") shall take place at the offices of Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may agree upon), on the earlier of (i) December 26, 1986 or (ii) five (5) business days after the last of the conditions specified in sections 7.1(c), 7.1(e) and 7.2(d) has been fulfilled (or waived by the party entitled to waive such condition). The date on which the Closing takes place is referred to in this Agreement as the "Closing Date". Buyer and Seller shall each use its best efforts to cause the fulfillment at the earliest practicable date of all the conditions to the obligations of the parties to consummate the sale and purchase under this Agreement.

12

2021MARVEL-0068512

3.2.  Termination.

(a)  If the Closing has not occurred on or before December 26, 1986, Buyer or Seller may terminate this Agreement by giving notice to the other.  Upon such termination neither Buyer nor Seller shall have any liability of any kind arising out of this Agreement or the termination thereof except as provided in sections 6.5 and 6.7 and for any liability resulting from that party's breach of this Agreement prior to such termination including, if applicable, reasonable attorneys' fees incurred in establishing such breach.

(b)  Neither party may elect to terminate this Agreement based upon the nonfulfillment of a condition precedent to such party's obligation to consummate the transactions contemplated hereby, where such nonfulfillment results from such party's own acts or omissions.

3.3.  Specific Performance.  Buyer and Seller acknowledge that irreparable damage would result if this Agreement is not specifically enforceable and that, therefore, the rights and obligations of the parties under this Agreement, including, without limitation, their respective rights and obligations to purchase and sell the Assets, may be enforced by a decree of specific performance issued by a court of competent jurisdiction.  Such remedy shall, however,

13

2021MARVEL-0068513

not be exclusive and shall be in addition to any other reme-
dies which any party may have under this Agreement or
otherwise.

       4.   Representations and Warranties of Seller.
Seller represents and warrants to Buyer as follows:

       4.1.   Seller's Organization and Authority.
Seller is a corporation duly organized, validly existing and
in good standing under the laws of the State of Delaware and
has the full corporate power and authority to enter into and
perform this Agreement.  Seller is licensed or qualified to
do business as a foreign corporation and is in good standing
in each jurisdiction in which the conduct of the Business or
the character of the property owned or leased by it in con-
nection with the Business requires such qualification, except
where the failure to so qualify would not have a material
adverse effect on the Business or the Assets.  Schedule 4.1
sets forth a list of the jurisdictions in which Seller is
licensed or qualified to do Business as a foreign
corporation.

       4.2.   Subsidiaries' Organization.

       (a)   Each Subsidiary is a corporation duly
organized, validly existing and in good standing under the
laws of the jurisdiction of its incorporation as set forth on
Schedule 1.1(n), and has the full corporate power and author-

14

ity to own all of its properties and assets and to carry on its business as presently conducted.  Each Subsidiary is licensed or qualified to do business as a foreign corporation in each jurisdiction in which the conduct of its business or the character of the property owned or leased by it makes qualification necessary, except where the failure to so qualify would not have a material adverse effect on the Business or the Assets.  Schedule 4.2(a) sets forth a list of the jurisdictions in which each Subsidiary is licensed or qualified to do business as a foreign corporation.

(b)  The outstanding capital stock of each Subsidiary is validly issued, fully paid and non-assessable and is owned beneficially and of record as set forth on Schedule 4.2(b), free and clear of all liens, mortgages, claims, pledges or encumbrances of any nature whatsoever or other restrictions or equitable interests or rights of third parties ("Liens").  None of the Subsidiaries has any outstanding options, warrants, rights (preemptive or otherwise), or other securities, plans, contracts or agreements which give the holder or any other person the right to purchase any shares of such Subsidiary's capital stock or any shares of any other class (issued or unissued) of stock of such Subsidiary, or which are convertible into or exercisable for any such shares or under which any such option, warrant, right or

15

2021MARVEL-0068515

security may be issued in the future.  Seller has not taken
any action which by reason of the sale of the capital stock
of the Subsidiaries pursuant to this Agreement will result in
the imposition of a Lien on such stock upon such sale.

       4.3.  <u>Authorization of Agreement</u>.  The execu-
tion, delivery and performance of this Agreement by Seller
has been duly authorized by all necessary corporate action of
Seller and this Agreement constitutes the valid and binding
obligation of Seller, enforceable in accordance with its
terms, except as may be limited by bankruptcy, insolvency,
reorganization, moratorium or similar laws affecting cred-
itors' rights and remedies generally and by general prin-
ciples of equity (regardless of whether such enforceability
is considered in a proceeding in equity or at law).

       4.4.  <u>Consents of Third Parties</u>.  Except as set
forth on Schedule 4.4, there are no Material Agreements (as
defined in section 4.9) which by their express terms require
consent of a third party to the assignment thereof in connec-
tion with this transaction.

       4.5.  <u>No Violation</u>.  Except as set forth on
Schedule 4.5, the execution, delivery and performance of this
Agreement by Seller will not (i) violate any provision of the
certificate of incorporation or by-laws as currently in
effect of Seller, (ii) violate, conflict with, or result in

16

2021MARVEL-0068516

the breach or termination of, constitute a default (with or without the giving of notice or lapse of time or both) under, or increase Seller's obligations or diminish its rights under, any agreement assumed by Buyer in connection with the purchase of the Assets, any agreement to which any of the Subsidiaries is a party or any order, judgment or decree by which Seller is bound or to which any of the Assets is subject; (iii) constitute a violation of any law or regulation applicable to it, the enforcement of which would have a material adverse effect on the Assets or the Business subsequent to the Closing or upon the ability of Seller to consummate the sale pursuant to this Agreement; (iv) result in the creation of any Lien upon any of the Assets; or (v) permit the exercise of any right by any other party to any such agreement, the result of which would be contrary to, or inconsistent with, the transactions contemplated by this Agreement and/or Buyer's rights hereunder. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement, except for the filings with the Federal Trade Commission and the Department of Justice referred to in section 6.1.

17

4.6.  <u>Taxes</u>.

(i)  Seller and each of the Subsidiaries has timely filed, and will duly and timely file, all foreign, federal, state and local tax returns which were or are required to be filed by such corporation prior to the Closing Date; and

(ii)  Seller has made adequate provision on its books of account for all taxes of Seller and the Subsidiaries which have accrued but have not been paid.

4.7.  <u>Financial Statements</u>.  Prior to the Closing Date, Seller shall deliver to Buyer (i) the audited combined balance sheet of the Business as at December 31, 1984 and 1985 and September 26, 1986 and the statements of operation for each of the three years ended December 31, 1983, 1984 and 1985 and for the interim period ended September 26, 1986 (the "Audited Statements"), including the opinion of Peat, Marwick, Mitchell & Co. ("Peat Marwick") with respect to such statements, and (ii) the unaudited combined balance sheet of the Business as at September 25, 1985 and the related statement of operations for the interim period then ended, accompanied by the accountant's review report of Peat, Marwick with respect to such interim financial statements.  The Audited Statements fairly present the combined financial condition of the Business as at the dates thereof

18

and the combined results of operations for the periods set forth above, before interest income or expenses, in conformity with generally accepted accounting principles applied on a consistent basis, excepting that such statements were prepared on a historical basis and therefore the adjustments necessary to reflect the application of purchase accounting as a result of the Seller's "Going Private" transaction have not been reflected. All liabilities or obligations of the Business as of the Effective Date, of a type and nature required to be set forth on an audited balance sheet prepared in accordance with generally accepted accounting principles consistently applied, are reflected, or reserved against, in the Consolidated Balance Sheet or in the notes to such financial statement, or are otherwise disclosed in this Agreement.

4.8. <u>Absence of Certain Changes</u>. Except as set forth in Schedule 4.8, since the Effective Date, Seller has not:

(a)  suffered any material adverse change in the Business or the Assets, or experienced any material labor difficulty, or suffered any material casualty or other material loss whether or not insured;

(b)  with respect to the Business, incurred any indebtedness other than trade debt incurred in the ordinary course of business consistent with past practice; or

19

2021MARVEL-0068519

(c)    with respect to the Business, incurred any other obligations or liabilities other than in the ordinary course of business, none of which has had a material adverse effect on the financial condition of the Business.

        4.9.    <u>Material Agreements and Commitments</u>.

(a)    Schedule 4.9 contains a list of all material agreements and other material commitments which for purposes hereof is deemed to include the following (the "Material Agreements"):  (i) all real property leases, tenancies and occupancy arrangements under which Seller or any Subsidiary is either lessor or lessee involving per annum payments in excess of $75,000; (ii) all employment and consulting agreements involving per annum payments in excess of $75,000; (iii) all license agreements with third parties relating to the Business, which in the reasonable opinion of Seller, are material to the Business in amount, type or nature; and (iv) all other agreements, commitments and understandings (written or oral) relating to the conduct of the Business, which in the reasonable opinion of Seller, are material to the Business in amount, type or nature.  Copies of the Material Agreements, or summaries thereof in the case of unwritten Material Agreements, in each case, have heretofore been delivered to Buyer.

20

2021MARVEL-0068520

(b)   Except as set forth in Schedule 4.9(b), or as
otherwise disclosed herein, to Seller's knowledge, all the
Material Agreements are in full force and effect in accor-
dance with their respective terms and there is no existing
default or material breach which would permit the other party
to any such Material Agreement to terminate such Material
Agreement, not to perform its obligations thereunder or to
accelerate the payment of money, or any other event which
with the passage of time would constitute a default, or which
would permit the exercise of any right by any other party to
any such agreement, the result of which would be contrary to,
or inconsistent with, the transactions contemplated by this
Agreement and/or Buyer's rights hereunder.

4.10.   <u>Tangible Property</u>.  Except as set forth
on Schedule 4.10, all of Seller's equipment, furniture and
fixtures to be sold or otherwise transferred to Buyer pursu-
ant to this Agreement are in operating condition and fit for
the purpose for which they are intended.

4.11.   <u>Litigation</u>.  Except as set forth on
Schedule 4.11, there is no claim, litigation, proceeding or
governmental investigation pending or, to the knowledge of
Seller, threatened, involving or affecting the Business or
any of the Assets or any order, injunction or decree out-
standing of any court, government or governmental agency,

21

restricting the conduct of, or affecting, the Business or any of the Assets.

  4.12. <u>Agreements Regarding Employees</u>. Except as set forth in Schedule 4.12, neither the Seller nor any Subsidiary is a party to or bound by any pension, annuity, retirement, stock option, stock purchase, savings, profit sharing or deferred compensation plan or agreement, or any bonus, group insurance, welfare benefit or other incentive or benefit contract, plan or arrangement (domestic or foreign), with respect to the Business. Except as set forth on Schedule 4.12, no employee of Seller engaged in the Business or of any of the Subsidiaries is represented by a union or other collective bargaining agent and covered under a collective bargaining or other labor agreement applicable to the Seller or any of the Subsidiaries. Schedule 4.12 contains a list of plans relating to vacation, sick leave and severance policies, bonus, incentive and contingent compensation and group insurance plans for the benefit of employees of Seller engaged in the Business and of the Subsidiaries.

  4.13. <u>Intangible Assets</u>. (a) Schedule 4.13(a) contains a list as of the date set forth in such schedule, of the trademarks relating to the Business which are registered (the "Registered Trademarks") or for which an application for registration ("Applications") has been filed.

22

2021MARVEL-0068522

(b)   Schedule 4.13(b) contains a list of the copy-right registrations issued to Seller through March 21, 1986 with respect to copyrights for which Seller or any Subsidiary has any colorable claim to ownership.

(c)   To the best of Seller's knowledge, except as set forth on Schedule 4.13(c), as of the date hereof each of the Registered Trademarks is free and clear of any lien, encumbrance, order, decree or stipulation, other than with respect to existing agreements with third parties granting the use of such Registered Trademarks entered into by Seller or a Subsidiary in the ordinary course of business.

(d)   To the best of Seller's knowledge, each of the Registered Trademarks is valid and subsisting and is owned by Seller or a Subsidiary for use in the country in which the registration is applicable for use on the products or ser-vices for which such trademark is registered and is currently being used by Seller, or a Subsidiary, or a duly authorized licensee of Seller or such Subsidiary, as the case may be.

(e)   Attached to this Agreement as Exhibit B is the most current copy of the "Marvel Universe", which sets forth an additional, but not comprehensive, compilation of Seller's characters, character likenesses and logos.

4.14.   Insurance.   Schedule 4.14 contains a complete list as of the Effective Date of all insurance poli-

23

2021MARVEL-0068523

cies relating to the Business, other than employee benefit policies which are listed on Schedule 4.12, specifying the policy limit, type of coverage and expiration date for each such policy.

4.15.  Labor Matters.  Except as set forth in Schedule 4.15, there are, with respect to the Business, no (i) labor disputes or material grievances pending against Seller or any Subsidiary, (ii) to the knowledge of Seller, strikes or labor disputes threatened against Seller or any Subsidiary, (iii) to the knowledge of Seller, labor organizing activities on the part of any labor union or organization relating to Seller or any Subsidiary, (iv) unfair labor practice charges pending, or to the knowledge of Seller, in process or threatened by or on behalf of any employees of Seller or any Subsidiary, or (v) written complaints received by Seller or any Subsidiary, or, to the knowledge of Seller, threatened, or, with respect to unresolved complaints, on file, with any federal, state or local governmental agencies alleging employment discrimination by Seller or any Subsidiary.  All payments due from Seller or any Subsidiary pursuant to the provisions of any collective bargaining agreement with respect to the Business, have been paid or accrued as a liability on the Consolidated Balance Sheet.

24

4.16.  <u>Accuracy of Representations and</u>
<u>Warranties</u>.  No representation or warranty of Seller in this
Agreement and the schedules and exhibits to this Agreement
and no statement made or contained in any certificate or
instrument to be delivered to Buyer at the Closing pursuant
to this Agreement contains or will contain any untrue state-
ment of material fact or omits or will omit to state any
material fact necessary to make the statements made not
misleading.

5.  <u>Representations and Warranties of Buyer</u>.

Buyer represents and warrants to Seller as
follows:

5.1.  <u>Buyer's Organization</u>.  Buyer is a corpo-
ration duly organized, validly existing and in good standing
under the laws of the State of Delaware and has the full cor-
porate power and authority to enter into and perform this
Agreement in accordance with its terms.

5.2.  <u>Authorization of Agreement</u>.  The execu-
tion, delivery and performance of this Agreement by Buyer
have been duly authorized by all necessary corporate action
of Buyer and this Agreement constitutes the valid and binding
obligation of Buyer, enforceable in accordance with its
terms, except as may be limited by bankruptcy, insolvency,
reorganization, moratorium or similar laws affecting the

25

enforcement of creditors' rights and remedies generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

       5.3.  <u>No Violation; Consents and Approvals</u>. The execution, delivery and performance of this Agreement by Buyer will not (i) violate any provision of the certificate of incorporation or by-laws as currently in effect of Buyer, (ii) violate, conflict with, or result in the breach or termination of, or constitute a default under, any lease agreement, commitment or other instrument, or any order, judgment or decree to which Buyer is a party or by which Buyer is bound, or (iii) constitute a violation by Buyer of any law or regulation applicable to Buyer, the enforcement of which would have a material adverse effect upon Buyer's ability to perform its obligations under this Agreement. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority is required on the part of Buyer in connection with the execution, delivery and performance of this Agreement, except for the filings with the Federal Trade Commission and the Department of Justice referred to in section 6.1.

       5.4.  <u>Litigation</u>.  There is no claim, litigation, proceeding or governmental investigation pending or, to

26

2021MARVEL-0068526

the best of Buyer's knowledge, threatened, or any order, injunction or decree outstanding, against Buyer or any of its affiliates that would prevent the consummation of the transactions contemplated by this Agreement.

        5.5.  <u>Accuracy of Representations and Warranties</u>.  No representation or warranty of Buyer in this Agreement and the schedules and exhibits to this Agreement and no statement made or contained in any certificate or instrument to be delivered to Seller at the Closing pursuant to this Agreement contains or will contain any untrue statement of material fact or omits or will omit to state any material fact necessary to make the statements made not misleading.

        6.  <u>Further Agreements of the Parties</u>.

        6.1.  <u>Hart-Scott-Rodino Act</u>.  Within three (3) days after the execution of this Agreement, each of the parties hereto shall, in cooperation with the other, file in connection with the transactions contemplated by this Agreement any reports or notifications that may be required to be filed by it under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), with each of the Department of Justice and the Federal Trade Commission, and shall thereafter promptly comply with all requests for further documents and information made by the Department of Justice

27

2021MARVEL-0068527

or the Federal Trade Commission, and shall furnish to the other all such information in its possession as may be necessary for the completion of the reports or notifications to be filed by the other.

6.2.  <u>Operation of the Seller's Business</u>.  From the date of this Agreement through the Closing Date, with respect to the Business:

(a)  Except as otherwise provided in this section 6.2 or as otherwise specifically requested by Buyer, Seller shall operate the Business, and shall cause each of the Subsidiaries to operate its respective business, in the ordinary course and consistent with past practice;

(b)  Seller shall, and shall cause each of the Subsidiaries to, use its best efforts (i) to preserve the goodwill and business of the customers, advertisers, suppliers and others having business relations with Seller or such Subsidiary, as the case may be, (ii) to retain the services and goodwill of its employees and to assist Buyer in its efforts to secure the services of key management and key sales employees and artistic talent, and (iii) to preserve the intangible assets, including, without limitation, all trademarks, copyrights and registrations thereof, owned by it or with respect to which it has any rights or licenses.  Notwithstanding anything in the foregoing to the contrary, Sel-

28

2021MARVEL-0068528

ler or its Subsidiaries shall not be required to make any payments or perform or assume any obligations in addition to those presently required under existing agreements or arrangements in the performance of its obligations pursuant to this section 6.2(b);

(c)  Seller shall not, and shall cause each of the Subsidiaries not to, except with Buyer's prior written approval, which approval shall not be unreasonably withheld, enter into, modify, amend or renew any Material Agreement, home video distribution agreement, live action license agreement or animated motion picture production agreement;

(d)  Seller shall, and shall cause each of the Subsidiaries to, maintain or cause to be maintained insurance on the assets and businesses of Seller or such Subsidiary, as the case may be, as set forth on Schedule 4.15 or, in the case of renewals or cancellations, in commercially reasonable amounts;

(e)  Seller shall not permit any of the Subsidiaries to (i) issue or commit to issue any shares of its capital stock or other securities or options or warrants with respect to its capital stock, (ii) amend its charter documents or by-laws, or (iii) except as otherwise provided in this section 6.2 or as otherwise approved by Buyer, waive any of its rights or claims having value;

29

2021MARVEL-0068529

(f)  Seller shall not, and shall cause each of the Subsidiaries not to, effect any change in the compensation arrangements of key management, and in any other compensation arrangements relating to its employees except in the ordinary course of business consistent with past practices; and

(g)  Seller shall not effect any change in its past practices with respect to the intercompany accounts and shall cause all receipts and disbursements of Seller relating to the Business to be reflected in such accounts.

6.3.  <u>Notices</u>.  From the date of this Agreement to the Closing Date, Seller shall promptly notify Buyer in writing of, and furnish any information that Buyer may request with respect to, (a) any claim, litigation, proceeding, or governmental investigation threatened or asserted by or against Seller or any of the Subsidiaries relating to the Business, (b) any proceeding in connection with any matter set forth on Schedule 4.11, and/or (c) any material adverse change in the financial condition or results of operations of the Business.

6.4.  <u>Consents; Assignment of Agreements</u>.  Seller shall use its best efforts to obtain at the earliest practicable date, by instruments in form and substance reasonably satisfactory to Buyer and Seller, all consents and

30

2021MARVEL-0068530

approvals listed on Schedule 4.4 and the approval referred to in section 6.1. In addition, Seller shall use reasonable efforts to obtain all other consents and approvals with respect to all other leases, licenses, commitments and other agreements relating to the Business which by their express terms require consent of another party thereto to the assignment thereof and which Buyer has requested be obtained. If any consents or approvals listed in Schedule 4.4 or set forth in section 6.1 are not obtained by Seller, Buyer may terminate this Agreement without any liability, except as provided in sections 6.5 and 6.7 and for any liability arising from Buyer's breach of this Agreement prior to such termination. In the event Buyer elects to waive any such consent or approval, Seller shall not be responsible for indemnifying Buyer with respect thereto.

6.5.  <u>Expenses</u>.  Each party shall bear its own expenses incurred in connection with the negotiation and preparation of this Agreement and the obligations required to be performed by it pursuant to this Agreement.

6.6.  <u>Taxes; Tax Returns</u>.

(a)  Seller shall pay (i) any state or local sales and use taxes payable in connection with the sale of the Assets and (ii) any stamp or transfer taxes assessed in connection with the sale of the stock of the Subsidiaries.

31

2021MARVEL-0068531

(b)    Buyer shall pay all recording fees arising out of the sale of the Assets to Buyer and Buyer's perfection of its interests therein.

(c)    For any taxable period of the Subsidiaries that includes, but does not end on, the Closing Date:

(i)    Buyer shall prepare and file all tax returns and reports of the Subsidiaries for such taxable period, and Buyer shall pay all taxes, plus interest, penalties and additions to tax, if any, with respect to such period, subject to receipt by Buyer from Seller of the amount described in section 6.6(c)(iii).

(ii)    Not later than 45 days prior to the due date for filing such tax returns of the Subsidiaries for such taxable period, Buyer shall deliver to Seller (A) completed copies of such tax returns and (B) a statement setting forth the amount of the tax liability of the Subsidiaries shown on each such return that is attributable to the period from January 1, 1986 through the Closing Date, determined as follows: (1) if the liability as shown on such return (the "Full Year Return") is based on federal taxable income of such Subsidiary as such amount may be further modified for purposes of state or local tax law, an amount equal to the product of the tax liability shown on the Full Year Return multiplied by a fraction, the numerator of which is the

32

2021MARVEL-0068532

federal taxable income of such Subsidiary shown on the con-
solidated federal income tax return filed by Seller and the
denominator of which is the federal taxable income shown on
the Full Year Return; provided, however, that such amount
shall not exceed the tax liability shown on the Full Year
Return; or (2) if the tax liability of such Subsidiary as
shown on the Full Year Return is not based on federal taxable
income, an amount equal to the product of the tax liability
shown on the Full Year Return multiplied by a fraction, the
numerator of which is the number of days included in the tax-
able period during which the Subsidiary is owned by Seller
and the denominator of which is the total number of days in
the taxable year of such Subsidiary.

(iii)   Not later than five (5) days prior to the
due date for the filing the tax returns of the Subsidiaries
for such period, Seller shall make a payment to Buyer in an
amount equal to the excess of (A) the amount of the tax lia-
bility of the Subsidiaries for such period that is attribu-
table to the period from January 1, 1986 through the Closing
Date (as determined in accordance with section 6.6(c)(ii) and
section 6.6(e)) over (B) the sum of (1) the amount of the tax
liability, if any, of the Subsidiaries accrued on the Con-
solidated Balance Sheet and (2) any prepayments of tax of

33

2021MARVEL-0068533

such Subsidiaries by Seller or such Subsidiaries which are
not reflected on the Consolidated Balance Sheet.

(d)  For all other taxable periods ending on
or prior to the Closing Date, Seller shall prepare, Buyer
shall cause the Subsidiaries to execute (if necessary), and
Seller shall file all tax returns and reports of the Subsidi-
aries and Seller shall pay all taxes, plus interest, penal-
ties and additions to tax (if any) with respect to such
periods.

(e)  If Seller does not agree with the compu-
tation set forth in the statement described in section
6.6(c)(ii)(B), and Buyer and Seller have not promptly
resolved such dispute, the specific matter or matters in dis-
pute shall be submitted to a mutually acceptable firm of
independent certified public accountants of recognized stand-
ing (other than Peat Marwick, Arthur Andersen & Co. or any
other accounting firm then employed by Buyer or Seller or
their respective affiliates), which firm shall make a final
and binding determination as to such matter or matters.  The
expenses of such firm shall be borne equally by Buyer and
Seller.

(f)  Promptly following the execution of this
Agreement, Buyer and Seller shall each file the required
documentation with the New York State Department of Taxation

34

2021MARVEL-0068534

and Finance pursuant to Article 31-B of the New York State Tax Law.

(g)  All personal property and real property taxes with respect to the Subsidiaries and the Assets, whether imposed by the local governments of the United States or by foreign countries, are to be apportioned as of the Closing Date in accordance with Section 164(d) of the Internal Revenue Code of 1986.

(h)  Each of Buyer, the Subsidiaries and Seller shall provide the other with such assistance as may reasonably be requested by the other in connection with the preparation by such other party of any tax return, any audit or other examination by any taxing authority, and any judicial or administrative proceedings relating to liability for taxes, and each shall retain and provide the other with any records or information which may be relevant to such return, audit or examination, proceedings or determination.  Such assistance shall include making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and shall include providing copies of any relevant tax returns and supporting work schedules, or any portion thereof, to the extent they relate to the Assets or the assets and operations of the Subsidiaries.  The party requesting assistance here-

35

2021MARVEL-0068535

under shall reimburse the other for reasonable expenses in-
curred in providing such assistance. Notwithstanding, and
consistent with, the foregoing, in connection with the tax
returns to be prepared by Seller pursuant to Section
6.6(d)(i), Buyer shall provide Seller, in a manner consistent
with the past practice of the Subsidiary providing any such
information, all information necessary and appropriate for
the preparation of such tax returns.

6.7. Access to Information.

(a) Prior to the Closing, Seller and the
Subsidiaries have made available, and will continue to make
available, to Buyer and its duly authorized representatives,
during normal business hours, the corporate records, books of
account, contracts and all other documents relating to the
Business which are reasonably requested by Buyer or such
representatives to make reasonable inspection and examination
of the Business. All such records, books, contracts and
documents furnished to Buyer pursuant to this section 6.7
shall be kept confidential in accordance with the terms of
the Confidentiality Agreement dated October 8, 1986, between
Buyer and Seller. In the event the purchase and sale contem-
plated by this Agreement are not consummated for any reason,
Buyer shall return to Seller all such information and docu-
ments and any copies thereof as soon as practicable. Buyer's

36

obligations under this section 6.7 shall survive the termina-
tion of this Agreement.

        (b)  For a period of three (3) years after the
Closing Date, Buyer shall, and Buyer shall cause each of the
Subsidiaries to, make available to Seller and its duly autho-
rized representatives all records, files and other data,
including, without limitation, account books of original
entry and general ledgers, transferred to Buyer pursuant to
section 1.1(i).  Such records and data shall be made avail-
able by Buyer for inspection by Seller at any mutually con-
venient time during normal business hours for a period of
three (3) years after the Closing Date and Seller may, at its
own expense, make such copies and extracts as it may desire,
it being understood that Buyer shall not destroy any records
and data following such three (3) year period unless it shall
have first given Seller thirty (30) days prior written notice
of its intention to destroy such records and data.  If Seller
requests that such records and data not be destroyed, Buyer
shall have the option of continuing to maintain such records
and data or delivering them to Seller.

        6.8.  <u>Unfulfilled Subscriptions</u>.  Buyer shall
assume, perform and discharge all of Seller's unfulfilled
subscription obligations relating to issues of each of the
publications of Seller to be published after the Closing

37

2021MARVEL-0068537

Date.  As full consideration for Buyer's assumption of
Seller's obligations pursuant to this section 6.8, Seller
shall pay to Buyer an amount equal to the aggregate amount of
Seller's deferred subscription income accounts as reflected
on the Consolidated Balance Sheet.  Such amount shall be pay-
able to Buyer at the Closing by wire transfer of immediately
available funds to an account designated by Buyer.

      6.9.  <u>Employees; Employee Benefits and Plans</u>.

      (a)  <u>Employment and Severance</u>.  All employees
of Seller engaged in the Business shall become employees of
Buyer as of the Closing Date.  Buyer and Seller shall cooper-
ate to assure the orderly transfer of such employees to
Buyer.  It is specifically understood by the parties hereto
that the terms and conditions of employment of said individu-
als shall be those determined by Buyer, in its sole discre-
tion.  Any liability, incurred under the severance policy of
Seller for any employees of Seller and the Subsidiaries
engaged in the Business as in effect on the date hereof and
as described in the "Personnel Policy and Procedures Manual"
of Seller, as a result of this transaction or any changes in
the terms and conditions of employment of those individuals
employed in the Business as of the Closing Date, up to an
aggregate of $1,350,000 shall be the sole and exclusive
responsibility of Buyer, and any liability incurred under

38

such policy in excess of $1,350,000 shall be the sole and
exclusive responsiblity of Seller.

(b)    Vacation Pay, Sick Pay, Disability and
Bonus.    Buyer shall assume and perform all of Seller's unpaid
obligations as of the Closing Date relating to vacation pay,
sick pay, disability and bonus for those employees of Seller
engaged in the Business and the employees of the Subsid-
iaries, it being understood that sick pay is payable only
when, if and as required under the policies of Seller in
effect on the Closing Date.  Seller has made all appropriate
accruals on the Consolidated Balance Sheet for vacation pay
and bonus through the Effective Date.  The foregoing to the
contrary notwithstanding, nothing contained herein is in-
tended to limit Buyer's right to establish such employee
benefit policies subsequent to the Closing as it deems appro-
priate.  Buyer shall give credit, however, for purposes of
eligibility, vesting and seniority to such employees under
its benefit plans for the period of employment of such indi-
viduals with Seller and its Subsidiaries.

(c)    Retirement Plan and Savings Plan.

(i)    Buyer shall not have, on or after
the Closing Date, any liabilities or obligations, contingent
or otherwise, under the Cadence Industries Corporation Em-
ployees' Retirement Plan (the "Retirement Plan") or the

39

2021MARVEL-0068539

Cadence Industries Corporation Employees' Savings Plan (the
"Savings Plan") nor shall Buyer have, on or after the Closing
Date, any interest in or right to the assets of the Retire-
ment Plan or the Savings Plan.

(ii)  The parties agree that there shall
be charged to the cost of operating the Business for the
period from the Effective Date to the Closing Date the addi-
tional cost (whether or not contributions are required), in
accordance with past practices, of providing coverage under
the Retirement Plan and the Savings Plan to employees engaged
during such period in the Business and the employees of the
Subsidiaries.

(d)  Welfare and Fringe Benefit Plans.
Coverage under the welfare and fringe benefit plans main-
tained by Seller for all employees engaged in the Business,
including, without limitation, the group life insurance,
severance pay and medical benefit plans, shall continue
through the Closing Date, provided that any person who
terminates or is terminated as an employee of the Business
before the Effective Date shall remain the responsibility of
Seller.  On and after the Closing Date, Buyer shall have the
responsibility for providing welfare and fringe benefit plan
coverage for all employees of the Business employed by Buyer.
The parties agree that there shall be charged to the inter-

40

2021MARVEL-0068540

company account the cost of operating the Business for the
period from the Effective Date to the Closing Date the cost
of providing welfare and fringe benefits to all employees of
the Business during such period.

6.10.  Bulk Sales.  Buyer hereby waives com-
pliance by Seller with the provisions of any "bulk sales"
law.

6.11.  Returns.  From and after the Closing,
Seller shall appoint Buyer to act as Seller's agent with
respect to the payment of all obligations relating to returns
of publications sold by Seller prior to the Effective Date.
At the Closing, Seller shall deliver a deposit (the "Depos-
it") by wire transfer to Buyer in the amount of Seller's
estimated liability for returns as reflected on the Consoli-
dated Balance Sheet as an advance against the amounts that
Buyer shall be obligated to pay or which may be deducted from
amounts otherwise collectible by Buyer as agent on behalf of
Seller (the "Payments").  Buyer shall pay the amount of any
obligations of Seller relating to returns of publications
sold by Seller prior to the Effective Date and, to the extent
the Payments exceed the amount of the Deposit, Seller shall
reimburse Buyer for the amount of such excess within five (5)
business days after receipt of a notice of payment from
Buyer.  If the Payments by Buyer through December 31, 1987

41

2021MARVEL-0068541

are less than the Deposit, Buyer promptly shall refund the difference to Seller.  Until December 31, 1987, Buyer shall give Seller a monthly accounting of all payments and charges in accordance with this section 6.11.  On December 31, 1987, the agency established by this section 6.11 shall terminate and Seller shall thereafter be responsible for any and all amounts to be paid with respect to any further returns of publications.

6.12.  <u>Release of Letter of Credit</u>.  Buyer shall take all such action as is necessary in order for Seller's letter of credit to be released at the Closing as collateral security for Marvel Productions, Ltd.'s obligations under the lease for certain property located at 6007 Sepulveda Boulevard, Los Angeles, California.

6.13.  <u>Release as Guarantor</u>.  Buyer shall take all such action as is reasonably requested by Seller to cause Seller to be released from its obligations, contingent or otherwise, under any guaranty or lease to be assumed by Buyer pursuant to this Agreement.

6.14.  <u>Tax Exemption Information</u>.  At or prior to the Closing, Buyer shall deliver to Seller all documents reasonably requested by Seller for purposes of perfecting any exemption from applicable sales taxes with respect to the sale of the Assets.

42

6.15.  <u>Access with Respect to Peat Marwick</u>
<u>Audit</u>.  Upon reasonable notice and during normal business
hours, Seller shall, and Seller shall cause Peat Marwick to,
give Buyer and Buyer's accountants full access to all working
papers, other documents and personnel related to or involved
in the audit of the Consolidated Balance Sheet by Peat
Marwick.

6.16.  <u>Computer Services</u>.  Seller shall
continue to provide to Buyer, through December 31, 1986, such
computer services as are currently provided to the Business,
upon the same terms and conditions as are currently in
effect.

6.17.  <u>Other Action</u>.  Each of the parties to
this Agreement shall use its best efforts to cause the ful-
fillment at the earliest practicable date of all the condi-
tions to the obligations of the parties to consummate the
sale and purchase under this Agreement.  Seller shall, and
Seller shall cause each of the Subsidiaries to, duly perform
its obligations under this Agreement.  The foregoing to the
contrary notwithstanding, neither party shall be required to
make any payments or perform or assume any obligations in
addition to those presently required under existing agree-
ments or arrangements in order to effectuate the foregoing.

43

2021MARVEL-0068543

6.18.  <u>Further Assurances</u>.  At any time and
from time to time after the Closing, each of Buyer and Seller
shall, without further consideration, execute and deliver to
the other such additional documents and shall take such other
action as the other may reasonably request to carry out the
transactions contemplated by this Agreement and effect an
orderly transition.  Buyer and Seller shall cooperate with
each other and shall provide each other with such information
as may be reasonably required for the completion of tax
returns or in connection with any tax examination.

7.  <u>Conditions Precedent to Closing</u>.

7.1.  <u>Conditions Precedent to the Obligations
of Buyer</u>.  Buyer's obligation to consummate the purchase
under this Agreement is subject to the fulfillment, at or
prior to the Closing, of each of the following conditions
(any of which may be waived in writing by Buyer):

(a)  each representation and warranty of
Seller under this Agreement shall be true and correct in all
material respects at and as of the time of the Closing with
the same effect as though such representation and warranty
had been made again at and as of that time with the exception
of changes caused by the operation of the Business from the
Effective Date to the Closing Date in the ordinary course;

44

(b)   Seller shall have performed and complied in all respects with each obligation, covenant and condition required by this Agreement to be performed or complied with by it prior to or at the Closing;

(c)   Seller shall have received all consents and approvals listed on Schedule 4.4 and in section 6.1;

(d)   there shall not be in effect an injunction or restraining order issued by a court of competent jurisdiction in an action or proceeding against the consummation of the transactions contemplated by this Agreement;

(e)   all applicable waiting periods under the HSR Act with respect to the transactions contemplated by this Agreement shall have expired;

(f)   Buyer shall have been furnished with a certificate of an executive officer of Seller, dated the Closing Date, certifying as to the fulfillment of the conditions set forth in sections 7.1(a) and 7.1(b);

(g)   Buyer shall have been furnished with an opinion of Weil, Gotshal & Manges, in the form of Exhibit C, and such additional opinions with respect to trademarks and copyrights and to Marvel Comics Ltd., as shall have been reasonably requested by Buyer; and

(h)   The Adjusted Stockholders' Equity shall not be less than $25,903,000.

2021MARVEL-0068545

7.2.  <u>Conditions Precedent to the Obligations</u>
<u>of Seller</u>. Seller's obligation to consummate the sale under
this Agreement is subject to the fulfillment, at or prior to
the Closing, of each of the following conditions (any of
which may be waived in writing by Seller):

(a)  each representation and warranty of Buyer
under this Agreement shall be true and correct in all materi-
al respects at and as of the time of Closing with the same
effect as though such representation and warranty had been
made at and as of that time;

(b)  Buyer shall have performed and complied
in all respects with each obligation, covenant and condition
required by this Agreement to be performed or complied with
by it prior to or at the Closing;

(c)  there shall not be in effect an injunc-
tion or restraining order issued by a court of competent jur-
isdiction in an action or proceeding against the consummation
of the transactions contemplated by this Agreement;

(d)  all applicable waiting periods under the
HSR act with respect to the transactions contemplated by this
Agreement shall have expired;

(e)  Seller shall have been furnished with a
certificate of an executive officer of Buyer, dated the
Closing Date, in form and substance satisfactory to Seller,

46

certifying as to the fulfillment of the conditions set forth in sections 7.2(a) and 7.2(b);

(f)   Seller shall have been furnished with an opinion of Rudin, Richman & Appel in the form of Exhibit D;

(g)   Seller shall have been furnished with the documents referred to in section 6.14;

(h)   Buyer shall have assumed the obligations of Seller under the leases with 387 P.A.S. Enterprises;

(i)   Buyer shall have secured the release of Seller's letter of credit, as provided in section 6.12; and

(j)   Buyer shall have taken such actions as are required by section 6.13.

8.   <u>Deliveries at the Closing</u>.

8.1.   <u>Deliveries by Seller</u>. At the Closing, Seller shall deliver to Buyer the following:

(a)   the Escrow Agreement, duly executed by Seller;

(b)   the bill of sale and assignment in the form of Exhibit E;

(c)   a copy of resolutions of the board of directors and the shareholders of Seller authorizing the execution, delivery and performance of this Agreement, accompanied by a certificate of the secretary or an assistant secretary of Seller, dated the Closing Date, certifying that

47

2021MARVEL-0068547

such resolutions were duly adopted and are in full force and effect;

(d)   the certificate referred to in section 7.1(f);

(e)   the opinions referred to in section 7.1(g);

(f)   copies of all consents and approvals referred to in section 7.1(c);

(g)   evidence of the wire transfers of the amounts provided for in sections 6.8 and 6.11;

(h)   stock certificates for all the outstanding capital stock of each of the Subsidiaries, duly endorsed in blank or accompanied by stock transfer powers and with all requisite stock transfer tax stamps attached;

(i)   evidence of the release referred to in section 7.1(h); and

(j)   such other documents as Buyer may reasonably request.

8.2.   <u>Deliveries by Buyer</u>.  At the Closing, Buyer shall deliver to Seller the following:

(a)   evidence of the wire transfer of the amount of the purchase price provided for in section 2.1;

(b)   an instrument of assumption pursuant to which Buyer shall assume the obligations and liabilities of

48

2021MARVEL-0068548

Seller to be assumed by Buyer pursuant to section 2.3(a) in the form of Exhibit F;

(c)  the Escrow Agreement, duly executed by Buyer;

(d)  a copy of resolutions of the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement by Buyer, accompanied by a certificate of the secretary or an assistant secretary of Buyer, dated the Closing Date, certifying that such resolutions were duly adopted and are in full force and effect;

(e)  the certificate referred to in section 7.2(e);

(f)  evidence of the release of Seller's letter of credit, as provided in section 6.12;

(g)  evidence of the release of Seller from its obligations under any guaranty or lease to be assumed by Buyer, as provided in section 6.13;

(h)  the opinion referred to in section 7.2(f); and

(i)  such other documents as Seller may reasonably request.

49

9.    Survival of Representations and Warranties;
Indemnification.

9.1.    Survival.    All representations and
warranties made pursuant to this Agreement shall survive the
Closing until December 31, 1988 except that the representa-
tions and warranties of Seller in section 4.6 shall continue
and survive until the expiration of the applicable statute of
limitations.

9.2.    Indemnification.

(a)    Seller shall indemnify and hold harmless
Buyer against any and all losses, liabilities, obligations
(including, without limitation, federal, state or other taxes
of whatever kind, plus any assessments, interest and penal-
ties thereon), damages, deficiencies and expenses (including
reasonable fees and expenses of counsel) that Buyer may suf-
fer, sustain or become subject to as a result of (i) any
breach or misrepresentation of any warranties, covenants or
other agreements contained in this Agreement by Seller; pro-
vided, however, that with respect to the representations and
warranties contained in section 4.7, no claim may be made by
Buyer based upon a revaluation of any of the Assets and that
Buyer shall only be entitled to make a claim pursuant to
section 4.7 to the extent the Consolidated Balance Sheet,
including the notes thereto, fails to set forth as of the

50

2021MARVEL-0068550

Effective Date any liability of a type and nature required to be set forth on an audited balance sheet prepared in accordance with generally accepted accounting principles consistently applied, (ii) the failure by Seller to pay, perform or discharge any of Seller's and/or the Business' obligations, liabilities, agreements or commitments not assumed by Buyer pursuant to this Agreement, (iii) any liability with respect to California sales and use taxes of Marvel Productions, Ltd. with respect to periods prior to the Effective Date, including related legal costs and expenses and (iv) Seller's failure to fully comply with the applicable provisions of the bulk sales laws.

(b)    Buyer shall indemnify and hold harmless Seller against any and all losses, liabilities, obligations (including, without limitation, federal, state or other taxes of whatever kind, plus any assessments, interest and penalties thereon), damages, deficiencies and expenses (including reasonable fees and expenses of counsel) Seller may suffer, sustain or become subject to as a result of (i) any breach or misrepresentation of any warranties, covenants or other agreements contained in this Agreement by Buyer, (ii) the failure by Buyer to pay, perform or discharge any obligations, liabilities, agreements or commitments expressly assumed by Buyer pursuant to this Agreement, and (iii) the

51

2021MARVEL-0068551

excess, if any, of (A) the amount of the tax liability of the Subsidiaries that is attributable to the period from January 1, 1986 through the Closing Date as determined in accordance with sections 6.6(c)(ii) and 6.6(e), over (B) such amount for such period as finally determined following an examination of the tax returns of the Subsidiaries by the appropriate taxing authority.

(c)   If Buyer receives a refund of tax attributable to the Subsidiaries for any period through or including the Closing Date, Buyer shall remit such amount of tax to Seller promptly after receipt.

(d)   Notwithstanding anything to the contrary contained in this section 9.2, any obligation of Seller or Buyer to indemnify the other pursuant to this section 9.2 shall be net of any benefits which the party entitled to indemnification has received with respect thereto.

(e)   The provisions of this section 9.2 to the contrary notwithstanding, Seller shall not be required to indemnify Buyer, unless and until and solely to the extent that, the aggregate amount of any losses and liabilities suffered by Buyer by reason of Seller's breach of the representations and warranties contained in sections 4.5 and 4.9 shall exceed $500,000 (the amount of any such loss or liability being based upon the net operating profit which would

52

2021MARVEL-0068552

have been realized by Buyer had such representation and war-
ranty not been breached by Seller or the net loss actually
incurred by Buyer should it be required to make a payment to
a third party by reason of Seller's breach).

(f)  The provisions of this section 9.2 to the
contrary notwithstanding, Seller shall not be required to
indemnify Buyer by reason of Seller's breach of any represen-
tations and warranties, covenants and agreements of Seller
under this Agreement (other than the representations and war-
ranties contained in sections 4.5 and 4.9) unless and until,
and solely to the extent that, the aggregate amount of any
losses and liabilities suffered by Buyer shall exceed
$250,000, except with respect to any liabilities or obli-
gations for taxes as provided for in this Agreement.

(g)  The provisions of this section 9.2 to the
contrary notwithstanding, to the extent there has been an
adjustment to the Adjusted Stockholders' Equity pursuant to
the Escrow Agreement, Buyer shall not be entitled to seek
indemnification hereunder with respect to such particular
items as to which an adjustment has been made under the
Escrow Agreement.

9.3.  <u>Conditions of Indemnification for Third
Party Claims</u>.  In the event that any legal proceedings shall
be instituted or that any claim or demand shall be asserted

53

2021MARVEL-0068553

by any third person in respect of which payment may be sought
by one party hereto from another party or parties under the
provisions of section 9.2 (including any claim for taxes by
any taxing authority and any interest and penalties thereon),
the party seeking indemnification shall promptly cause writ-
ten notice of the assertion of any claim of which it has
knowledge and which such party asserts is covered by this
indemnity to be forwarded to the other party, which shall
have the right, at its option and at its own expense, to be
represented by counsel of its choice who must be reasonably
satisfactory to the party seeking indemnification, and to
defend against, negotiate, settle or otherwise deal with any
proceeding, claim or demand which relates to any loss, lia-
bility, obligation, damage, deficiency or expense indemnified
against hereunder; provided, however, that no settlement
shall be made without the prior written consent of the party
seeking indemnification, which shall not be unreasonably
withheld, and provided further, however, that the party
seeking indemnification may participate in any such proceed-
ing with counsel of its choice and at its expense provided
that such party agrees in writing to pay the full amount of
such indemnification to the party seeking indemnification.
The party seeking indemnification shall not compromise or
settle any such proceeding, claim or demand without the prior

54

2021MARVEL-0068554

written consent of the indemnifying party, which consent shall not be unreasonably withheld or delayed. The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such legal proceeding, claim or demand. After any final judgment or award shall have been rendered by a court, administrative agency, bureau, board, commission office, authority, department or other governmental body or agency of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the party seeking indemnification and the indemnifying party shall have arrived at a mutually binding agreement with respect to each separate matter indemnified by the indemnifying party hereunder, the party seeking indemnification shall forward to the indemnifying party notice of any sums due and owing by him or it with respect to such matter and, subject to the provisions of section 9.2, such indemnifying party shall be required to pay all of the sums so owing to the other party, together with interest thereon at the prime rate as announced from time to time by Chemical Bank, N.A. through the date of payment, within thirty (30) days after the date of such notice.

9.4. <u>Time Limitations</u>. No claim or action with respect to this Agreement may be asserted unless made in

55

2021MARVEL-0068555

writing or commenced, (i) with respect to claims involving obligations to be performed pursuant to this Agreement, within twenty-four (24) months after such obligation is to be performed and, (ii) with respect to all other claims, by December 31, 1988 (other than claims for indemnification involving any federal, state or local tax liability, including any interest or penalties thereon, which shall survive for periods coterminous with any applicable statutes of limitation or agreed upon extensions thereof).  The indemnity provided for in section 9.2 shall not terminate with respect to any loss, liability, obligation, damages deficiency or expense, whether or not the actual amount of which shall have been ascertained prior to the last date of the applicable period as long as written notice shall have been given to the indemnifying party prior to the conclusion of said applicable period of the matter as to which indemnification has been asserted.

9.5.  <u>Section 338 Election</u>.  Notwithstanding anything to the contrary contained in this Agreement, (i) Seller shall not be required to pay or to indemnify Buyer for any tax or any other liability, including related costs and expenses (including reasonable attorneys' fees) caused by, or arising from (a) any election made or deemed to be made by Buyer pursuant to Section 338 of the Code (or any similar

56

2021MARVEL-0068556

election under state or local income tax laws) with respect to the sale of the capital stock of the Subsidiaries or (b) any sale of assets by any of the Subsidiaries on the Closing Date which sale is completed after the shares of capital stock of the Subsidiaries have been transferred to Buyer, and (ii) Buyer agrees to indemnify, defend and hold harmless Seller from any and all taxes and any other liability, including related costs and expenses (including reasonable attorneys' fees) caused by, or arising from (a) any election made or deemed to be made by Buyer pursuant to Section 338 of the Code (or any similar election under state or local income tax law) with respect to the sale of the capital stock of the Subsidiaries or (b) any sale of assets by any of the Subsidiaries on the Closing Date which sale is completed after the shares of capital stock of the Subsidiaries have been transferred to Buyer.

10.   Miscellaneous.

10.1.   Notices.   Any notice or other communication under this Agreement shall be in writing and shall be considered given when personally delivered or forty-eight (48) hours after sent by registered or certified mail, return receipt requested, postage prepaid, to the parties at the addresses set forth below (or at such other address as a party may specify by notice to the other):

57

2021MARVEL-0068557

If to Buyer:

New World Pictures, Ltd.
1440 South Sepulveda Boulevard
Los Angeles, California 90025
Attention: Mr. Harry E. Sloan

with a copy to:

Rudin, Richman & Appel
9601 Wilshire Boulevard
Penthouse
Beverly Hills, California  90210
Attention:  Fredric N. Richman, Esq.

If to Seller:

Mr. Sheldon Feinberg
29 Farmstead Road
Short Hills, New Jersey  07006

with a copy to:

Mr. James E. Foy
3 Starling Road
Randolph, New Jersey  07801

and a copy to:

Weil, Gotshal & Manges
767 Fifth Avenue
New York, New York 10153
Attention: Arthur P. Jacobs, Esq.

        10.2.  <u>Finders</u>.  Buyer and Seller each repre-
sents and warrants to the other that it has not retained or
dealt with any broker or finder in connection with the trans-
actions contemplated by this Agreement.

        10.3.  <u>Entire Agreement</u>.  This Agreement,
including the schedules and exhibits hereto, contains a com-
plete statement of all the arrangements between the parties

58

with respect to the subject matter hereof, supersedes any previous agreements and understandings among the parties and cannot be amended, modified or terminated orally.

    10.4.  Headings.  The section headings contained in this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

    10.5.  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in New York.

    10.6.  Severability.  If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in effect.

    10.7.  Assignment.  No party may assign any of its rights or delegate any of its duties under this Agreement without the consent of the other, except that (i) Buyer may assign its rights hereunder to one or more wholly-owned subsidiaries of Buyer formed for the purpose of consummating the transactions contemplated hereby; provided, however, that any such assignment shall not release Buyer from its obligations hereunder; and (ii) Seller may assign its rights and obligations hereunder (including its rights to receive any proceeds hereunder) to its stockholders or to a trust,

59

partnership, escrow account or other entity formed on behalf of its stockholders.

10.8.  <u>Publicity</u>.  No party hereto shall issue any press release or other public statement regarding the transactions contemplated by this Agreement without prior written approval of the other party hereto.

10.9.  <u>Third Parties</u>.  This Agreement is solely for the benefit of the parties hereto and their successors and assigns and not for the benefit of any third party.

10.10.  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

10.11.  <u>Cross References Within Agreement</u>. Buyer acknowledges that while Seller has attempted to list all agreements and other information in each of the schedules as required by this Agreement, because of the volume of agreements and information to be listed and to avoid undue repetition in the various schedules, any agreement or information listed on one schedule hereto shall be deemed listed for all purposes on any other schedule hereto.

10.12.  <u>Revisions to Schedules</u>.  Seller shall not have the right to revise any Schedule hereto without the consent of Buyer.

60

2021MARVEL-0068560

10.13.  <u>Service of Process</u>.

(a)  Buyer hereby irrevocably appoints Rudin,
Richman & Appel, 9601 Wilshire Boulevard, Beverly Hills,
California 90210, Attention:  Fredric N. Richman, as its
authorized agent to accept and acknowledge service of any and
all process on its behalf which may be served in any suit,
action or proceeding arising out of or relating to this
Agreement, and agrees that failure of such designee,
appointee and agent to give any notice of such service to
Buyer shall not impair or affect the validity of such service
or any judgment rendered in any action or proceeding based
thereon.  Said designation and appointment shall be
irrevocable until the termination of this Agreement pursuant
to the terms hereof.  Buyer consents to process being served
in any suit, action or proceeding arising out of or relating
to this Agreement either (i) by mailing a copy thereof by
registered or certified mail, postage prepaid, return receipt
requested, to the address of Buyer specified herein or (ii)
by serving a copy thereof upon Rudin, Richman & Appel, as its
agent for service of process.  If process is served in
accordance with clause (ii) above, a copy of such pleading or
other service shall be mailed by registered or certified
mail, postage prepaid, return receipt requested, to Buyer at
its address referred to in clause (i) above.  To the fullest

61

2021MARVEL-0068561

extent permitted by law, Buyer agrees that such service (A) shall be deemed in every respect effective service of process upon Buyer in any such suit, action or proceeding and (B) shall be taken and held to be valid personal service upon and personal delivery to Buyer.

(b)   Seller hereby irrevocably designates and appoints Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153, Attention:  Arthur P. Jacobs, Esq., as its authorized agent to accept and acknowledge service of any and all process on its behalf which may be served in any suit, action or proceeding arising out of or relating to this Agreement, and agrees that failure of such designee, appointee and agent to give any notice of such service to Seller shall not impair or affect the validity of such service or any judgment rendered in any action or proceeding based thereon.  Said designation and appointment shall be irrevocable until the termination of this Agreement pursuant to the terms hereof.  Seller consents to process being served in any suit, action or proceeding arising out of or relating to this Agreement either (i) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the address of Seller specified herein or (ii) by serving a copy thereof upon Weil, Gotshal & Manges, as its agent for service of process.  If process is served in

62

2021MARVEL-0068562

accordance with clause (ii) above, a copy of such pleading or other service shall be mailed by registered or certified mail, postage prepaid, return receipt requested, to Seller at its address referred to in clause (i) above. To the fullest extent permitted by law, Seller agrees that such service (A) shall be deemed in every respect effective service of process upon Seller in any such suit, action or proceeding and (B) shall be taken and held to be valid personal service upon and personal delivery to Seller.

63

2021MARVEL-0068563

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their duly authorized officers as of the date first written above.

NEW WORLD PICTURES, LTD.

By: _____
Title: _____
Co-Chairman

CADENCE INDUSTRIES CORPORATION

By: _____
Title: President

64

2021MARVEL-0068564

## Schedule A

## Description of the Business

The Business consists of (i) the publication, sale and distribution of comic books and children's books of all types, (ii) the production and exploitation of animated motion pictures and (iii) the licensing and other exploitation of the underlying and ancillary rights in and to the characters, creative work and intellectual properties derived therefrom.

2021MARVEL-0068565