# EXHIBIT 15

# Redacted - Privileged

2021MARVEL-0068190

ACQUISITION AGREEMENT

Dated as of November 4, 1988

by and among

NEW WORLD ENTERTAINMENT, LTD.

and

ANDREWS GROUP INCORPORATED

relating to

MARVEL ENTERTAINMENT GROUP, INC.

2021MARVEL-0068191

Table of Contents

Article and Section                                           Page

I     Introduction ................................   1

II    Closing and Sale of Stock ...................   1

      2.01.     Closing ..........................   1
      2.02.     Sale and Purchase of Shares .......   2
      2.03.     Purchase Price....................   2

III   Representations and Warranties of Seller ....   2

      3.01.     Organization; Good Standing;
                Marvel Subsidiaries .............   2
      3.02.     Corporate Authority ..............   2
      3.03.     The Stock and the Subsidiary
                Stock ...........................   3
      3.04.     Financial Statements .............   3
      3.05.     Title to Tangible Assets .........   5
      3.06.     Taxes ............................   6
      3.07.     Leases; Contracts; Commitments ....   6
      3.08.     Employee and Fringe Benefit
                Plans ...........................   8
      3.09.     Insurance ........................   8
      3.10.     Litigation .......................   9
      3.11.     Consents .........................   9
      3.12.     Titles of Publications;
                Copyright; Infringement .........   10
      3.13.     Patents; Trademarks;
                Trade Names .....................   11
      3.14.     No Material Adverse Change ........   12
      3.15.     Non-contravention ................   12
      3.16.     Intercompany Agreements ..........   13
      3.17.     Full Disclosure ..................   13

IV    Representations and Warranties of Buyer .....   13

      4.01.     Organization and Good Standing ....   13
      4.02.     Corporate Authority ..............   13
      4.03.     Non-contravention ................   13
      4.04.     Consents .........................   14
      4.05.     Purchase for Investment ..........   14
      4.06.     Litigation .......................   14

i

2021MARVEL-0068192

<u>Article and Section</u>                                                        <u>Page</u>

V     Pre-Closing Covenants of Seller ..............          14

      5.01.    Conduct of the Business ...........           14
      5.02.    Payments to Seller .................          16
      5.03.    No Agreements Other Than in
               Ordinary Course of Business .....             16
      5.04.    No Breach of Representations
               and Warranties ..................             16
      5.05.    Access to the Company's Business ..           16
      5.06.    No Solicitation ...................           16
      5.07.    HSR Act ...........................           17
      5.08.    Reasonable Efforts ................           17
      5.09.    Insurance .........................           17
      5.10.    Intercompany Balance ..............           17

VI    Pre-Closing Covenants of Buyer ..............          17

      6.01.    HSR Act ...........................           17
      6.02.    No Breach of Representations
               and Warranties ..................             18
      6.03.    Release ...........................           18
      6.04.    Reasonable Efforts ................           18

VI A Intercompany Agreements

      6A.01.   Intercompany Agreements ...........           18

VII   Conditions to Buyer's Obligations ...........          19

      7.01.    Representations and Warranties
               True at the Closing Date ........            19
      7.02.    Seller's Performance ..............           19
      7.03.    Officer's Certificates ............          19
      7.04.    Resignation of Directors
               of Marvel and the
               Marvel Subsidiaries .............             19
      7.05.    Releases ..........................           19
      7.06.    Opinion of Counsel for Seller .....          19
      7.07.    Governmental Approvals;
               Litigations......................             20
      7.08.    Release of Security Interest ......          20
      7.09.    Consents ..........................           20
      7.10.    Foothills .........................           20

2021MARVEL-0068193

| Article and Section | | | Page |
|---|---|---|---|
| VIII | Conditions to the Seller's Obligations ...... | | 21 |
| | 8.01. | Representations and Warranties of Buyer True at the Closing Date .......................... | 21 |
| | 8.02. | Buyer's Performance ............... | 21 |
| | 8.03. | Officer's Certificates ............ | 21 |
| | 8.04. | Opinion of Counsel for Buyer ...... | 21 |
| | 8.05. | Governmental Approvals ............ | 21 |
| | 8.06. | Release of Security Interest ...... | 22 |
| | 8.07. | Release as Guarantor ............. | 22 |
| IX | Post-Closing Covenants ..................... | | 22 |
| | 9.01. | Availability of Documents ......... | 22 |
| | 9.02. | Delivery of Publications .......... | 23 |
| | 9.03. | Intercompany Agreements ........... | 23 |
| | 9.04. | Non-Competition ................... | 23 |
| | 9.05. | No Contest ........................ | 24 |
| | 9.06. | Insurance ......................... | 24 |
| X | Indemnification ............................ | | 24 |
| | 10.01. | By the Seller ..................... | 24 |
| | 10.02. | By the Buyer ...................... | 25 |
| | 10.03. | Special Indemnity ................. | 26 |
| XI | Termination and Abandonment ................ | | 26 |
| | 11.01. | Termination ....................... | 26 |
| XII | Tax Matters ............................... | | 28 |
| | 12.01. | Preparation and Filing of Tax Returns; Elections; Allocations; Consents; Cooperation ..................... | 28 |
| | 12.02. | Tax Payment Responsibility........ | 30 |
| | 12.03. | Filing of Returns; Audits ......... | 32 |
| | 12.04. | Definitions ....................... | 32 |
| XIII | Miscellaneous ............................. | | 34 |
| | 13.01. | Notices ........................... | 34 |
| | 13.02. | No Modification Except in Writing ......................... | 35 |
| | 13.03. | Entire Agreement .................. | 35 |
| | 13.04. | Severability ...................... | 35 |
| | 13.05. | Assignment ........................ | 35 |
| | 13.06. | Publicity; Announcements .......... | 35 |

2021MARVEL-0068194

Article and Section                                          Page

    13.07.    Governing Law .....................    36
    13.08.    Consent to Jurisdiction;
                Service of Process ..............    36
    13.09.    Captions and Cross References .....    36
    13.10.    Counterparts .....................     36
    13.11.    Confidentiality ...................    36
    13.12.    Survival .........................     38
    13.13.    Expenses .........................     38
    13.14.    Broker's or Finder's Fees ........     38

Exhibits

    A.    Intercompany Agreement Memorandum
    B.    Form of Merchandising Agreement
    C.    Form of Opinion of Counsel of Seller

SCHEDULES

Schedule  3.01      Subsidiaries

Schedule  3.03      Liens; Securities; Interests, Investments;
                      Options

Schedule  3.04      Contingent Liabilities

Schedule  3.05      Existing Liens on Assets

Schedule  3.07      Leases; Contracts; Agreements; Commitments;
                      Required Consents

Schedule  3.08      Employee Benefit Plans

Schedule  3.09      Insurance Policies

Schedule  3.10      Litigation

Schedule  3.11      Required Consents and Approvals

Schedule  3.12      Titles of Publications; Copyright;
                      Infringement

Schedule  3.13      Patents, Trademarks, Tradenames

Schedule  3.14      Exceptions to No Material Adverse Change;
                      Dividends and Distributions

2021MARVEL-0068195

Schedule  3.15        Exceptions to Non-Contravention

Schedule  3.16        Agreements between Seller and Marvel

Schedule  6.03        Guarantees of Seller

v

2021MARVEL-0068196

DEFINITIONS

"Act" shall mean the 1976 Copyright Act of the United States.

"Audited Balance Sheet" shall having the meaning ascribed to such term in Section 3.04 hereof.

"Characters" shall have the meaning ascribed to such term in Section 3.12 hereof.

"Closing", "Closing Date", "Closing Place", "Closing Time" shall have the meanings ascribed to such terms in Section 2.01 hereof.

"Code" shall mean the Internal Revenue Service Code of 1986, as amended.

"Counsel for Seller" shall have the meaning ascribed to such term in Section 2.01 hereof.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Intercompany Agreements" shall have the meaning ascribed to such term in Section 6A.01 hereof.

"Intellectual Property" shall have the meaning ascribed to such term in Section 3.12 hereof.

"Issues" shall have the meaning ascribed to such term in Section 3.12 hereof.

"Licenses" shall have the meaning ascribed to such term in Section 3.12 hereof.

"Liens" shall have the meaning ascribed to such term in Section 3.03 hereof.

"Marks" shall have the meaning ascribed to such term in Section 3.13 hereof.

"Marvel Subsidiaries" shall mean Epic Comics, Ltd., Gateway Projects, Ltd., Marvel Comics, Ltd., and Magazine Management Company, Inc., collectively; and "Marvel Subsidiary" shall mean any of the Marvel Subsidiaries, individually.

"Material Adverse Effect" shall have the meaning ascribed to such term in Section 3.01 hereof.

vi

2021MARVEL-0068197

"<u>Minimum Amount</u>" shall have the meaning ascribed to such term in Section 10.01 hereof.

"<u>1987 Financial Statements</u>" shall have the meaning ascribed to such term in Section 3.04 hereof.

"<u>1988 Financial Statements</u>" shall have the meaning ascribed to such term in Section 3.04 hereof.

"<u>Permitted Liens</u>" shall mean (i) to the extent consistent with the ordinary course of business of Marvel, security interests in property existing or created at the time of the acquisition thereof by Marvel or any Marvel Subsidiary which secure indebtedness which is without recourse to Marvel or any Marvel Subsidiary and which do not become a lien on any other property of Marvel or any Marvel Subsidiary, (ii) deposits under workman's compensation, unemployment insurance and social security laws or to secure statutory obligations or surety or appeal bonds, or to secure performance of other similar bonds in the ordinary course of business, (iii) liens for taxes or assessments or other governmental charges or levies, either not yet due and payable or to the extent that nonpayment thereof is permitted by the terms of this Agreement, and (iv) workers', mechanics', suppliers', carriers', warehousemen's or other similar liens arising in the ordinary course of business.

"<u>Publications</u>" shall have the meaning ascribed to such term in Section 3.12 hereof.

"<u>Purchase Price</u>" shall have the meaning ascribed to such term in Section 2.03 hereof.

"<u>September Balance Sheet</u>" shall have the meaning ascribed to such term in Section 3.04 hereof.

"<u>Stock</u>" shall have the meaning ascribed to such term in Section 1.01 hereof.

"<u>Subsidiary Stock</u>" shall have the meaning ascribed to such term in Section 1.02 hereof.

"<u>Termination Date</u>" shall have the meaning ascribed to such term in Section 2.01 hereof.

2021MARVEL-0068198

AGREEMENT made and entered into as of the 4th day of November, 1988, by and among NEW WORLD ENTERTAINMENT, LTD. ("Seller"), a corporation organized under the laws of the State of Delaware, and ANDREWS GROUP INCORPORATED ("Buyer"), a corporation organized under the laws of the State of Delaware.

## ARTICLE I

### Introduction

1.01.  Seller owns all of the issued and outstanding capital stock (the "Stock") of Marvel Entertainment Group, Inc., a corporation organized under the laws of the State of Delaware ("Marvel"), consisting of 100 shares of common stock, no par value.

1.02.  Marvel owns all of the issued and outstanding capital stock (the "Subsidiary Stock") of each of Epic Comics, Ltd., Gateway Projects, Ltd., Marvel Comics, Ltd. and Magazine Management Company, Inc. (collectively, the "Marvel Subsidiaries" and individually, a "Marvel Subsidiary").

1.03.  Buyer desires to purchase and acquire from Seller, and Seller desires to sell, transfer and convey to Buyer, all of the Stock, on the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants hereinafter contained, the parties hereto hereby agree as follows:

## ARTICLE II

### Closing and Sale of Stock

2.01.  The Closing.  The closing (the "Closing") of the transactions set forth in sections 2.02 and 2.03 of this Article II shall take place at 10:00 A.M., New York time, on January 4, 1989; provided, that if any of the conditions to the Closing have not been met or waived by January 4, 1989, then the Closing shall take place on such date on or prior to January 31, 1989 (January 31, 1989 being hereinafter referred to as the "Termination Date"), as soon as practicable after such conditions have been met or waived, at the offices of Rosenman & Colin, 575 Madison Avenue, New York, New York 10022. (Hereinafter, such date is referred to as the "Closing Date", and such time on the Closing Date is referred to as the "Closing Time", such offices are referred to

as the "Closing Place" and Rosenman & Colin are referred to as "Counsel for Seller").

2.02.  <u>Sale and Purchase of Shares</u>.  For the cash consideration set forth in section 2.03 hereof, Seller agrees that it will sell, transfer, convey and deliver to Buyer at the Closing certificates representing all of the issued and outstanding shares of the Stock, duly endorsed in blank or accompanied by stock powers in blank, together with any applicable stock transfer tax stamps acquired at Seller's expense affixed thereto.

2.03.  <u>Purchase Price</u>.  The purchase price for the Stock shall be EIGHTY TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($82,500,000) (the "Purchase Price").  The Purchase Price will be paid on the Closing Date by Buyer by wire transfer of immediately available New York clearing house funds to an account or accounts to be designated by Seller no later than five business days prior to the Closing Date.

ARTICLE III

<u>Representations and Warranties of Seller</u>

Seller represents and warrants to Buyer that:

3.01.  <u>Organization; Good Standing; Marvel Subsidiaries</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware.  Each of Marvel and each of the Marvel Subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation (which jurisdiction is listed in Column B of Schedule 3.01 hereto); has the power and authority to conduct all of the activities now conducted by it, to own or lease all of the assets now owned or leased by it, and except as set forth in Schedule 3.01 is duly licensed or qualified to do business and in good standing as a foreign corporation in all jurisdictions (such jurisdictions being listed in Column C of Schedule 3.01 hereto) in which the nature of the activities conducted by it and/or the character of the assets owned or leased by it makes such license or qualification necessary, except where the failure to be so qualified would not have a material adverse effect on the business, assets, financial position or results of operations of Marvel and the Marvel Subsidiaries taken as a whole ("Material Adverse Effect").

3.02.  <u>Corporate Authority</u>.  The board of directors of Seller has duly authorized the execution and delivery of this Agreement by Seller and the transactions hereby contemplated.  No other corporate action of such board of directors or Seller is required in connection herewith.  Seller has the corporate power

2

and authority to execute, deliver and perform this Agreement, to consummate the transactions hereby contemplated and to take all other actions required to be taken by it pursuant to the provisions hereof. This Agreement has been duly and validly executed by Seller and is valid and binding upon Seller and enforceable in accordance with its terms except as enforceability may be limited by the effect of bankruptcy, insolvency, moratorium or similar laws affecting creditor's rights generally and by general principles of equity. Complete and correct copies of the Certificate of Incorporation and By-Laws, or other charter documents, of Seller, Marvel and of each Marvel Subsidiary have been delivered to Buyer.

3.03. <u>The Stock and the Subsidiary Stock</u>. Marvel is authorized to issue 3,000 shares of capital stock; and has heretofore validly issued and has outstanding, fully paid and non-assessable, 100 shares of common stock, no par value. Each of the Marvel Subsidiaries is authorized to issue that number of shares of capital stock, and has heretofore validly issued and has outstanding, fully paid and non-assessable, that number of shares of capital stock (being the Subsidiary Stock), set forth opposite its respective name in Columns D and E, respectively, of Schedule 3.01 hereto. Except as set forth in Schedule 3.03 hereto (i) Seller owns the Stock, and Marvel owns the Subsidiary Stock (other than director's qualifying shares), as applicable, free and clear of all liens, claims, encumbrances or rights of others (hereinafter "Liens"), and (ii) upon the Closing and payment by Buyer of the Purchase Price, Seller will transfer the Stock to Buyer (and, indirectly, the Subsidiary Stock) free and clear of all Liens. Except as set forth in said Schedule 3.03, neither Marvel nor any Marvel Subsidiary owns any shares of stock or any other securities of any corporation or has any interest or investment in, any firm, partnership, corporation, joint venture, association or other entity. Except as listed in Schedule 3.03 hereto, neither Marvel nor any Marvel Subsidiary has outstanding any options to purchase, or any rights or warrants to subscribe for, or any securities or obligations convertible into, or any contracts or commitments to issue or sell, shares of its capital stock or any such options, warrants, convertible securities or obligations.

3.04. <u>Financial Statements</u>. Seller has heretofore delivered to Buyer (i) the combined audited statements of operations and statements of changes in financial position of The Marvel Entertainment Group, a division of Cadence Industries Corporation, as of and for the period January 1, 1986 to September 26, 1986, together with a combined balance sheet as of September 26, 1986 and the notes thereto, (ii) the combining audited statements of operations and statements of changes in financial positions of The Marvel Entertainment Group, a division of Cadence Industries Corporation, as of and for the period September 27, 1986 to

3

December 31, 1986, together with a combining balance sheet as of
December 31, 1986 and the notes thereto, (iii) the audited
combined financial statements of Marvel Comics Group (New York)
("Comics Group") and Marvel Comics, Ltd. (United Kingdom) ("U.K.")
as of and for the year ended December 31, 1987 together with the
notes thereto (the "1987 Financial Statements"), including the
audited combined statement of assets, liabilities and intercompany
balance (the "Audited Balance Sheet") of Comics Group and U.K. as
of December 31, 1987 and the audited combined statement of revenue
and expenses, excluding income taxes, for the year ended December
31, 1987 and the audited combined statement of changes in assets,
liabilities and intercompany balance as of December 31, 1987 of
Comics Group and U.K.; and (iv) the unaudited combined statement
of assets, liabilities and intercompany balance of Comics Group
and U.K. as of September 30, 1988 (the "September Balance Sheet")
and the unaudited combined statement of revenue and expenses,
excluding income taxes, for the nine months ended September 30,
1988 and the unaudited combined statement of changes in assets,
liabilities and intercompany balance as of September 30, 1988 of
Comics Group and U.K. (collectively, the "1988 Financial State-
ments").  The 1987 Financial Statements are in accordance with the
books and records of Comics Group and U.K.; and are true, complete
and correct and fairly present the combined financial position of
Comics Group and U.K. as of December 31, 1987 and the combined
results of operations of Comics Group and U.K. for the year then
ended, and the 1987 Financial Statements were prepared in con-
formity with generally accepted accounting principles and prac-
tices applied on a consistent basis with prior periods, except as
disclosed in the notes thereto.  The 1988 Financial Statements are
in accordance with the books and records of Comics Group and U.K.;
and are true, complete and correct (except that the 1988 Financial
Statements do not present notes thereto) and fairly present the
combined financial position of Comics Group and U.K. as of
September 30, 1988 and the combined results of operations of
Comics Group and U.K. for the nine months then ended, in each case
subject to normal year end adjustments (none of which would be
material to the 1988 Financial Statements other than adjustments
in the inventory of the children's books division of Marvel or for
depreciation), and the 1988 Financial Statements were prepared in
conformity with generally accepted accounting principles and
practices with the exception of notes and normal year end adjust-
ments, applied on a consistent basis with the 1987 Financial
Statements including reserves and accruals for, and including a
full and fair allocation of, corporate overhead and other appli-
cable intercompany charges which charges approximate the amounts
Comics Group and U.K. would have incurred for such services if
they had operated on a stand-alone basis and not been affiliates
of Seller.

　　　　Neither Marvel nor any Marvel Subsidiary has any debts,
liabilities or obligations, whether accrued, absolute contingent

4

or otherwise and whether due or to become due, that would be
required to be included in a balance sheet or related notes of
Marvel prepared in conformity with generally accepted accounting
principles applied consistently with the 1987 Financial State-
ments, except for (i) those set forth or provided for in the 1987
Financial Statements or in the September Balance Sheet and not
paid or discharged subsequent to the dates thereof, (ii) those
previously disclosed to Buyer in this Agreement or the Schedules
hereto or (iii) those incurred since the date of the September
Balance Sheet in the ordinary and usual course of its business.

Schedule 3.04 sets forth a correct and complete list of
(i) the nature of all Intercompany (as defined below) transactions
from January 1, 1987 through September 30, 1988, (ii) all assets,
properties and services of Seller or any of its affiliates used by
Marvel or any of the Marvel Subsidiaries at any time from Janu-
ary 1, 1987 through September 30, 1988, and (iii) all assets,
properties or services of Marvel or any of the Marvel Subsidiaries
used by Seller or any of its affiliates at any time from Janu-
ary 1, 1987 through September 30, 1988 and (iv) all Intercompany
agreements.  Except as set forth in Schedule 3.04, all Inter-
company transactions listed in Schedule 3.04 were, or in the case
of ongoing transactions and agreements are, on terms at least as
favorable to Marvel or such Marvel Subsidiary as the terms which
would be available with independent third parties at arm's length.
All Intercompany transactions have been booked in the ordinary
course of business as a payable or a receivable, as the case may
be, of Marvel or the relevant Marvel Subsidiary engaged in such
transaction.  Schedule 3.04 sets forth a summary statement of all
Intercompany accounts payable and all Intercompany accounts
receivable as of September 30, 1988 reflected in the September
Balance Sheet (the "Intercompany Statement") which was prepared in
conformity with generally accepted accounting principles and
practices on a basis consistent with prior periods except as set
forth in Schedule 3.04.  Except as set forth in Schedule 3.04
hereto, from January 1, 1988, no Intercompany transactions,
obligations, agreements or accounts have been entered into between
Seller or any of its affiliates and Marvel or any Marvel Subsi-
diary.  For purposes of this Agreement, the term "Intercompany"
shall mean with respect to any transaction, obligation, agreement
or account, a transaction, obligation, agreement or account
between Marvel or any of the Marvel Subsidiaries, on the one hand,
and Seller or any of its affiliates (other than Marvel or any
Marvel Subsidiary) on the other hand.

3.05.  _Title to Tangible Assets_.  Marvel and each of the
Marvel Subsidiaries has good and marketable title to all of its
tangible personal property reflected in the September Balance
Sheet or acquired since the date thereof, other than assets dis-
posed of in the ordinary course of business since the date there-

2021MARVEL-0068203

of, free and clear of all Liens, except for (i) Liens disclosed in
Schedule 3.05 hereto and any renewals and extensions thereof, (ii)
Liens reflected or reserved for in the September Balance Sheet,
and (iii) Permitted Liens.  Neither Marvel nor any Marvel Subsi-
diary owns any real property.

        3.06.  <u>Taxes</u>.  Marvel and each of the Marvel Subsidi-
aries has made available to the Buyer true and complete copies of
all tax returns of Marvel and each of the Marvel Subsidiaries
(including, without limitation, state income tax and sales tax
returns) that were filed by them as of the date hereof.  Each such
corporation has also made available to the Buyer information
relating to all actual and proposed adjustments, assessments
and/or deficiencies, if any, asserted by any federal, state, local
or other political subdivision, taxing authority or agency as
being payable on account of such tax return (or portions thereof)
and there are no other actual or formally proposed adjustments,
assessments and/or deficiencies asserted by any taxing authority
as being payable.  All taxes shown on such tax returns as being
due and payable to any jurisidiction, including any estimated
taxes, with respect to each such corporation through the date
hereof have been, except to the extent being contested in good
faith, paid in full.  The Seller will or will arrange to have
Marvel and each Marvel Subsidiary, on or prior to the Closing
Date, (i) file those tax returns not due as of the date hereof but
which are required to be filed by the Closing Date and (ii) pay
the taxes shown on such tax returns.

        3.07.  <u>Leases; Contracts; Commitments</u>.  Except as set
forth in Schedule 3.07 hereto, neither Marvel nor any Marvel
Subsidiary is a party to any written or oral (i) material lease,
(ii) purchase or sale agreements (other than commitments for
purchase orders for inventory or supplies, or sales orders from
customers, in each case entered into in the ordinary course of
business) involving per annum payments (in 1987 or 1988) in excess
of $50,000 in any one instance or in the case of related agree-
ments $50,000 in the aggregate; (iii) contract or agreement for
employment of any officer, individual employee, professional
person or firm or independent contractor or consultant and
involving per annum payments (in 1987 or 1988) in excess of
$50,000 in any one instance; (iv) contract or collective bargain-
ing agreement with any labor union or representative of employees;
(v) material commitment, contract or agreement guaranteeing the
payment or performance of the obligations of others; (vi) commit-
ment, contract or agreement not made in the ordinary course of
business; (vii) agency or advertising contracts which are not
terminable on 30 days' notice by Marvel or such Marvel Subsidiary;
(viii) contract or agreement of any other nature with any officer,
director or employee of Marvel or any Marvel Subsidiary pursuant
to which Marvel is or was obligated to make per annum payments (in

6

1987 or 1988) in excess of $50,000; (ix) commitment or agreement with any party for the sale of all or any part of the business or capital stock of Marvel or any Marvel Subsidiary; (x) settlement agreement pursuant to which Marvel receives or is obligated to pay annual payments in excess of $50,000 or renders or is obligated to render services the value of which would exceed $50,000; (xi) agreements for borrowed money or other evidences of indebtedness in excess of $50,000 in any one instance; or (xii) non-competition or other agreements (other than trademark or license agreements) between Marvel or any Marvel Subsidiary, on the one hand, and any other person, on the other hand, preventing Marvel or any Marvel Subsidiary from carrying on its business or restricting its business practices in any material respect anywhere in the world. True and complete copies of each of such written agreements have been provided to Buyer.  Except as set forth in said Schedule 3.07, Marvel and each Marvel Subsidiary has performed all obliga-tions required to be performed by it under each of the foregoing agreements and is not in default under any such agreement or other document to which it is a party and which defaults individually or in the aggregate would have a Material Adverse Effect, and no event has occurred thereunder which with the lapse of time or the giving of notice would constitute such a default by Marvel or any Marvel Subsidiary.  Each of the agreements set forth in 3.07 hereto constitutes a valid, binding and legally enforceable obligation of Marvel and/or the Marvel Subsidiaries, as appli-cable, in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency or other laws affecting the rights of creditors generally, principles of equity and the availability of equitable remedies.  Neither Marvel nor any Marvel Subsidiary has received notice that any other party to any of such agreements is in default thereunder.  Except as set forth in said Schedule 3.07, none of the agreements listed therein by its express terms requires the consent of a third party in connection with the transactions contemplated hereby.  With respect to all agreements to which Marvel or any Marvel Subsidiary is a party other than the agreements set forth in Schedules 3.07 and 3.12 hereto, (i) Marvel and each Marvel Subsidiary has performed all obligations required to be performed by it there-under, and is not in default under, any such agreement, (ii) no event has occurred thereunder which with the passage of time or giving of notice would constitute a default by Marvel or any Marvel Subsidiary, and (iii) each of such agreements constitutes a valid, binding and legally enforceable obligation of Marvel and/or the Marvel Subsidiaries, as applicable, in accordance with its terms, except as enforcement may be limited by applicable bank-ruptcy, insolvency or other laws effecting the rights of creditors generally, principles of equity and the availability of equitable remedies; and except in each such case referred in subsections (i), (ii) or (iii) of this sentence where any inaccuracy in any

2021MARVEL-0068205

such representation and warranty would not individually or in the aggregate have a Material Adverse Effect.

3.08.  Employee and Fringe Benefit Plans.  Except as listed in Schedules 3.07 and 3.08 hereto, neither Marvel nor any Marvel Subsidiary sponsors or is obligated to make contributions to any pension, profit-sharing, thrift or other retirement plan, employee stock ownership plan, deferred compensation, stock ownership, stock purchase, performance share, bonus or other incentive plan, severance plan or other similar plan, agreement, arrangement or understanding, or any other fringe-benefit plan, with respect to employees or former or retired employees of Marvel or any Marvel Subsidiary, whether or not any such plan is or is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code") and whether or not any such plan, agreement, arrangement or understanding is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Such agreements, plans, arrangements and understandings are valid and in effect and Marvel and each Marvel Subsidiary has performed all material obligations required to be performed by it thereunder and is not in material default thereunder.  Seller has delivered to Buyer copies of all such agreements, plans, arrangements and understandings, each as amended to date.  Except as set forth in Schedules 3.07 and 3.08, none of the employees of Marvel or any Marvel Subsidiary are covered by any other such fringe benefit plans or any other "employee pension benefit plan" or "employee welfare benefit plan" within the meaning of ERISA.  Except as set forth in Schedules 3.07 and 3.08, neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will result in (i) any payment of severance pay, unemployment compensation or golden parachute payment becoming due from Marvel or any Marvel Subsidiary to any employee or former employee of any of them or of Seller or (ii) the increase of any benefits or the acceleration of the time of payment or vesting of any benefits under any plan or agreement contemplated by this section 3.08 or section 3.07.

3.09.  Insurance.  Schedule 3.09 hereto is a true, complete and correct list of all policies of fire, liability, errors and omissions, and other forms of insurance held by Marvel or the Marvel Subsidiaries, or by Seller with respect business or assets of Marvel or the Marvel Subsidiaries, together with their respective termination dates.  All of such policies are in full force and effect.  All premiums due and payable with respect to such policies have been paid in full.  To the best knowledge of Seller, there exists no default or other circumstance which would create the substantial likelihood of the cancellation or non-renewal of any such policy.  To the best knowledge of Seller, Marvel has notified such insurers of any claim known to Marvel which Marvel believes is covered by any such insurance policy.

8

2021MARVEL-0068206

3.10. <u>Litigation</u>. Except as set forth in Schedule 3.10 hereto and except for actions, suits, proceedings or investigations regarding worker's compensation or liability for personal injury which are covered by insurance (other than the deductible applicable to any such policy), there is not at the date hereof any action, suit, proceeding or investigation pending or, to the best knowledge of Seller, threatened, against Marvel, the Marvel Subsidiaries or affecting any of their respective assets, which, if resolved adversely to Marvel or such Marvel Subsidiary, would result in Losses (as hereinafter defined) of $5,000 in any one case or $25,000 in the aggregate, including, without limitation, any action, suit, proceeding or investigation pending, or, to the best knowledge of Seller, threatened, in which it is sought to restrain, prohibit, invalidate or set aside, in whole or in part, the transactions contemplated hereby. Except as set forth in said Schedule 3.10, neither Marvel nor any Marvel Subsidiary is subject to or in material default under or with respect to any judgment, order, writ, injunction or decree of any court or any federal, state, municipal or other governmental authority, department, commission, board, agency or other instrumentality, including, without limitation, any judgment, order, writ, injunction or decree restraining, prohibiting, invalidating or setting aside, in whole or in part, the transactions contemplated hereby. Except as set forth in said Schedule 3.10, neither Marvel nor any Marvel Subsidiary is involved in any pending or, to the knowledge of Seller, threatened, labor dispute, strike or disturbance, other than routine grievances none of which is material.

3.11. <u>Consents</u>. No governmental authorizations, consents, permits, approvals, orders, licenses, forms or filings are required for the operation of the business conducted by Marvel and the Marvel Subsidiaries except such licenses as Marvel and the Marvel Subsidiaries have obtained to qualify to do business as a foreign corporation or where the failure to obtain same would not have a Material Adverse Effect. Other than as set forth in Schedule 3.11 hereto and except for the requirements under the HSR Act, no authorizations, consents, permits, approvals, orders, licenses, forms or filings of any governmental or regulatory authority, commission, board or agency is required for the execution and delivery by Seller of this Agreement and the consummation of the transactions contemplated hereby. Marvel and each of the Marvel Subsidiaries has, to the best of Seller's knowledge, complied in all material respects with all laws, regulations and orders (including, without limitation, any federal, state or local laws, rules or regulations regulating the safety of the workplace and/or the discharge of materials into the environment or otherwise relating to the protection of the environment) applicable to Marvel or the Marvel Subsidiaries or their respective businesses.

2021MARVEL-0068207

    3.12. <u>Titles of Publications; Copyright; Infringement</u>.
Schedule 3.12A hereto sets forth a true and complete list of the
titles of all publications (including comics, graphic novels,
books and trade paperbacks) in publication during the period
October 1, 1987 to September 30, 1988 by Marvel in the United
States (the "Publications"), and with respect to each of the
Publications, the first date of publication, the frequency of
publication during such period and the number of issues published.
Schedule 3.12B sets forth a list of the material characters
created by or on behalf of Marvel used in the business of Marvel
and the Marvel Subsidiaries (the "Characters").  Schedule 3.12C
sets forth substantially all fulfillment, printing or distribution
agreements and through the date hereof any royalty or license
agreements (other than the Intercompany Agreements, as hereinafter
defined) pursuant to which Marvel or any Marvel Subsidiary (i) as
licensor has permitted a third party to use the Publications (or
prior issues thereof) and/or the Characters or (ii) as licensee
has obtained from any third party the right to use any character,
concept, story or any other intellectual property for use in, or
which is currently being developed for, the business conducted by
Marvel or any Marvel Subsidiary (collectively, the "Licenses").
Except as provided in Schedule 3.12C, Marvel and the Marvel Sub-
sidiaries are the sole and exclusive owners throughout the world
of the Publications and rights therein which they purport to own,
and, to the extent exclusive rights were obtained under the
Licenses, are the sole and exclusive owners in the Publications
which are the subject of such rights.  With respect to the
Publications, all of the Publications bear a copyright notice
complying with the applicable provisions of the Universal Copy-
right Convention, and substantially all have been registered for
copyright in the United States Copyright Office.  The Publications
are protected by copyright in the United States and in those
countries which are signatory or adhere to the Universal Copyright
Convention and, to the best of Seller's knowledge, are not in the
public domain anywhere in the world where copyright protection is
available.  From January 1, 1987 to the present, all literary
works published by Marvel in the United States bear a copyright
notice complying with the applicable provisions of the Universal
Copyright Convention, and substantially all have been registered
in the United States Copyright Office.  To the best of Seller's
knowledge, it was the regular business practice of the entities
conducting the business which have become Marvel and the Marvel
Subsidiaries to place a proper copyright notice on all of such
literary works, and register such literary works for copyright in
the United States Copyright Office from the period January 1, 1985
to January 1, 1987.  With respect to Characters, all of such
Characters are owned solely and exclusively by Marvel or a Marvel
Subsidiary except to the extent rights in such Characters are the
subject of the Licenses.  None of such Characters are in the
public domain in the United States.  Except as provided in

2021MARVEL-0068208

for the categories of goods and services with respect to which the Marks are registered to the extent that such goods and services are currently being used.  Except as provided in Schedule 3.12C, Marvel and the Marvel Subsidiaries have not assigned, licensed or in any manner encumbered or materially impaired any rights in the Marks, such Marks are free and clear of any Liens other than Permitted Liens, and no Mark infringes or violates any personal, property, statutory or common law or any other rights of any third parties (including, without limitation, trademarks), and no claim alleging any such infringement or violation has been received by Marvel or any Marvel Subsidiary, except as set forth in Schedule 3.10.  Except as set forth in Schedule 3.10, no unresolved claims or notices have been asserted or given during the past two years by any person challenging the use by Marvel or any of the Marvel Subsidiaries of any Mark or challenging or questioning the validity, enforceability or effectiveness of or the title to any Mark or any License or agreement relating thereto nor is there any action, suit, investigation or proceeding by or before any court or other governmental entity reasonably likely to materially adversely affect the validity or enforceability of, or the title or right of Marvel or the Marvel Subsidiaries to use, any Mark.

3.14.  <u>No Material Adverse Change</u>.  Except as set forth in Schedule 3.14 hereto and other than as permitted by this Agreement, since September 30, 1988, (i) there has not been (a) any material adverse change in the business, assets, financial condition or results of operations of Marvel and the Marvel Subsidiaries taken as a whole, (b) any damage, destruction or loss, whether or not covered by insurance, which has materially adversely affected the business or assets of Marvel and the Marvel Subsidiaries taken as a whole or (c) any event or condition of any character whatsoever the occurrence of which materially adversely affected, or threatens to materially adversely affect, the business, assets, financial condition or results of operations of Marvel and the Marvel Subsidiaries taken as a whole, and (ii) there has not been any transaction or event of the types re- stricted or prohibited by Sections 5.01 or 5.03 hereof.

3.15.  <u>Non-contravention</u>.  Except as set forth in Schedule 3.15 hereto, neither the execution and delivery of this Agreement nor the consummation of the transactions hereby con- templated by Seller will constitute any violation or breach of, or result in a default under, the Certificate of Incorporation or the By-Laws, or other charter documents, of Seller, Marvel or any Marvel Subsidiary or any provisions of any material contract or other instrument to which Seller, Marvel or any Marvel Subsidiary is a party or by which any of the material assets of Seller, Marvel or any Marvel Subsidiary may be affected or secured or any permit, license or approval referred to in Section 3.11 hereof or any order, writ, injunction, decree, statute, rule or regulation

12

2021MARVEL-0068209

or will result in the creation of any Lien, except Permitted
Liens, on any of the assets of Marvel or any Marvel Subsidiary.

3.16.  Intercompany Agreements.  Except as set forth in
Schedule 3.16 hereto, there are no agreements between Marvel or
any Marvel Subsidiary, on the one hand, and Seller or any Subsi-
diary or affiliate of Seller, on the other hand.

3.17.  Full Disclosure.  No representation or warranty
of Seller in this Agreement or any other certificate, schedule or
other document delivered to Buyer pursuant to this Agreement
contains any incorrect statement of a material fact or omits to
state a material fact necessary to make the statements herein not
misleading in light of the circumstances in which made.

ARTICLE IV

Representations and Warranties of Buyer

Buyer represents and warrants to Seller that:

4.01.  Organization and Good Standing.  Buyer is a
corporation duly organized, validly existing and in good standing
under the laws of the State of Delaware.

4.02.  Corporate Authority.  The execution, delivery and
performance of this Agreement by Buyer have been duly and validly
authorized by all necessary corporate action on the part of Buyer.
Buyer has the corporate power and authority to execute, deliver
and perform this Agreement, to consummate the transactions hereby
contemplated and to take all other actions required to be taken by
it pursuant to the provisions hereof.  This Agreement has been
duly and validly executed by Buyer and is valid and binding upon
Buyer in accordance with its terms except as enforceability may be
limited by the effect of bankruptcy, insolvency, moratorium or
similar laws affecting creditor's rights generally and by general
principles of equity.

4.03.  Non-contravention.  Neither the execution and
delivery of this Agreement nor the consummation of the transac-
tions hereby contemplated by Buyer will constitute any violation
or breach of the Certificate of Incorporation or By-Laws of Buyer
or any provisions of any material contract or other instrument to
which Buyer is a party or by which any of the material assets of
Buyer may be affected or secured or any order, writ, injunction,
decree, statute, rule or regulation or will result in the creation
of any Lien, except Permitted Liens, on any of the assets of
Buyer.

13

2021MARVEL-0068210

4.04.  <u>Consents</u>.  Except as required under the HSR Act, no authorization, consent, order, license, form, filing or approval of any governmental or regulatory authority, commission, board or agency is required for the execution and delivery by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

4.05.  <u>Purchase for Investment</u>.  Buyer will acquire the Stock for investment only for its own account and not with a view toward any resale or distribution thereof, and Buyer will not offer to sell or otherwise dispose of the Stock or any portion thereof in violation of any of the registration requirements of the Securities Act of 1933, as amended.

4.06.  <u>Litigation</u>.  There are no suits, actions, pro-ceedings or investigations pending or, to the best knowledge of the Buyer, threatened, against the Buyer which seek to restrain, prohibit, invalidate or set aside, in whole or in part, the consummation of this Agreement or the transactions contemplated hereby or to obtain damages in connection therewith and there is not in effect any order or injunction of a court or governmental authority of competent jurisdiction restraining, prohibiting, invalidating or setting aside, in whole or in part, the trans-actions contemplated hereby.

ARTICLE V

<u>Pre-Closing Covenants of Seller</u>

Seller agrees that subsequent to the date hereof and prior to the Closing Time:

5.01.  <u>Conduct of the Business</u>.  (a) Pending the Closing, and except as otherwise consented to or approved by Buyer, which consent or approval will not be unreasonably with-held, disclosed in Schedule 3.14 hereto or otherwise contemplated by this Agreement or the Schedules hereto, Seller agrees that Marvel and each of the Marvel Subsidiaries will carry on its respective business only in the ordinary course consistent with past practice, and use all reasonable efforts to preserve intact its business organization, to keep available the services of its officers and employees and maintain satisfactory relationships with suppliers, distributors, sales representatives, customers and others having economically viable business relationships with it.

Without limiting the generality of the foregoing:

(a)  <u>Certain Changes</u>.  Neither Marvel nor any Marvel Subsidiary will without the consent of Buyer, which consent will not be unreasonably withheld:

14

(i)    Change or amend its Certificate of Incorporation or By-Laws (or equivalent documents);

(ii)    Issue or sell any shares of its capital stock or other securities, acquire directly or indirectly, by redemption or otherwise, any such capital stock, reclassify or split-up any such capital stock, or grant or enter into any options, warrants, calls or commitments of any kind with respect thereto;

(iii)    Other than intercompany indebtedness, which will be contributed to capital as set forth in Section 5.10, incur or assume any indebtedness whatsoever for borrowed money, or make any capital contributions to or equity investments in any person, or, except in the ordinary course of business, incur or assume any other indebtedness, assume or otherwise become liable or responsible for the obligations of any other person or make any loans or advances to any person, other than any of the foregoing relating solely to another Marvel Subsidiary or Marvel and other than as permitted by Section 5.02;

(iv)    Acquire any assets for a price in excess of $20,000 in any one case or $100,000 in the aggregate;

(v)    Cancel any debts of others or waive any claims or rights in excess of $20,000 in any one case or $100,000 in the aggregate except trade debts and claims cancelled or waived in the ordinary course of business, or amend or terminate any agreement listed in Schedules 3.07 or 3.12;

(vi)    Dispose of or permit to lapse any material copyright or trademark set forth in Schedules 3.12 or 3.13;

(vii)    Increase the compensation or fringe benefits of any of its officers or employees (other than increases in accordance with its customary compensation practices);

(viii)    Except as provided in Section 5.02, pay or declare any dividend or other distribution with respect to the Stock;

(ix)    Otherwise than in the ordinary course of business consistent with past practice, liquidate existing inventories or sell or dispose of other tangible assets;

(x)    Repay any intercompany indebtedness other than as permitted by Section 5.02;

(xi)    Enter into any agreement for the acquisition, licensing or disposition of rights in and to any characters, trademarks or other intellectual property; or

15

2021MARVEL-0068212

(xii)  Agree, whether in writing or otherwise, to do any of the foregoing.

5.02.  <u>Payments to Seller</u>.  Notwithstanding Section 5.01, Marvel may deliver to Seller on a daily basis all cash generated by Marvel in the ordinary course of business from the date hereof through the Closing Date, but in no event will such amount, plus amounts so delivered on and after October 1, 1988 to the date hereof, exceed $2,500,000; provided, however, that notwithstanding the foregoing, on the Closing Date Marvel and the Marvel Subsidiaries shall have book cash balances aggregating at least $1,000,000.

5.03.  <u>No Agreements Other Than In Ordinary Course of Business</u>.  Neither Marvel nor any Marvel Subsidiary will, without the consent of Buyer, which consent will not be unreasonably withheld, enter into any material leases, agreements, contracts, licenses, or other commitments, whether written or oral, other than commitments for purchase orders for supplies and inventory or sales orders from customers or any other commitments, in each case entered into in the ordinary course of business.

5.04.  <u>No Breach of Representations and Warranties</u>.  Neither Seller, Marvel nor any Marvel Subsidiary will take any action which would cause or constitute a material breach, or would, if it had been taken prior to the date hereof, have caused or constituted a material breach of, any of the representations and warranties set forth in Article III hereof.  Seller will, in the event of, and promptly after the occurrence of, or promptly after becoming aware of the occurrence of or the impending or threatened occurrence of, any event which would cause or constitute a material breach of any of the representations and warranties set forth in said Article III, give detailed notice thereof to the Buyer, and the Seller will use its reasonable efforts to prevent or promptly remedy such breach.

5.05.  <u>Access to the Company's Business</u>.  The Buyer and its representatives will at all times during regular business hours be permitted access to, and will be permitted to make copies of or abstracts from, all of the books and records of Marvel and the Marvel Subsidiaries, will have access to the premises and physical properties of Marvel and the Marvel Subsidiaries, and will be permitted to discuss the affairs, finances and accounts of Marvel and the Marvel Subsidiaries with its directors, officers, employees, counsel, accountants, suppliers and customers.

5.06.  <u>No Solicitation</u>.  Between the date of this Agreement and the Closing, neither Seller nor any of its representatives or agents shall, directly or indirectly, solicit or engage into negotiations or otherwise cooperate with any person or

2021MARVEL-0068213

entity who or which seeks to acquire, or expresses an interest in acquiring, all or a substantial part of the equity securities, or assets of Marvel or the Marvel Subsidiaries, or for the purpose of otherwise affecting a transaction inconsistent with the transactions contemplated by this Agreement, nor will the Seller enter into any agreement with or grant any option to any third person or entity in connection with the transactions contemplated by this Agreement. Seller shall promptly advise Buyer of any unsolicited offer to buy or offer to engage in negotiations to buy Marvel or the Marvel Subsidiaries made by any third party and known to any of Seller's Co-Chairmen.

5.07. <u>HSR Act</u>. Seller will promptly file with the United States Department of Justice and the United States Federal Trade Commission its Pre-Merger Notification and Report Forms and any other information and documents required under the HSR Act in connection with the sale of the Stock, and will promptly notify Buyer of any communication with respect to such filings from the Department of Justice or the Federal Trade Commission. Seller will promptly furnish to Buyer copies of all pleadings, notices, or other written communications received by it that relate to the transactions contemplated by this Agreement.

5.08. <u>Reasonable Efforts</u>. Seller will use its reasonable efforts to effectuate the transactions hereby contemplated, to obtain the consents contemplated by Section 7.09 and to fulfill the other conditions to the Buyer's obligations under Article VII of this Agreement.

5.09. <u>Insurance</u>. The insurance policies listed in Schedule 3.09 will not be cancelled, modified or changed prior to the Closing Time without the express written consent of Buyer (which consent will not be unreasonably withheld), except to extend the maturity dates thereof.

5.10. <u>Intercompany Balance</u>. Seller shall cause the net intercompany balance reflected on the September Balance Sheet, as such amount may have been adjusted from September 30, 1988 through the Closing Date as contemplated by this Agreement, to be contributed to the capital of Marvel as of the Closing Date.

ARTICLE VI

<u>Pre-Closing Covenants of Buyer</u>

Buyer agrees that subsequent to the date hereof and prior to the Closing Time:

6.01. <u>HSR Act</u>. Buyer will promptly file with the United States Department of Justice and the United States Federal

17

Trade Commission its Pre-Merger Notification and Report Forms and
any other information and documents required under the HSR Act in
connection with the purchase of the Stock, and will promptly noti-
fy Seller of any communication with respect to such filings from
the Department of Justice or the Federal Trade Commission.  Buyer
will promptly furnish to Seller copies of all pleadings, notices,
or other written communications received by it that relate to the
transactions contemplated by this Agreement.

     6.02.  <u>No Breach of Representations and Warranties</u>.
Buyer will not take any action which would cause or constitute a
breach, or would, if it had been taken immediately prior to the
date hereof, have caused or constituted a breach, of any of the
representations and warranties set forth in Article IV hereof.
Buyer will, in the event of, and promptly after the occurrence of,
or promptly after becoming aware of the occurrence of or the
impending or threatened occurrence of, any event which would cause
or constitute a breach or would, if it had occurred immediately
prior to the date hereof, have caused or constituted a breach of
any of the representations and warranties set forth in said
Article IV, give detailed notice thereof to Seller, and Buyer will
use its reasonable efforts to prevent or promptly remedy such
breach.

     6.03.  <u>Release</u>.  Buyer shall take any reasonable action
as may be requested by Seller, including the payment of a reason-
able amount of money or the providing of reasonable security, in
order to cause Seller to be released from its obligations,
contingent or otherwise, under any guarantee, agreement or lease
of Marvel or any Marvel Subsidiary listed in Schedule 6.03 hereto.

     6.04.  <u>Reasonable Efforts</u>.  Buyer will use its reason-
able efforts to effectuate the transactions hereby contemplated
and to fulfill the conditions to Seller's obligations under
Article VIII of this Agreement.

### ARTICLE VIA

### Intercompany Agreements

     6A.01.  Buyer and Seller agree to negotiate in good
faith the terms and conditions of the agreements contemplated by
Exhibit A hereto, and agree to negotiate in good faith the form of
the agreement attached as Exhibit B hereto (collectively, the
"Intercompany Agreements").

2021MARVEL-0068215

ARTICLE VII

Conditions to Buyer's Obligations

All obligations of Buyer under this Agreement are sub-
ject to the fulfillment of each of the following conditions, any
or all of which may be waived in whole or in part by Buyer, in its
sole discretion:

7.01.  Representations and Warranties True at the Clos-
ing Date.  The representations and warranties contained in Article
III hereof shall be true in all material respects at and as of the
Closing Time.

7.02.  Seller's Performance.  Seller shall have per-
formed and complied in all material respects with all agreements
and conditions on its part required by this Agreement to be
performed or complied with prior to or at the Closing Time.

7.03.  Officer's Certificates.  Buyer shall have
received a certificate of the Chief Executive Officer and the
Treasurer of each of Seller and Marvel, dated the Closing Date,
certifying to the fulfillment of the conditions specified in
sections 7.01 and 7.02.

7.04.  Resignation of Directors of Marvel and the Marvel
Subsidiaries.  On the Closing Date, Seller shall have delivered to
Buyer written resignations, effective as of the Closing, of each
director of Marvel.  On the Closing Date, Seller shall cause
Marvel to deliver to Buyer written resignations, effective as of
the Closing, of each director of each Marvel Subsidiary; provided,
that with respect to Gateway Projects Ltd. and Marvel Comics,
Ltd., Seller shall provide (i) similar resignations in proper form
or (ii) a shareholder resolution of Marvel evidencing the removal
of the directors of such companies and shall provide Buyer with
indemnification in accordance with Section 10.01 hereof with
respect to any "Losses" (as defined in Section 10.01) incurred by
Buyer as a result of such removal.

7.05.  Releases.  Each of Messrs. Sloan, Kuppin and
Rehme, and Seller on behalf of itself and its affiliated companies
other than Marvel and the Marvel Subsidiaries, shall have executed
and delivered to Buyer general releases in favor of Marvel and the
Marvel Subsidiaries, other than with respect to the obligations
contemplated by this Agreement and the agreements contemplated
hereby.

7.06.  Opinion of Counsel for Seller.  Buyer shall have
received an opinion of Counsel for Seller, dated the Closing Date,
substantially in the form thereof attached hereto as Exhibit C.

19

2021MARVEL-0068216

7.07. <u>Governmental Approvals; Litigations</u>. There shall have been full compliance with all notification requirements under all applicable federal laws, and all filings, applications, statements and reports to all federal, state or local government agencies or entities which are required to be made pursuant to any statute, rule, or regulation in connection with the transactions contemplated by this Agreement (including, without limiting the generality of the foregoing, complete filings with the Federal Trade Commission and the Department of Justice pursuant to the HSR Act, and the waiting period thereunder shall have elapsed or shall have been shortened without either a request for additional information or any other communication having been sent out by either of said agencies expressing their intention to take action to prevent, delay, impede or subject to conditions not expressed in this Agreement, the lawful consummation of the transactions hereby contemplated or which has the legal effect of requiring postponement of the Closing Date, or the initiation of proceedings by either such agency to prohibit consummation of the transactions which are the subject of this Agreement), and there shall have been no governmental action, pending or threatened,  or communication from any other governmental agency or entity expressing the intention to take action to, and there shall be no injunction of a court of competent jurisdiction obtained by any third party the effect of which is to, prevent, delay, impede or subject to conditions not expressed in this Agreement, the lawful consummation of such transactions.

7.08. <u>Release of Security Interest</u>. The security interests of General Electric Capital Corporation ("GECC") listed in Schedules 3.05 and 3.07 hereto, to the extent such security interests affect the assets of Marvel or any Marvel Subsidiary, shall have been terminated.  The pledges of Stock and Subsidiary Stock listed in Schedule 3.03 hereto shall have been released.

7.09. <u>Consents</u>. Seller shall (i) have obtained all required consents to the assignment of agreements contemplated by Schedules 3.07 and 3.12 hereof and/or any such consents which are material to the business of Marvel or any of the Marvel Subsidiaries or (ii) indemnify Buyer pursuant to Section 10.01 hereof for any Losses incurred by Buyer as a result of Seller's failure to obtain any such consent.

7.10. <u>Foothills</u>. The security interests of Foothills Capital Corporation ("Foothills") listed in Schedule 3.05 hereto in certain accounts receivable of Marvel or any Marvel Subsidiary shall have been terminated, or if not so terminated, Seller shall, pending such termination, have provided to Buyer evidence reasonably satisfactory to Buyer that Buyer has no liability or obligation to Foothills with respect to such security interests or the credit facility pursuant to which such security interest was

20

created in respect of which Buyer, Marvel and any Marvel Subsidiary has not been fully protected against.

ARTICLE VIII

Conditions to the Seller's Obligations

All obligations of Seller under this Agreement are subject to the fulfillment of each of the following conditions, any or all of which may be waived in whole or in part by Seller:

8.01.  Representations and Warranties of Buyer True at the Closing Date.  The representations and warranties contained in Article IV hereof shall be true in all material respects at and as of the Closing Time.

8.02.  Buyer's Performance.  Buyer shall have performed and complied in all material respects with all agreements and conditions on its part required by this Agreement to be performed or complied with prior to or at the Closing Time.

8.03.  Officer's Certificates.  Seller shall have received a certificate of the Chief Executive Officer and Treasurer of Buyer, dated the Closing Date, certifying to the fulfillment of the conditions specified in sections 8.01 and 8.02.

8.04.  Opinion of Counsel for Buyer.  Seller shall have received an opinion of counsel to the Buyer, dated the Closing Date, substantially in similar scope to the opinion of Counsel for Seller attached hereto as Exhibit C, relating to the matters set forth in Sections 4.01, 4.02, 4.03 and 4.06.

8.05.  Governmental Approvals.  There shall have been full compliance with all notification requirements under all applicable federal laws, and all filings, applications, statements and reports to all federal, state or local government agencies or entities which are required to be made pursuant to any statute, rule, or regulation in connection with the transactions contemplated by this Agreement (including, without limiting the generality of the foregoing, complete filings with the Federal Trade Commission and the Department of Justice pursuant to the HSR Act, and the waiting period thereunder shall have elapsed or shall have been shortened without either a request for additional information or any other communication having been sent out by either of said agencies expressing their intention to take action to prevent, delay, impede or subject to conditions not expressed in this Agreement, the lawful consummation of the transactions hereby contemplated or which has the legal effect of requiring postponement of the Closing Date, or the initiation of proceedings by either such agency to prohibit consummation of the transactions

21

which are the subject of this Agreement), and there shall have
been no governmental action, pending or threatened, or communi-
cation from any other governmental agency or entity expressing the
intention to take action to, and there shall be no injunction of a
court of competent jurisdiction obtained by any third party the
effect of which is to, prevent, delay, impede or subject to
conditions not expressed in this Agreement, the lawful consum-
mation of such transactions.

8.06.  Release of Security Interest.  The security
interests of GECC listed in Schedules 3.05 and 3.07 hereto, to the
extent such security interests affect the assets of Marvel or any
Marvel Subsidiary, shall have been terminated.  The pledges of
Stock and Subsidiary Stock listed in Schedule 3.03 hereto shall
have been released.

8.07.  Release as Guarantor.  Seller shall have been
released from its obligations as guarantor under the guarantees,
agreements and leases listed in Schedule 6.03 hereto.

ARTICLE IX

Post-Closing Covenants

9.01.  Availability of Documents.  For a period of three
(3) years after the Closing Date, Buyer shall, and Buyer shall
cause each of Marvel and the Marvel Subsidiaries to, make avail-
able to Seller and its duly authorized representatives all
records, files and other data, including, without limitation,
account books of original entry and general ledgers, transferred
to Buyer in connection with the transactions contemplated hereby,
provided that such material and information shall be made avail-
able to Seller only in connection with the financial and tax
affairs of Seller, Seller's obligations or rights under this
Agreement or in order to enable Seller to comply with any laws or
regulations applicable to Seller.  Such records and data shall be
made available by Buyer for inspection by Seller at any mutually
convenient time during normal business hours for a period of three
(3) years after the Closing Date and Seller may, at its own
expense, make such copies and extracts as it may desire, it being
understood that Buyer shall not destroy any records and data
following such three (3) year period unless it shall have first
given Seller thirty (30) days' prior written notice of its inten-
tion to destroy such records and data.  If Seller requests that
such records and data not be destroyed, Buyer shall have the
option of continuing to maintain such records and data or deliver-
ing them to Seller at Seller's cost and expense.  Any material or
information received by Seller pursuant to this Section 9.01 shall
be subject to the provisions of Section 13.11 hereof.

22

2021MARVEL-0068219

9.02.  <u>Delivery of Publications</u>.  Buyer agrees to deliver, at its own cost and expense, to each of Messrs. Lawrence Kuppin, Harry Sloan and Robert Rehme, at such address as each of them may specify to Buyer from time to time, copies of all printed editions published or distributed by Marvel, as and when published or distributed, for a period of ten years from the Closing Date or for such shorter period as Buyer or its affiliates may own Marvel.

9.03.  <u>Intercompany Agreements</u>.  The Intercompany Agreements shall continue in full force and effect after the Closing in accordance with their respective terms.  If either party to any Intercompany Agreement breaches the terms of any such agreement, such breach shall not be deemed a breach by such party of the terms or conditions of this Agreement, and the non-breaching party shall be limited to its rights and remedies under the Intercompany Agreement which is the subject of such breach.

9.04.  <u>Non-Competition</u>.  Seller agrees that to the extent permitted by law and during the period commencing on the Closing Date and ending on the fifth anniversary of the Closing Date, it will not own, manage, operate, control or participate in the ownership, management, operation or control of any business, firm, corporation or other entity engaged in the comic book publishing or distribution business or the development of char- acters primarily for use in the comic book business (the "Busi- ness"); <u>provided</u>, <u>however</u>, that the provisions of this Section 9.04 shall not apply to investments by Seller in shares of stock registered under the Securities Exchange Act of 1934 and which shall constitute less than 2% of the outstanding shares of such stock; and <u>provided</u> <u>further</u>, that the licensing by Seller to third parties of rights to publish comic books based upon Seller's audio-visual works shall not be deemed to be included in the Business (in which event, however, Seller shall give Buyer a right of first negotiation with respect to characters developed by Seller).  It is the desire and the intent of the parties hereto that the provisions of this Section 9.04 shall be enforced to the fullest extent of the law and public policies applied in each jurisdiction in which enforcement is sought.  If any particular provision of this Section 9.04 shall be adjudicated to be invalid or unenforceable, this Section 9.04 shall be deemed amended to delete therefrom such provision or portion so adjudicated to be invalid or unenforceable, such amendment to apply only with respect to the operation of this Section 9.04 in the jurisdiction in which such adjudication is made.  The parties acknowledge that money damages would not be a sufficient remedy for any violation of the terms of this Section 9.04 and, accordingly, the Buyer shall be entitled to specific performance and injunctive relief as remedies for any violation.  These remedies shall not be deemed to be the exclusive remedies for a violation of the terms of this

23

Section 9.04, but shall be in addition to all other remedies available at law or equity.

9.05.  <u>No Contest</u>.  Buyer will not challenge or contest, or cause to be challenged or contested, the assignment referred to in paragraph (vi) of Schedule 3.14.

9.06.  <u>Insurance</u>.  Without limitation of any indemnity obligation of Seller pursuant to Section 10.01, from and after the Closing Date, Seller will indemnify, defend and hold harmless Buyer, Marvel and the Marvel Subsidiaries from and against all Losses covered under insurance covering the business, assets or operations of Marvel and the Marvel Subsidiaries (other than deductibles) held by Seller and its affiliates (other than Marvel and the Marvel Subsidiaries) on the Closing Date in the amounts recovered in connection with such Losses and in accordance with the terms of the applicable insurance policy; <u>provided</u> that such Losses relate to occurrences (as such term is used in the above-mentioned policies) which arose prior to the Closing Date.  Seller shall remit to Marvel and the Marvel Subsidiaries all insurance proceeds relating to Marvel and the Marvel Subsidiaries covering such insured Losses arising prior to the Closing to the extent such insurance proceeds are received by Seller.  Seller agrees it will not voluntarily terminate any insurance applicable to the business, assets or operations of Marvel and the Marvel Subsidi-aries for any period prior to the Closing.  Upon notice from Buyer, Marvel or any Marvel Subsidiary, Seller will diligently pursue all claims for insurance as provided in this Section 9.06, and Seller shall consult with Buyer with respect to the pursuit of such insurance and shall promptly advise Buyer as to the progress thereof.

ARTICLE X

Indemnification

10.01.  <u>By the Seller</u>.  (a) Subject to the provisions of section 13.12 hereof and subparagraph (b) of this section 10.01, Seller agrees to indemnify and hold harmless Buyer, Marvel and the Marvel Subsidiaries from and against, and to reimburse Buyer with respect to, any and all loss, damage, liability, cost and expense, including reasonable attorneys' fees to the extent set forth herein (collectively "Losses"), incurred by Buyer, Marvel or any Marvel Subsidiary by reason of or arising out of or in connection with a breach of any representation, warranty or agreement con-tained herein or in any certificate delivered to Buyer pursuant to the provisions of this Agreement or the failure of Seller to perform any agreement required by this Agreement to be performed by it; <u>provided</u>, that with respect to Losses arising out of or in connection with a breach of a representation or warranty or

24

Section 5.04 hereof, no indemnification shall be required under this Section 10.1 unless and until the aggregate of all such Losses (including all amounts which but for this clause would be subject to indemnification hereunder) exceeds $400,000 (the "Minimum Amount"); _provided_, _however_, that when the aggregate of all such Losses exceeds the Minimum Amount, the Buyer, Marvel and the Marvel Subsidiaries shall be indemnified in respect of all such Losses in excess of $200,000 (it being understood that all Losses up to $200,000 shall be deductible and not compensible). Buyer agrees to give prompt notice to Seller of the assertion by any third party of any claims giving rise to a claim for indemnity under this Article X; _provided_, that the failure to give such notice shall not affect Buyer's right to receive such indemnity.

(b) Seller shall have the right to participate in and to control the contest, defense, settlement or compromise of any third party claim contemplated by this section 10.01 at its own cost and expense with attorneys and accountants of its choosing, including the cost and expense of such attorneys' and auditors' fees in connection with such contest, defense, settlement or compromise. Buyer shall be entitled to participate in the contest, defense, settlement or compromise of any such claim at its own cost and expense; _provided,_ _that_ if Seller shall fail to diligently defend any such claim, Buyer shall be entitled to do so at Seller's expense with attorneys and accountants of its choosing. In such event, Buyer shall not settle or compromise any such claim without the prior written consent of Seller, which consent will not be unreasonably withheld.

10.02. _By the Buyer_. (a) Subject to the provisions of section 13.12 and subparagraph (b) of this section 10.02, Buyer agrees to indemnify and hold harmless Seller from and against, and to reimburse Seller with respect to, any and all Losses incurred by Seller by reason of or arising out of or in connection with a breach of any representation, warranty or agreement contained herein or in any certificate delivered to Seller pursuant to the provisions of this Agreement or the failure of Buyer to perform any agreement required by this Agreement to be performed by it; _provided_, that with respect to Losses arising out of or in connection with a breach of a representation or warranty or Section 6.02 hereof, no indemnification shall be required under this Section 10.2 unless and until the aggregate of all Losses (including all amounts which but for this clause would be subject to indemnification hereunder) exceeds the Minimum Amount; _provided_, _however_, that when the aggregate of all such Losses exceeds the Minimum Amount, Seller shall be indemnified in respect of all such Losses in excess of $200,000 (it being understood that all Losses up to $200,000 shall be deductible and not compensible). Seller agrees to give prompt notice to Buyer of the assertion by any third party of any claims giving rise to a claim for indemnity under this

25

Article X; <u>provided</u>, that the failure to give such notice shall not affect Seller's right to such indemnity.

(b)  Buyer shall have the right to participate in and to control the contest, defense, settlement or compromise of any third party claim contemplated by this section 10.02 at its own cost and expense with attorneys and accountants of its choosing, including the cost and expense of such attorneys' and auditors' fees in connection with such contest, defense, settlement or compromise.  Seller shall be entitled to participate in the contest, defense, settlement or compromise of any such claim at its own cost and expense; <u>provided</u>, <u>that</u> if Buyer shall fail to diligently defend any such claim, Seller shall be entitled to do so at Buyer's expense with attorneys and accountants of its choosing.  In such event, Seller shall not settle or compromise any such claim without the prior written consent of Buyer, which consent will not be unreasonably withheld.

10.03.  <u>Special Indemnity</u>.  Seller agrees to indemnify and hold harmless Buyer from and against, and to reimburse Buyer with respect to, any and all Losses incurred by Buyer, Marvel or any Marvel Subsidiary by reason of, or in connection with or arising from (i) <u>ARP Films, Inc. v. Marvel Entertainment Group</u>, (ii) <u>L.F. Rothschild & Co. Incorporated v. Marvel Entertainment Group Inc. and New World Entertainment, Ltd.</u>, (iii) <u>Feinberg & Foy (Trustees of Cadence Industries Liquidating Trust) v. New World Pictures and Marvel</u>; (iv) <u>The Cannon Group Inc. et ano v. Marvel Entertainment</u> (LASC C682464); (v) <u>Depatie-Freleng Enterprises, Inc.</u> claim; (vi) <u>Phillips Entertainment, Inc.</u> claim; (vii) <u>Marvel Entertainment Group Inc. et ano v. The Cannon Group, Inc. et ano</u> (LASC C642303) (each of which litigations is more particularly described in Schedule 3.10 hereto); (viii) any litigation or claim in connection with or arising from facts or circumstances related to any of the foregoing litigations or any similar set of facts or circumstances; or (ix) any other matter referred to in the assignment referred to in paragraph (vi) of Schedule 3.14.  The indemnity provided pursuant to this Section 10.03 shall be without regard to the Minimum Amount.  Seller shall have sole control and discretion regarding the contest, defense, settlement or compromise of the lawsuits specified in this Section 10.03.

ARTICLE XI

<u>Termination and Abandonment</u>

11.01.  <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing Date:

26

    (a)  by mutual consent of the Buyer and the Seller;

    (b)  by the Buyer, if there has been a material viola-tion or material breach by the Seller of any agreement, represent-ation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Buyer impossible and such violation or breach has not been waived by the Buyer and the same shall remain unremedied for a period of 20 days after Seller shall receive written notice from Buyer of such violation or breach;

    (c)  by the Seller, if there has been a material violation or material breach by the Buyer of any agreement, representation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Seller impossible and such violation or breach has not been waived by the Seller and the same shall remain unremedied for a period of 20 days after Buyer shall receive written notice from Seller of such violation or breach; or

    (d)  by either party, if the Closing has not been con-summated on or before the Termination Date unless as a result of the breach of this Agreement by the party seeking such termination under this subsection (d).

    No termination pursuant to this Section 11.01 shall be deemed to constitute a release or waiver by either party of any claim against the other party hereto based on any breach by such party of its agreements, representations and warranties contained herein.

27

ARTICLE XII

Tax Matters

Section 12.01.  Preparation and Filing of Tax Returns;
Elections; Allocations; Consents; Cooperation.

(a)  Tax Returns.

(i)  The Seller shall be responsible for the pre-
paration and filing of the Seller Group's consolidated federal
Income Tax return (and any consolidated, unitary or combined
state, county or local Income or Franchise Tax return of the
Seller Group) and all Pre-Closing Tax Returns with the relevant
Taxing Authorities on or before the due date or extended due date
for such returns.  No position shall be taken on such Tax returns
for which there is not a reasonable basis in law or fact.

(A)  In the case of any Tax return for the Current
Tax Year that is required to be prepared and filed by the Seller
under Section 12.01(a)(i) the Seller shall deliver a copy of such
return (or portion thereof) to the Buyer for the Buyer's review at
least 30 days before the due date or extended due date for such
return (or portion thereof).  The Buyer may provide comments on
such return (or portion thereof) to the Seller.  The Buyer's
comments shall be delivered to the Seller no more than 14 days
after the Seller has delivered the copy of such return (or portion
thereof) to the Buyer.  In the event that (1) the Buyer provides
any such comments in respect of such return (or portion thereof)
to the Seller, and (2) the Seller and the Buyer fail to agree as
to any item that is the subject of such comments at least ten days
before the due date or extended due date for such return (or
portion thereof), the return (or portion thereof) shall be
prepared and filed in such manner as is determined by the Seller.

(B)  The Seller shall cause a copy of any Tax
return (or portion thereof) that is described in Section
12.01(a)(i)(A) to be delivered to the Buyer promptly after the
filing of such return (or portion thereof) with the appropriate
Taxing Authorities.

(ii)  The Buyer shall be responsible for the prepa-
ration and filing of all Straddle Tax Returns with the relevant
Taxing Authorities on or before the due date or extended due date
for such returns.  The Seller and the Buyer shall work in coordi-
nation with one another in the preparation of the Straddle Tax
Returns.

28

(A)  The Seller's requests regarding the handling of matters which, in its judgment, affect periods ending on or prior to the Closing Date shall be respected, and any dispute with respect to such request shall be resolved by the Seller; provided, however, that every election and Seller's request made on a Straddle Tax Return for the Current Tax Year shall be made on a basis consistent with the methodology employed by Marvel and the Marvel Subsidiaries in prior years (subject to changes in Tax Laws), and no position shall be taken on such a return for which there is no reasonable basis in law or fact.

(B)  The Buyer shall deliver a copy of any Straddle Tax Return that is required to be prepared and filed by the Buyer under Section 12.01(a)(ii) to the Seller for the Seller's review at least 30 days before the due date or extended due date for such return.  The Seller may provide comments, including the comments described in Section 12.01(a)(ii)(A), on such return to the Buyer. The Seller's comments shall be delivered to the Buyer no more than 14 days after the Buyer has delivered the copy of such return to the Seller.  In the event that (1) the Seller provides any such comments in respect of such return to the Buyer, which include comments affecting only taxable periods beginning after the Closing Date, and (2) the Buyer and the Seller fail to agree as to any item that is the subject of such comments at least ten days before the due date or extended due date for such return, then, subject to Section 12.01(a)(ii)(A) above, the return shall be prepared and filed in such manner as is determined by the Buyer.

(C)  The Buyer shall cause a copy of any Straddle Tax Return that is required to be prepared and filed by the Buyer under Section 12.01(a)(ii) to be delivered to the Seller promptly after the filing of such return with the appropriate Taxing Authorities.

(b)  Co-operation.  The Buyer agrees to cooperate with and to cause Marvel and the Marvel Subsidiaries to cooperate with the Seller, and the Seller agrees to cooperate with the Buyer, in connection with the preparation, filing, execution, amendment and tax audit examinations of all Tax returns and all other Tax documents, forms, elections and consents.  As and when requested by the other, each party hereto shall promptly cause to be executed and delivered any such documents, forms, elections and consents as the requesting party is entitled to request under this Agreement. The Buyer agrees to make available to the Seller the records of Marvel and the Marvel Subsidiaries that are in the Buyer's custody or otherwise available to the Buyer, to prepare and furnish appropriate Tax return information, supporting data, and work papers consistent with prior years, and to cooperate to the extent reasonably requested and required for the Seller's preparation, filing, execution and amendment (and for tax audit examinations)

29

of those Tax returns that are required to be prepared and filed by
the Seller under Section 12.01(a).  The Seller agrees to make
available to the Buyer the records and information of Marvel and
the Marvel Subsidiaries that are in the Seller's custody or other-
wise available to the Seller, to prepare and furnish appropriate
Tax return information, supporting data, and work papers consis-
tent with prior years, and to cooperate to the extent reasonably
requested and required for the Buyer's preparation, filing,
execution, and amendment (and for tax audit examinations) of those
Tax returns that are required to be prepared and filed by the
Buyer under Section 12.01(a).

    12.02.  <u>Tax Payment Responsibility</u>.

    (a)  <u>Other Taxes</u>.  The Seller shall pay (i) all Tax
resulting from or relating to the Pre-Closing Operations of Marvel
and any Marvel Subsidiaries which are required to be reported on
(A) any Pre-Closing Tax Return or (B) the Seller Group's consoli-
dated federal Income Tax return (and the Seller Group's consoli-
dated, unitary or combined state, county or local Income or
Franchise Tax returns), (ii) any Tax arising from any restoration
of items of deferred gain as may be required by applicable
Treasury regulations under Section 1502 of the Code (or analogous
state, county, or local provisions) resulting from the transaction
or elections contemplated by this Agreement, and (iii) liability
of the Seller or any member of the Seller Group assessed against
Marvel or any Marvel Subsidiary for any taxable year by reason of
Marvel or any Marvel Subsidiaries being liable for all or part of
the tax of any other member of such affiliated group pursuant to
Treas. Reg. Section 1.1502-6.  Any Tax attributable to Marvel and
the Marvel Subsidiaries other than such Tax for which the Seller
is responsible pursuant to the first sentence of this paragraph
shall be paid by the Buyer, Marvel or the Marvel Subsidiaries, as
the case may be, and neither the Seller nor any member of the
Seller Group shall be required to pay or reimburse the Buyer,
Marvel or the Marvel Subsidiary for any such Tax.  The Buyer shall
pay to the Seller, when, as and if realized by the Buyer, Marvel
or any Marvel Subsidiary an amount equal to any net tax savings to
the Buyer, Marvel or any Marvel Subsidiary realized in any taxable
period ending on or after the Closing Date, resulting from (i) any
event giving rise to the obligation of the Seller to make any
payment pursuant to this Section 12.02(a); (ii) the making of any
payment by the Seller pursuant to this Section 12.02(a); or (iii)
the making of any payment by the Buyer, Marvel or any Marvel Sub-
sidiary to the appropriate Taxing Authority in connection with an
event described in clause (i) of this sentence.

    (b)  <u>Payments of Taxes Reported on Tax Returns</u>.  If the
Seller is liable for any Tax pursuant to this Section 12.02 and
the Tax is required to be reported on a Tax return that is

2021MARVEL-0068227

required to be prepared and filed by the Seller under Section 12.02(a), the Seller shall be responsible for the payment of such Tax to the relevant Taxing Authorities on or before the due date or extended due date for the payment of such Tax. If the Buyer, Marvel or any Marvel Subsidiary is liable for any Tax pursuant to this Section 12.02 and the Tax is required to be reported on a Tax return that is required to be prepared and filed by the Buyer under Section 12.01(a), the Buyer shall be responsible for the payment of such Tax to the relevant Taxing Authorites on or before the due date or extended due date for the payment of such Tax. If one party (the "Payor") is liable for a Tax pursuant to this Section 12.02 and the Tax is required to be reported on a Tax return that is required to be prepared and filed by the other party (the "Preparer") under Section 12.01(a), the Payor shall pay such Tax to the Preparer on or before the later of (i) five days before the date the Preparer intends to pay the Tax, provided that the Preparer's request for payment is accompanied by a copy of the applicable Tax return and, if necessary, a statement reflecting the calculation of the amount of the Tax for which the Payor is liable, and (ii) the completion of the procedure described in Section 12.01(a)(i)(A) or Section 12.01(a)(ii)(A) and (B), as the case may be, of this Agreement. The Preparer shall remit any amount paid by the Payor to the Preparer under this Section 12.02(c) to the appropriate Taxing Authority within five days after the Preparer receives such funds (but in no event after the due date), and if the Preparer does not so remit the funds such Tax shall become a liability of the Preparer for purposes of this Agreement, and the Payor shall not have any further liability hereunder with respect to such Tax to such extent.

(c) For purposes of this Section 12, the amount of taxable income, gain, loss or other items and any Tax thereon which is considered attributable to Pre-Closing Operations of Marvel and any Marvel Subsidiary shall be determined by (i) assuming that the entity's taxable year (including the taxable year of organizations in which such entity has a partnership interest or other equity interest) ends as of the close of business on the Closing Date; (ii) closing, on an actual basis (or if an actual closing is not permitted, on a pro forma basis) the books of the entity as of the close of business on the Closing Date; and (iii) preparing a Tax return based on the income, gain, losses or other items as so determined on a basis consistent with the methodology and elections (described in Section 12.01(a)(i), in the event of a Pre-Closing Tax Return, and Section 12.01(a)(ii), in the event of a Straddle Tax Return).

The amount of any payment required to be made by Seller shall be reduced by an amount equal to any estimated, partial or other payment attributable to the Tax at issue which payment is made on or prior to the Closing Date ("Prepaid Tax"). If the

31

amount of any Tax attributable to the Pre-Closing Operations of Marvel or any Marvel Subsidiary (as determined under this paragraph 12.02) is less than the amount of Prepaid Tax with respect to such Tax, then Buyer shall, five days after the completion of the procedure described in Section 12.01(a)(ii)(A) and (B), pay such amount to the Seller.

(d)  Refunds.  The Seller shall be entitled to retain or be paid all refunds of Taxes (whether in the form of payment, credit or otherwise) from any Taxing Authority to the extent that such refunds are attributable to Seller's Taxes.  All payments under this Section 12.02(d) shall be made 20 days after the receipt of a refund of Tax.

12.03.  Filing of Returns; Audits.  Except as otherwise expressly provided, all decisions relating to the preparation and filing of Tax returns and any audit, review, or settlement of such Tax returns shall be made in the sole discretion of the party responsible under this Agreement for the filing of such Tax returns.  Notwithstanding the foregoing, all decisions relating to any audit, review or settlement of any item of Seller's Taxes shall be made in the sole discretion of the Seller and all decisions solely relating to any audit, review or settlement of any item of Buyer's Taxes shall be made in the sole discretion of the Buyer.  The Buyer, Marvel or any Marvel Subsidiary agree to provide or cause to be provided to the Seller, and the Seller and any member of the Seller Group not transferred to Buyer agree to provide, or cause to be provided to the Buyer, necessary authorizations, including powers of attorney to control any proceedings with any Taxing Authority which this Section 12.03 entitles such party to control.

12.04.  Definitions.  For purposes of this Section 12, the following terms shall have the meanings ascribed to them below:

(a)  "Accounting Firm" shall mean such independent national accounting firm upon which the Buyer and the Seller may agree.

(b)  "Current Tax Year" of the Seller, Marvel or any Marvel Subsidiary shall mean the particular annual accounting period that includes the Closing Date and is used by such entity for Tax purposes.

(c)  "Determination" shall have the meaning given to it in Section 1313(a) of the Code.

(d)  "Income Tax" and "Franchise Tax" shall mean any federal, state, county or local income Tax or franchise Tax (if

32

2021MARVEL-0068229

computed by reference to income) imposed by a governmental authority pursuant to the Tax Laws.  Income Tax and Franchise Tax shall also include any deficiency, penalty, addition to tax, interest, asssessment or other charges imposed by a governmental authority in connection with an Income Tax or Franchise Tax.

 (e)  "<u>Pre-Closing Operations</u>" shall mean all activities that are attributable to, or conducted by, Marvel and the Marvel Subsidiaries during any taxable period that ends on or prior to the close of business on the Closing Date, but shall not include (i) the deemed transfer of assets pursuant to a Section 338(g) Election; (ii) any transfer of the assets of Marvel or any Marvel Subsidiary considered or treated as having occurred on or prior to the Closing Date as a result of the transactions or elections contemplated by this Agreement; and (iii) any sale or other trans-action of Marvel or any Marvel Subsidiary occurring after the Closing Time but before the close of business on the Closing Date, but shall include any deductions, credits or other tax benefits which may effect Seller's Taxes (other than net operating or capital loss carrybacks) which may be determined with reference to periods ending after the Closing Date.

 (f)  "<u>Pre-Closing Tax Returns</u>" shall mean all Tax returns, information reports, and other documents and forms (whether submitted on a consolidated, combined, separate, or unitary basis) of Marvel or any Marvel Subsidiary for any taxable period that ends on or prior to the Closing Date, other than any deemed sales tax return required to be filed as a result of the making of a Section 338(g) Election.

 (g)  "<u>Buyer's Taxes</u>" shall mean any and all Tax (includ-ing Income Tax and Franchise Tax) to the extent the Buyer, Marvel or any Marvel Subsidiary are liable and responsible for the payment of any such Tax (either directly to a Taxing Authority or, indirectly, by payment to the Seller) under Section 12.02 of this Agreement.

 (h)  "<u>Section 338(g) Election</u>" shall mean an election described in Section 338(g) of the Code with respect to the Buyer's acquisition of the shares of Marvel from the Seller pursuant to this Agreement.  A Section 338(g) Election shall include any corresponding election under any other applicable Tax Laws that requires a separate election with respect to the Buyer's acquisition of the shares of Marvel from the Seller under this Agreement.

 (i)  "<u>Seller's Taxes</u>" shall mean any and all Tax (including Income Tax and Franchise Tax) to the extent the Seller is liable and responsible for the payment (or has made a payment) of such Tax (either directly to the Taxing Authority or, indi-

33

2021MARVEL-0068230

rectly, by payment to the Buyer) under Section 12.02 of this Agreement.

(j)  "<u>Seller Group</u>" shall mean the affiliated group of corporations (as defined in Section 1504(a) of the Code) of which the Seller (or any successor thereto) is the common parent corporation.  Seller Group shall also include any group of corporations of which the Seller (or any successor thereto) is the common parent corporation which is required or eligible to file a consolidated or combined or unitary state, county or local Income or Franchise Tax return.

(k)  "<u>Straddle Tax Returns</u>" shall mean all Tax returns, information reports, and other documents and forms (whether submitted on a consolidated, combined, separate or unitary basis) of Marvel and the Marvel Subsidiaries for any taxable period that begins prior to the Closing Date and ends after the Closing Date (other than Seller Group's consolidated federal Income Tax return or Seller Group's consolidated or combined or unitary state, county or local Income or Franchise Tax returns) and any deemed sale tax return required to be filed as a result of the making of a Section 338(g) Election.

(l)  "<u>Tax</u>" shall mean any federal, state, county, local or foreign income, gross receipts, excise, import, ad valorem, property, franchise, license, sales, use, stamp, transfer, estimated or interim, withholding or other tax imposed by a governmental authority pursuant to the Tax Laws.  Tax shall also include any deficiency, penalty, addition to Tax, interest, assessment, or other charges imposed by a governmental authority in connection with a Tax.

(m)  "<u>Tax Laws</u>" shall mean the Code, federal, state, county, local, or foreign income, franchise or other tax statutes, and any regulations or official administrative pronouncements released thereunder.

(n)  "<u>Taxing Authority</u>" shall mean any governmental authority having jurisdiction over the assessment, determination, collection, or other imposition of a Tax.

(o)  "<u>Treas. Reg.</u>" shall mean United States Treasury regulations promulgated under the Code.

ARTICLE XIII

<u>Miscellaneous</u>

13.01.  <u>Notices</u>.  All communications hereunder shall be in writing and shall be sent by registered or certified mail,

34

2021MARVEL-0068231

return receipt requested; if intended for Buyer, shall be
addressed to Andrews Group Incorporated, 21 East 63rd Street, New
York, New York 10021, Attn: Carl T. Tsang, with a copy to
Frederick W. McNabb, Esq. at 767 Fifth Avenue, New York, New York
10153, or at such other address of which Buyer shall have given
notice to Seller in the manner herein provided; and if intended
for Seller, shall be addressed to it, 1400 South Sepulveda
Boulevard, Los Angeles, CA 90025, Attn: Harry E. Sloan, with a
copy to Paul A. Baumgarten, Esq. of Rosenman & Colin, 575 Madison
Avenue, New York, New York, and a copy to Fredric N. Richman,
Esq., Richman, Lawrence & Mann, 9601 Wilshire Blvd., Beverly
Hills, California 90210 or at such other address of which the
Seller shall have given notice to Buyer in the manner herein
provided.

13.02.  <u>No Modification Except in Writing</u>.  This Agree-
ment shall not be changed, modified, or amended except by a writ-
ing signed by the party to be charged and this Agreement may not
be discharged except by performance in accordance with its terms
or by a writing signed by the party to be charged.

13.03.  <u>Entire Agreement</u>.  This Agreement, including the
Schedules and Exhibits hereto, sets forth the entire agreement and
understanding among the parties as to the subject matter hereof
and merges and supersedes all prior discussions, agreements and
understandings of every kind and nature among them, and no party
hereto shall be bound by any conditions, definition, warranty or
representation other than as expressly provided for in this Agree-
ment or as may be on a date subsequent to the date hereof duly set
forth in writing signed by the party hereto which is to be bound
thereby.

13.04.  <u>Severability</u>.  If any provision of this Agree-
ment or the application of any provision hereof to any person or
circumstances is held invalid, the remainder of this Agreement and
the application of such provision to other persons or circum-
stances shall not be affected unless the provision held invalid
shall substantially impair the benefits of the remaining portions
of this Agreement.

13.05.  <u>Assignment</u>.  This Agreement shall be binding
upon and inure to the benefit of the parties hereto and their
respective successors and permitted assigns.  This Agreement may
not be assigned by Seller, except with the prior written consent
of Buyer, but may be assigned by Buyer to a direct or indirect
subsidiary or affiliate of Buyer; <u>provided</u>, <u>however</u>, that such
assignment shall not release Buyer from its obligations hereunder.

13.06.  <u>Publicity; Announcements</u>.  All publicity related
to the transactions contemplated hereby (other than in connection

2021MARVEL-0068232

with governmental or regulatory filings) shall be subject to the mutual approval of the parties hereto and no public announcement of any of the transactions contemplated hereby or communication thereof to third parties (other than communications to the shareholders of Seller and Buyer) will be made by any party without the prior written consent of the other party, which consent will not be unreasonably withheld.

13.07.  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed wholly within said State without giving effect to conflict of laws principles.

13.08.  <u>Consent to Jurisdiction; Service of Process</u>. Seller and Buyer hereby consent and submit to the jurisdiction of the New York State Supreme Court or the United States District Court for the Southern District of New York in connection with any dispute arising out of this Agreement or the transactions herein contemplated.  Seller and Buyer agree that process in any such action, in addition to any other method permitted by law, may be served upon Seller and Buyer by registered or certified mail, return receipt requested, addressed to person and address to which notice hereunder is to be sent or to such other address as any party may designate as herein provided, and such service shall be deemed effective as if personal service had been made upon Seller or Buyer within New York County.

13.09.  <u>Captions and Cross References</u>.  The captions appearing in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope and intent of this Agreement or any of the provisions hereof.  Buyer acknowledges that while Seller has attempted to list all agreements and other information in each of the schedules as required by this Agreement, because of the volume of agreements and information to be listed and to avoid undue repetition in the various schedules, any agreement or information listed on one schedule hereto shall be deemed listed for all purposes on any other schedule hereto.

13.10.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original.

13.11.  <u>Confidentiality</u>.  Each of Seller and Buyer for themselves, their respective directors, officers, employees, agents, affiliates  and representatives (collectively, the "Representatives") covenant with each other that they will use all information relating to the other party hereto acquired by any of them pursuant to the provisions of this Agreement or in the course

36

of negotiations with or examination of the other party only in connection with the transactions contemplated hereby and shall cause all information obtained by them pursuant to this Agreement and such negotiations and examinations, which is not publicly available (other than as a result of disclosure by them or their respective Representatives), to be treated as confidential except as may otherwise be required by law or court order (in which case the other party shall be notified prior to disclosure of such information and given the opportunity to seek a protective order or other appropriate remedy) or as may be necessary or appropriate in connection with the enforcement of this Agreement or any instrument or document referred to herein or contemplated hereby. If the transactions contemplated by this Agreement are consummated, Seller, its Representatives and affiliates will hold or cause to be held in strict confidence all information, documents and other material relating to the business of Marvel and the Marvel Sudsidiaries, except as may be otherwise required by law or court order (in which case Buyer shall be notified prior to disclosure of such information and given the opportunity to seek a protective order or other appropriate remedy) or as may be necessary or appropriate in connection with the enforcement of this Agreement or any instrument or document referred to herein or contemplated hereby, and except as any such information has been disclosed publicly (other than by Seller or its Representatives in breach of its obligations under this Section 13.11). In the event of termination of this Agreement, (i) neither Buyer nor its Representatives will initiate discussions with respect to prospective employment of Marvel's management personnel for a period of one year from the date hereof; (ii) each party will cause to be delivered to the other all documents, work papers and other material obtained by it from the other, whether so obtained before or after the execution of this Agreement, (iii) each party agrees that it shall not itself use or disclose, directly or indirectly, any information so obtained, or otherwise obtained from the other hereunder or in connection therewith, and will have all such information kept confidential and will not use such information in any way, provided that (a) any party may use and disclose any such information which has been disclosed publicly (other than by such party in breach of its obligations under this section 13.11) and (b) to the extent that any party may become legally compelled to disclose such information it shall have used its best efforts, and shall have afforded the other parties the opportunity, to obtain an appropriate protective order, or other satisfactory assurance of confidential treatment, for the information required to be disclosed. Either party hereto may institute appropriate proceedings against the other to enforce its rights hereunder. The parties acknowledge that money damages would not be a sufficient remedy for any violation of the terms of this Section 13.11 and, accordingly, the parties hereto shall be entitled to specific performance and injunctive relief as remedies for any violation. These

2021MARVEL-0068234

remedies shall not be deemed to be the exclusive remedies for a violation of the terms of this Section 13.11 but shall be in addition to all other remedies available at law or equity. Notwithstanding anything to the contrary contained herein, the obligations of Buyer and Seller under this section 13.11 shall survive the termination of this Agreement.

13.12.  <u>Survival</u>.  All statements, certifications, indemnifications, representations and warranties made or delivered hereunder by Seller or Buyer, and their respective covenants, agreements and obligations to be performed pursuant to the terms hereof, shall survive the Closing Time, notwithstanding any examination by on behalf of either party hereto or any notice of a breach or of a failure to perform not waived in writing and notwithstanding the consummation of the transactions contemplated hereby with knowledge of such breach or failure, and (except with respect to (i) the provisions of section 3.06 and the last sentence of section 3.08, which shall survive until the expiration of the applicable statutes of limitation, and (ii) the first, second and third sentences of section 13.03 hereof, and the confidentiality provisions of section 13.11 hereof, which shall survive without limitation) the representations and warranties contained herein shall terminate on the first anniversary of the Closing Date, except to the extent either party gives notice to the other of any breach thereof on or before such anniversary date or the expiration of the applicable statute of limitations date; <u>provided</u>, <u>however</u>, that nothing herein contained shall modify or be construed to modify in any respect whatsoever any covenant, agreement or obligation to be performed by any party hereto pursuant to the provisions hereof.

13.13.  <u>Expenses</u>.  Each party shall bear its own expenses incurred in connection with the negotiation and preparation of this Agreement and the obligations required to be performed by it pursuant hereto.

13.14.  <u>Broker's or Finder's Fees</u>.  Except for fees payable to Kidder Peabody & Co. Incorporated, which fees shall be borne by Seller, neither Buyer nor Seller has dealt with anyone in a fashion that would incur any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement and each party shall hold the other harmless

38

2021MARVEL-0068235

pursuant to Article 10 hereof from any Losses incurred by such other party as a result of a breach of this Section 13.14, without regard to the Minimum Amount.

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement the day and year first above written.

NEW WORLD ENTERTAINMENT, LTD.

By /s/ Harry E. Sloan
      Harry E. Sloan, Co-Chairman

ANDREWS GROUP INCORPORATED

By /s/ William Bevins
      William Bevins, President

39

2021MARVEL-0068236