# EXHIBIT 62

Marc Toberoff (MT 4862)
*mtoberoff@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Pacific Coast Hwy, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Patrick S. Ditko, Administrator of the
Estate of Stephen J. Ditko*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVEL CHARACTERS, INC., | Case No.: 1:21-cv-07957-LAK |
| Plaintiff, | Hon. Lewis A. Kaplan |
| v. | **DEFENDANT'S ANSWER & COUNTERCLAIM** |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendant. | |
| PATRICK S. DITKO, in his capacity as Administrator of the Estate of Stephen J. Ditko, | |
| Counterclaimant, | |
| v. | |
| MARVEL CHARACTERS, INC. and DOES 1-10, inclusive, | |
| Counterclaim-Defendants. | |

## NATURE OF THE ACTION

1. Defendant Patrick S. Ditko ("Patrick Ditko" or Defendant"), as the Administrator of the estate of Stephen J. Ditko ("Steve Ditko"), admits only that he has exercised Steve Ditko's termination rights under the United States Copyright Act (the "1976 Act") by serving notices of termination on plaintiff Marvel Characters, Inc. ("MCI" or "Plaintiff") regarding comic book characters and stories created or co-created by Steve Ditko, and that MCI has brought this civil action for declaratory relief as set forth in its Complaint, but Defendant otherwise denies the allegations in paragraph 1.

2. Defendant admits only that the district court in *Marvel Worldwide, Inc. v. Kirby*, granted Marvel Worldwide, Inc. summary judgment against the statutory heirs of Jack Kirby, 777 F. Supp. 2d 720 (S.D.N.Y. 2011), *aff'd in part*, 726 F.3d 119 (2d Cir. 2013), and to the extent relevant, if any, respectfully refers the Court to these decisions for their contents, but Defendant otherwise denies the allegations in paragraph 2.

3. Defendant respectfully refers the Court to *In re Marvel Entertainment Grp.*, 254 B.R. 817 (D. Del. 2000) for its contents, to the extent relevant, if any, but Defendant otherwise denies the allegations in paragraph 3.

4. Defendant admits only that that MCI has brought this civil action for declaratory relief pursuant to 28 U.S.C. § 2201, as set forth in its Complaint, but Defendant otherwise denies the allegations in paragraph 4.

## PARTIES

5. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5, and on that basis denies the same.

6. Admitted.

## JURISDICTION AND VENUE

7.      Defendant admits only that Plaintiff purports to bring an action for declaratory relief under 28 U.S.C. §§ 2201, *et seq.*, and under the 1976 Act, 17 U.S.C. §§ 101, *et seq.* Paragraph 7 otherwise contains conclusions of law as to which no responsive pleading is required.

8.      Defendant admits only that Patrick Ditko holds the statutory termination rights of Steve Ditko under the 1976 Act. Paragraph 8 otherwise contains conclusions of law as to which no responsive pleading is required.

9.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the factual allegations contained in paragraph 9, and on that basis denies the same. Paragraph 9 otherwise contains conclusions of law as to which no responsive pleading is required.

## ALLEGATIONS

10.     Denied.

11.     Denied.

12.     Denied.

13.     Denied.

14.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 and on that basis denies the same. Defendant respectfully refers the Court to all documents referred to in paragraph 14 for evidence of the contents thereof.

15.     Defendant admits that between approximately June 1 and July 16, 2021, Patrick Ditko, as the Administrator of the estate of Steve Ditko, duly served four notices of termination

on MCI and related entities, pursuant to 17 U.S.C. § 304 (c) and the regulations promulgated thereunder. Defendant otherwise respectfully refers the Court to the documents referred to in paragraph 15 for evidence of the contents thereof.

16.     Defendant admits the allegations in paragraph 16 only to the extent such allegations accurately reflect the contents of documents, and respectfully refers the Court to such documents for evidence of the contents thereof.

17.     Defendant admits the allegations in paragraph 17 only to the extent such allegations accurately reflect the contents of documents, and respectfully refers the Court to such documents for evidence of the contents thereof.

18.     Admitted.

## COUNT I: ACTION FOR DECLARATORY RELIEF

### [As to the Validity of All Notices]

19.     Defendant re-alleges and incorporates by reference paragraphs 1-18 inclusive of his Answer, as though fully set forth herein.

20.     Admitted.

21.     Denied.

22.     Denied.

23.     Denied.

24.     Denied.

25.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25, and on that basis denies the same.

26.     Admitted.

27.     Defendant lacks knowledge or information sufficient to form a belief as to the

truth of the factual allegations contained in paragraph 27, and on that basis denies the same.

28.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the factual allegations contained in paragraph 28, and on that basis denies the same. Paragraph 28 otherwise contains conclusions of law as to which no responsive pleading is required.

29.     Defendant denies the allegations contained in paragraph 29, except admits that MCI purports to seek a declaratory judgment pursuant to 28 U.S.C.§ 2201.

## PRAYER FOR RELIEF

A.     With respect to the relief requested in paragraph A. of the Prayer for Relief, Defendant specifically and generally denies that MCI is entitled to any of the relief requested in said paragraph.

B.     With respect to the relief requested in paragraph B. of the Prayer for Relief, Defendant specifically and generally denies that MCI is entitled to any of the relief requested in said paragraph.

C.     With respect to the relief requested in paragraph C. of the Prayer for Relief, Defendant specifically and generally denies that MCI is entitled to any of the relief requested in said paragraph.

## AFFIRMATIVE DEFENSES

Defendant hereby additionally alleges the following as affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1.     The Complaint fails to state a claim upon which the relief sought or any relief could be granted.

4

## SECOND AFFIRMATIVE DEFENSE

### (Laches)

2.      Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## THIRD AFFIRMATIVE DEFENSE

### (Unclean Hands)

3.      Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

4.      The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of unjust enrichment.

## FIFTH AFFIRMATIVE DEFENSE

### (Claim Preclusion)

5.      The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of *res judicata* or claim preclusion.

## SIXTH AFFIRMATIVE DEFENSE

### (Issue Preclusion)

6.      The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of collateral estoppel or issue preclusion.

## SEVENTH AFFIRMATIVE DEFENSE

### (Duress)

7.      Plaintiff's claims are barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or

void because of duress.

### EIGHTH AFFIRMATIVE DEFENSE

### (Statute of Frauds)

8.     Plaintiff's claims are barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because of the Statute of Frauds.

### NINTH AFFIRMATIVE DEFENSE

### (Failure of Consideration)

9.     Plaintiff's claims are barred, in whole or in part, by the fact that any alleged contract between the parties or their respective predecessors-in-interest is unenforceable and/or void because the contract(s) lacked consideration.

### TENTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

10.     The Complaint and each purported claim therein is barred, in whole or in part, by Plaintiff's failure to bring such claims within the governing statute of limitations.

### ELEVENTH AFFIRMATIVE DEFENSE

### (Waiver)

11.     The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of waiver.

### TWELFTH AFFIRMATIVE DEFENSE

### (Acquiescence)

12.     The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of acquiescence.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Judicial Estoppel)

13.     The Complaint and each purported claim therein is barred, in whole or in part, by the equitable doctrine of judicial estoppel.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Equitable Estoppel)

14.     The Complaint and each purported claim therein is barred, in whole or in part, by the doctrine of equitable estoppel.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Defendant's Termination Notices Not Invalidated by Technical Errors)

15.     Under 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, Defendant's Termination Notices are not invalidated or curtailed due to technical errors or omissions, if any, since Defendant's intent to terminate all prior grants by Stephen J. Ditko of his copyright interests in all works listed in the Notices is made clear to Plaintiff in the Termination Notices timely served on Plaintiff.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Against Public Policy)

16.     Any contract alleged in the Complaint which is contrary to public policy is unenforceable, and any relief requested in the Complaint which is contrary to public policy should not be granted.

_____

17.     The Complaint fails to state the claims for relief therein with sufficient particularity to permit Defendant to discern and raise all appropriate defenses. Defendant may

7

have additional affirmative defenses available to him, which are not now fully known or of which Defendant is not fully aware. Defendant accordingly reserves the right to amend or supplement this answer with additional affirmative defenses after the same have been ascertained.

FOR THESE REASONS, Defendant prays that the Court dismiss all of Plaintiff's claim(s) and find for Defendant on Plaintiff's Count One, and that Defendant be awarded costs, including reasonable attorneys' fees under Section 505 of the United States Copyright Act, and pray for such other and further relief as this Court deems just and proper.

## COUNTERCLAIM

Counterclaimant Patrick S. Ditko, as the Administrator of the estate of Stephen J. Ditko (the "Ditko Estate" or "Counterclaimant"), for his Counterclaim against Marvel Characters, Inc. ("MCI" or "Counterclaim-Defendant") alleges as follows:

## NATURE OF THE ACTION

1. Stephen J. Ditko ("Steve Ditko") was a renowned comic book author and artist best known for creating "Dr. Strange," co-creating "Spider-Man," and creating or co-creating numerous other iconic characters in various original comic book stories (the "Stories"), published in the 1960s by MCI's alleged predecessors. The United States Copyright Act of 1976, 17 U.S.C. §304 (c) ("Section 304(c)"), provides authors such as Steve Ditko and their estates with the right to recover their fair share of the U.S. copyright to the author's creative work, after a lengthy period, by statutorily terminating *without cause* prior transfer(s) of copyright within delineated time "windows."

2. On June 1, 2021, June 8, 2021, and July 16, 2021, respectively, the Ditko Estate properly availed itself of its termination rights under Section 304(c) by serving MCI and their

8

affiliates, within the prescribed window, with four notices of termination ("Termination

Notices") regarding Steve Ditko's author or co-author share of the Stories based on his creative

material (the "Ditko Material"). The Termination Notices become effective in June – July 2023.

This Counterclaim principally seeks a declaratory judgment that the Ditko Estate's Termination

Notices are valid and effective under the Copyright Act.

3.     The Supreme Court clearly elucidated the objective of the Copyright Act's

termination provisions:

> The principal purpose of the [termination right] was to provide added benefits to
> authors ... to make the rewards for the creativity of authors more substantial. More
> particularly, the termination right was expressly intended to relieve authors of the
> consequences of ill-advised and unremunerative grants that had been made before
> the author had a fair opportunity to appreciate the true value of his work product.
> That general purpose is plainly defined in the legislative history and, indeed, is fairly
> inferable from the text of § 304 itself.

*Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985).

4.     Congress recognized that publishers held far greater bargaining power and that,

consequently, authors commonly agreed to one-sided grants, precluding them from sharing in their

works' success. *Id.* The results were often supremely unfair, as when a work proved to have

enduring commercial value but enriched *only* the publisher. Congress thus created termination

rights to "safeguard[] authors against unremunerative transfers" made before their works were

commercially exploited, and to give them a second chance to obtain a more equitable portion of

their works' value when it is no longer conjectural. H.R. Rep. No. 94-1476, at 124; *see also N.Y.

Times v. Tasini,* 533 U.S. 483, 496 n.1 (2001) (recognizing Congress' intent to adjust "the

author/publisher balance" by an "inalienable authorial right to revoke a copyright transfer").

## JURISDICTION AND VENUE

5.     This is an action for declaratory relief brought under 28 U.S.C. §§ 2201, *et seq.*,

and under the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq*. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.     This Court has personal jurisdiction over the Counterclaim-Defendant MCI because MCI is regularly doing business in the State of New York and in this district and maintains contacts within the State of New York and this district.

7.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a), because MCI is conducting business in this district and is subject to personal jurisdiction in this district.

## PARTIES

8.     Counterclaimant Patrick S. Ditko is an individual and a citizen of and resides in the State of New York, in the County of New York, and is and at all times has been a citizen of the United States. Counterclaimant is the brother of Steve Ditko and the Administrator of his estate.

9.     Counterclaimant is informed and believes and based thereon alleges that Counterclaim-Defendant MCI is a Delaware corporation, which has its principal place of business in Burbank, California, and which regularly conducts significant business in the State of New York.

10.     Counterclaimant is informed and believes and based thereon alleges that the fictitiously named Counterclaim-Defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions and circumstances alleged herein. The true names and capacities of such fictitiously named Counterclaim-Defendants, whether individual, corporate, associate, or otherwise are presently unknown to Counterclaimant, and Counterclaimant will amend this

Counterclaim to assert the true names and capacities of such fictitiously named Counterclaim-Defendants when the same have been ascertained. For convenience, each reference herein to MCI shall also refer to the Doe Counterclaim-Defendants and each of them.

11.     Counterclaimant is informed and believes and based thereon allege that each of the Counterclaim-Defendant and the Doe Counterclaim-Defendants was the agent, partner, servant, employee, or employer of each other, and that at all times herein mentioned, each of the Counterclaim-Defendant and the Doe Counterclaim-Defendants was acting within the course and scope of such employment, partnership and/or agency and that each is jointly and severally responsible for the damages hereinafter alleged.

## STATUTORY BACKGROUND

12.     The United States Copyright Act of 1976, 17 U.S.C. § 101 *et seq*. (the "Copyright Act"), provides an author with the inalienable right to recapture the copyright to the author's creative material, after a lengthy waiting period, by statutorily terminating without cause any prior express or implied transfer of such copyright. Termination is easily carried out by serving advance notice of termination on the original grantee or its successors and filing the notice with the U.S. Copyright Office, within delineated time "windows." 17 U.S.C. § 304(c).

13.     Section 304(c) provides for the termination of a pre-1978 transfer of rights under copyright by the author during a five (5) year period commencing fifty-six (56) years after the date the author's work first secured a statutory copyright (by registration or publication, whichever is earlier). *Id*. §§ 304(c)(3). The requisite notice of termination sets forth the "effective date" of termination, within the five-year termination "window," when the previously transferred rights under U.S. copyright will be recaptured by the author. Notice of termination may be served by the author, or if the author is deceased, by the author's statutorily defined heirs

or estate, at any time between ten (10) and two (2) years before the effective termination date. *Id*. § 304(c)(4)(A).

14.    True "works made for hire" are the sole exemption from the Copyrights Act's termination provisions. *Id*. § 304(c). Whether a work, created and published prior to January 1, 1978, is a "work made for hire," is determined under and is defined in Section 26 of the 1909 Copyright Act. Pub.L. 60-349.

15.    The termination right is the most important authorial right provided by the Copyright Act, short of copyright itself. Congress was therefore very protective of this right and, to that end, enacted a number of provisions to prevent any waiver or encumbrance of an author's termination interest. For instance, "[t]ermination of the [prior copyright] grant may be effected notwithstanding any agreement to the contrary [.]" *Id*. § 304(c)(5).

16.    Furthermore, "[h]armless errors in a [termination] notice that do not materially affect the adequacy of the information required to serve the purposes of . . . section [304(c)] of title 17, U.S.C. . . . shall not render the notice invalid."  37 CFR § 201.10(e)(1).

17.    Congress also anticipated that the exercise of an author's termination right would usually result in a new license by the author or author's estate to the terminated grantee (here, MCI). To that end, Congress provided that "grantee" with the exclusive opportunity to re-license an author's recaptured copyright "after the notice or termination has been served," but before "the effective date of the termination." 17 U.S.C. § 304(c)(6)(D). The termination provisions thus reflect a deliberate balance of competing interests by Congress.

18.    Under the termination provisions, all "derivative works" created prior to a termination notice's effective termination date "may continue to be" distributed and exploited by the grantee or grantee's successor, just as before. 17 U.S.C. § 304(c)(6)(A). The Ditko Estate's

recovery of Steve Ditko's author or co-author share of the U.S. copyright to the Stories therefore does not prevent MCI and/or its licensees from continuing to freely exploit prior derivative works, including films, television series and merchandising.

19.     In addition, as to the Stories that were *co-authored* by Steve Ditko, MCI and/or its licensees can continue to freely exploit such Stories, including in new derivative works, even *after* the effective termination date(s), subject only to a duty to account to the Ditko Estate for an equitable share of proceeds therefrom, and this only in the unlikely event MCI does not enter into a preemptive new license with the estate regarding such works.

20.     Lastly, because the Copyright Act has *no extra-territorial application*, all rights to the Stories in all foreign territories, remain with MCI, notwithstanding the Termination Notices, providing additional incentives for the parties to cooperatively work together in the future.

21.     As a result, the Termination Notices, if held effective, will likely result in a new license from the Ditko Estate to MCI, but one which more fairly reflects the time-tested market value of Steve Ditko's creative material. Accordingly, the exercise of statutory termination rights does not prevent the further exploitation of these works by MCI; it simply allows the Ditko Estate to fairly participate in the financial benefits of Steve Ditko's creative efforts, just as Congress intended. H.R. Rep. No. 94-1476, at 124 (1976).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

22.     Steve Ditko is considered one of the great comic book creators, and throughout his career he authored or co-authored numerous original comic book stories that were published by a variety of different publishers.

### Steve Ditko's Creation of the Stories in 1962-1966

23.     Between 1962 and 1966 (the applicable "Period"), Steve Ditko created or co-

created a number of superhero characters, including but not limited to "Spider-Man" and "Doctor Strange," in the original illustrated comic book Stories, authored or co-authored by him, which are the subjects of the Ditko Estate's Termination Notices.

24.     Because "work for hire" is the *only* exception to the Copyright Act's remedial termination provisions, MCI attempts to rewrite history in asserting that the Ditko Material was "work made for hire," owned at inception by MCI's alleged predecessors. This bears no relation, however, to the facts or realities of comic book publishing in the relevant Period.

25.     By 1959, comic book publishing was on the brink of bankruptcy, due in large part to criticism in Fredric Wertham's book, "Seduction of the Innocent," the ensuing 1954 hearings before the Senate Subcommittee on Juvenile Delinquency, and the resulting censorship imposed by the "Comics Code Authority." Subsequently, the market for comic books underwent a severe contraction which endured well into the 1960s.

26.     As such, the purported comic book publishing entities which MCI alleges are its predecessor(s) from this Period (individually and collectively, "MCIPP") were largely shell companies, of no resemblance to the structured, established company Marvel is today.

27.     In 1962-63, for instance, the MCIPP did not even have their own office and consisted of one alleged employee with a small desk behind a partition in a room occupied by others. By 1964, the MCIPP had at best a tiny one or two-room office, and very few or no employees (depending on the MCIPP). The impecunious MCIPP fed the printing presses of other entities with inexpensive comic book material *purchased* for publication from a variety of "freelancers," like Steve Ditko, working from home on their own steam.

28.     The Ditko Estate is informed and believes and based thereon alleges that after the Ditko Material was purchased by one such entity, it was published by a different entity in

varying periodicals (e.g., *Amazing Fantasy*, Vol. 1, No. 15; *Strange Tales*, Vol. 1, Nos. 102-147; *Amazing Spider-Man*, Vol. 1, Nos. 1-38; *The Fantastic Four Annual*, Vol. 1, No. 2; *Strange Tales Annual*, Vol. 1, No. 2; and *Amazing Spider-Man Annual*, Vol. 1, Nos. 1-2).

29.     The Ditko Estate is further informed and believes and based thereon alleges that the copyrights in these periodicals, containing the Stories, were registered with the United States Copyright Office by and in the name of still different entities (e.g., Atlas Magazines, Inc., Non-Pareil Publishing Corporation, and Vista Publications, Inc.). As such, there was little continuity or substance to the use or participation of these revolving entities or MCIPP to support MCI's conclusion that the Ditko Material qualified as "work made for hire" under and as defined in the 1909 Copyright Act.

30.     Notably, even the MCIPP's contemporaneous copyright registrations by these assorted shell companies did not list or describe their copyrighted periodicals or the Stories therein, as "works made for hire," as was common legal practice for copyright registrations of actual "works for hire."

31.     As a freelancer, Steve Ditko created the Ditko Material, used in the stories he authored or co-authored, largely on his own and at his own expense. The MCIPP conspicuously never entered into any employment or any other engagement agreement with Steve Ditko.

32.     Steve Ditko was *not* employed by any MCIPP, either as a traditional employee *or* even as an independent contractor.

33.     Steve Ditko was thus not guaranteed a salary, wage or compensation for his time or services by any MCIPP, which purposefully avoided such legally binding financial obligations. And because the MCIPP had no employment agreement with Steve Ditko, the MCIPP also had no legal right to control his *creation* of the Ditko Material, at his home, on his

15

own time, and at his own expense.

34.    The MCIPP, by design, was also under no legal obligation to accept for publication and pay for the material created by Steve Ditko, or by any other freelancer. Accordingly, like many comic book writers and artists during this time of economic uncertainty, Steve Ditko worked hand to mouth, at his own premises, using his own instruments and materials, and he thereby bore the entire financial risk of *creating* the Ditko Material in question.

35.    Upon completion, Steve Ditko submitted his material to the MCIPP. If the MCIPP chose, in its sole discretion, to accept it for publication, it purchased the Ditko Material by the page. The MCIPP did *not* pay for submitted pages that it rejected, in its sole discretion, nor did it own such rejected material, underscoring that the nature of this was a purchase, as a matter of law, subsequent to creation, and that the Ditko Material was not "work made for hire," owned at inception by an MCIPP.

36.    The Ditko Estate is informed and believes and based thereon alleges that accordingly, the back of MCIPP checks issued to buy the Ditko Material contained a printed legend, which stated that by endorsement of the check, the payee acknowledges his *assignment* of the copyright in his material—the legal opposite of a "work for hire."

37.    Once the MCIPP purchased the Ditko Material, it, of course, was free to do with it what it pleased, including any alteration or additions thereto, and the copyright registration of the periodicals, containing the Stories authored or co-authored by Steve Ditko.

38.    One MCIPP allegedly employed Stan Lee. However, Lee's creative contributions, including to the Ditko Works, if any, were made by Lee as a freelance writer, not as an MCIPP employee. Thus, separate and apart from Lee's employee salary, the MCIPP always paid Lee by the page for his creative contributions, just like it did Steve Ditko and the other freelancers that

16

sold their material to the MCIPP.

39.     The MCIPP did not assign Steve Ditko stories to illustrate.

40.     For instance, *Dr. Strange* originated with a complete illustrated five-page story with a panel/page script, solely authored by Steve Ditko "on spec" and on his own. Accordingly, in a letter published in The Comic Reader #16 (February 23, 1963), Stan Lee wrote:

> "Well, we have a new character in the works for Strange Tales, just a 5-page filler named Dr. Strange …'Twas Steve [Ditko]'s idea."

41.     This was likewise confirmed by Steve Ditko in a 2007 essay:

> "On my own, I brought in to Lee a five-page, penciled story with a page/panel script of my idea of a new, different kind of character for variety … My character wound up being named Dr. Strange because he would appear in Strange Tales."

42.     Steve Ditko would both author and plot the stories of the Ditko Works and illustrate the Ditko Works. Thereafter, Stan Lee would add dialogue and captions. In fact, under the so-called "Marvel Method" at the time, an illustrator was looked upon to originate and plot his own stories.

43.     Of Steve Ditko's work in general, Stan Lee, wrote in his published book <u>Doctor Strange Master of the Universe</u> (Fireside Press, 1979):

> "Steve Ditko is one of the best plot men in the business. After Steve did the hard part — after he dreamed up the story and illustrated it … I then got to do the fun part. I wrote … the dialog balloons …".

44.     With respect to *Spiderman*, Stan Lee similarly stated in an interview, published in the New York Herald Tribune (January 9, 1966):

> "Steve Ditko, the artist, has been doing the stories . . . making up his own stories. He won't let anyone else ink his drawings either. He just drops off the finished pages with notes at the margins and I fill in the dialogue. I never know what he'll come up with next, but it's interesting to work that way."

45.     Notwithstanding that Steve Ditko created and plotted his own stories, the MCIPP

17

did not bother to pay him anything for this. Instead, Stan Lee habitually took the writing credit such that the MCIPP paid him the "writer's share" of money paid to purchase such freelance stories.

46.     Given the above facts and circumstances, the Ditko Material was not "work made for hire" for any MCIPP under the 1909 Copyright Act.

**Steve Ditko's Estate Exercises His Termination Rights Under the Copyright Act**

47.     On June 1, 2021, June 8, 2021, and July 16, 2021, respectively, the Ditko Estate served by first class mail, postage prepaid, the Termination Notices, pursuant to the Copyright Act, 17 U.S.C. § 304(c) on MCI and its affiliates, duly terminating all express or implied grants or transfers by Steve Ditko to the MCIPP of his copyright interests in the Stories. Copies of these Termination Notices are attached hereto as Exhibit "A."

48.     The copyrights to the periodicals containing the Stories were renewed by MCI or its alleged predecessor(s) with the United States Copyright Office, and such renewal registrations served to renew the copyrights to the constituent Stories.

49.     The Termination Notices were drafted and served on MCI and related entities, and submitted to the United States Copyright Office for recordation, all in full compliance with the Copyright Act, 17 U.S.C. § 304(c), and the regulations promulgated thereunder by the Register of Copyrights, 37 C.F.R. § 201.10.

50.     The Termination Notices will terminate, on the respective effective termination dates set forth therein, all operative prior grants or transfers by Steve Ditko to an MCIPP of his copyright interest as an author or co-author of the Stories.

51.     On the effective termination dates, the Ditko Estate will duly recover ownership of Steve Ditko's copyright interest as an author or co-author of the Stories for their extended

renewal terms.

## COUNT ONE

(Declaratory Relief: Termination Notices Are Valid and Effective Under 17 U.S.C. § 304(c))

52.     The Ditko Estate re-alleges and incorporates by reference paragraphs 1 through 51 of this Counterclaim inclusive, as though fully set forth herein.

53.     By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between the parties under federal copyright law, concerning the validity and effect of the Termination Notices.

54.     The Ditko Estate contends and MCI denies that the Termination Notices are valid and effective under the Copyright Act, 17 U.S.C. § 304(c).

55.     Steve Ditko was never employed by MCI's alleged predecessor(s) as either an employee or as an independent contractor.

56.     MCI's alleged predecessor(s) therefore had no legal right to control Steve Ditko's creation of the Ditko Material, and once completed, it had no legal obligation to pay Steve Ditko for his material unless it was accepted, in its sole discretion, for publication.

57.     The Ditko Material was therefore not created by Steve Ditko at the "instance and expense" of MCI's alleged predecessor(s), and instead was purchased subsequent to Steve Ditko's creation of the material on a freelance basis at his own expense.

58.     The Ditko Material, comprising his contribution to the Stories, was therefore by no means "work made for hire" under and as defined in Section 26 of the 1909 Copyright Act. Pub.L. 60-349.

59.     A declaration of the Court is necessary and appropriate at this time so that the parties may know their respective rights and obligations regarding the Termination Notices and

Stories.

60. Accordingly, the Ditko Estate seeks pursuant to 28 U.S.C. § 2201 a declaratory judgment from this Court that its Termination Notices are valid and effective under the Copyright Act.

## PRAYER FOR RELIEF

WHEREFORE, the Ditko Estate prays for a judgment against MCI as follows:

1. For a declaration that its Termination Notices are valid under the Copyright Act, and as to the parties' rights and obligations regarding the Stories;

2. For reasonable attorney's fees and costs of suit; and

3. For such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Date: December 7, 2021

By: _____ */s/ Marc Toberoff* _____
Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
*mtoberoff@toberoffandassociates.com*
23823 Pacific Coast Hwy, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Patrick S. Ditko*,
Administrator of the Estate of Stephen J. Ditko

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendant and

Counterclaimant Patrick S. Ditko hereby demands a trial by jury on each claim for relief and/or

issue that is triable by a jury.

Respectfully submitted,

Date: December 7, 2021

By: _____ */s/ Marc Toberoff* _____
                    Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
*mtoberoff@toberoffandassociates.com*
23823 Pacific Coast Hwy, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Patrick S. Ditko*,
Administrator of the Estate of Stephen J. Ditko