# EXHIBIT 1

# EXPERT REPORT OF MARK EVANIER
## (SUPPLEMENTED)

## I.    INTRODUCTION

I am informed that Nanci Solo and Erik Colan, Keith A. Dettwiler, Michele Hart-Rico and Buz Donato F. Rico III, Patrick S. Ditko, and Larry Lieber ("Defendants") have served Marvel and filed with the U.S. Copyright Office notices of termination under the Copyright Act to recover, respectively, Gene Colan, Don Heck, Don Rico, Steve Ditko, and Larry Lieber's ("Creators") copyrights in works that each created or co-created that were published by Marvel or its alleged predecessors ("Marvel") between 1962 and 1975 (the "Period"). I have also been informed that Marvel sued Defendants challenging their termination notices by arguing that all the works created by independent freelancers, including the Creators, during the Period, were allegedly "works for hire," owned at inception by Marvel.

To assist the Court and jury in making their determinations, and to help place the subject matter of the current actions in their true historical context, I have been asked to opine on the history of comic book publishing, the customs and practices in the comic book industry during the Period, and, in particular, the evolution of those customs and practices at Marvel, including the working relationship such comic book publishers had with freelance writers and artists in the relevant Period. Set forth below are my opinions regarding these topics

As my report is based on my current knowledge and information, I reserve the right to supplement or revise my report in the event new information later becomes available to me.

I am not receiving any payment of money or other form of compensation for this report or my opinions.

## II.    QUALIFICATIONS

I have been involved in the comic book industry for over fifty years as a writer, columnist, and historian. I have written numerous books on the history of comic books, including *Kirby: King of Comics* (2008), which won both the prestigious Eisner and Harvey Awards. It was the definitive biography of Marvel/Disney Legend Jack Kirby. I

was also the author of, among other works, *Mad Art* (2002)*,* a history of *Mad* Magazine, *Marvel Mini-Books*, the definitive history of an unusual line of comics published by Marvel in the 1960s, and contributed historical essays to two separate editions of *Fantastic Four #1: Panel by Panel*, a detailed examination of the first super-hero comic published by Marvel in the 1960s. I also contributed a detailed historical essay in a similar book being published later this year that discusses and analyzes the first *Spider-Man* comic book.

    As a comic book historian, I have written about, and acted as, an advisor to most of the major comic book publishers, including Marvel, DC Comics, and Dark Horse Comics. I have consistently served as a moderator or panelist at numerous comic book industry events, including the Comic-Con International in San Diego, where, for over forty years, I have routinely interviewed the comic book "greats," including Stan Lee, Will Eisner, Ray Bradbury, Jack Kirby, Gene Colan, Larry Lieber, Roy Thomas, Irwin Donenfeld, Al Feldstein, John Buscema, Sal Buscema, Joe Sinnott, Gil Kane, Neal Adams, Marie Severin, John Romita, Don Rico, Joe Kubert and hundreds of others. For my efforts in recording and preserving the history of the comic book art form, I received the esteemed Bob Clampett Humanitarian Award in 2001.

    In addition, the convention awards the industry's top honor, the Will Eisner Award, which is given for excellence in the creation of comic books, and I have been awarded four "Eisners" and have been nominated seven times. The other major award in the comic book field is called the "Harvey" and I have been nominated three times for this award and have won twice. In addition, I serve as the administrator of the Bill Finger Award for Excellence in Comic Book Writing, which is presented each year at Comic-Con to honor the previously unacknowledged co-creator of Batman.

    I have been called upon to write numerous forewords and introductory material for books about comics, including many reprint volumes published by Marvel, DC, Dark Horse, IDW and other publishers, and to appear on television programs and supplemental DVD materials dealing with animation and comics. These include the foreword for the recent *Marvel Masterworks: The Mighty Thor* Vol. 6 (reprinting past issues of *The Mighty Thor*) and *Marvel Masterworks: The Inhumans*.

At Stan Lee's request, I appeared on an episode of the TV series, *Biography* (broadcast on the A&E Network and released on home video) detailing his life and career. I was interviewed as well for the feature-length documentary *With Great Power– The Stan Lee Story* and I also worked for Mr. Lee as the Vice-President of Creative Affairs at Stan Lee Media, a firm he presided over for a time.

I have also acted as an informal advisor and historian for most of the major comic book publishers, including DC, Marvel, and Dark Horse. All these publishers have called on me from time to time to help them establish facts about their past publications and contributors. For example, I have been asked by staffers at Marvel to identify who "inked" particular Marvel comic book issues, and to determine the identity of pseudonymous contributors to various materials it has published in the past.

My first sale as a professional writer came in 1969, when I was 17 years old, and soon after I was hired by a Los Angeles-based firm that was operating a licensed Marvel fan club, called Marvelmania, which advertised in Marvel comics. The "club" was a means of merchandising items such as posters and decals of the Marvel characters, and I was hired as the local firm's in-house expert and as the editor of a fan magazine that Marvel also authorized. While I was still working in that position, I was hired as an apprentice by Marvel's most prolific artist and co-creator Jack Kirby (*Captain America, The Fantastic Four*, *The Mighty Thor, The Incredible Hulk, The Avengers, X-Men, Ant-Man,* etc.). I assisted him with storylines, handled research, co-authored the letter pages in his comic books, and did a limited amount of art production work. While apprenticing under Kirby, I began working as a comic book writer for The Walt Disney Company and also for Western Publishing, which was issuing comic books published under the Gold Key imprint (*Bugs Bunny*, *Daffy Duck*, *Porky*, etc.). Shortly after that, I was hired as the editor and head writer for the Edgar Rice Burroughs estate (*Tarzan*).

I began writing for television in the mid-1970s, including *The Nancy Walker Show*, *Cheers, That's Incredible*, *Love Boat, Superboy, Pryor's Place, Bob* (starring Bob Newhart as a comic book artist), and *Welcome Back, Kotter*, and animated series such as *Scooby Doo*, *Plastic Man*, *Thundarr the Barbarian*, *The ABC Weekend Special, CBS Storybreak*, *Richie Rich*, *The Wuzzles*, *Superman: The Animated Series, Dungeons & Dragons, Garfield and Friends*, and *The Garfield Show*.

I have been nominated for three Emmy Awards for my work on *Garfield and Friends* (two) and *Pryor's Place* (one). In 2003, I was awarded the Lifetime Achievement Award in Animation Writing by the Animation Writers Caucus of the Writers Guild of America, West ("WGAw").

From 1977 to 1982, I ran the comic book division of Hanna-Barbera Studios, as editor and head writer. In addition, I have written and edited numerous comic books, including writing DC Comics' *Superman Adventures*, *The New Gods*, and *Blackhawk*, on which I served as both the writer and the editor. Since 1983, I have collaborated with artist Sergio Aragonés on the long-running comic book series, *Groo the Wanderer*, previously published by Marvel Comics, and currently published by Dark Horse Comics. I also co-created, wrote and edited several other comic books series including *The DNAgents* (with Will Meugniot) and *Crossfire* (with Dan Spiegle), both published by Eclipse Comics; *Hollywood Superstars* (with Spiegle), published by Marvel, and *Magnor* (with Aragonés), published by Malibu Comics.

I have significant personal knowledge of many facts referenced herein and further knowledge from conducting hundreds of interviews of the creators of comic books published in the 1960s and 1970s by Marvel Comics, DC Comics, and other publishers, and from my research and writing over the past half-century on the history, methods, customs, and practices of the comic book industry. My knowledge includes, without limitation, facts learned from my relationships with each of the entities noted herein, and from professional and personal relationships with freelance artists and writers and Marvel staffers who worked on comic books published by Marvel during the relevant Period, and from my considerable research into the history, methods, customs, and practices in the field, undertaken in both my personal and professional endeavors.

### III.   PRIOR CASES

I served as an expert witness in a 1997 lawsuit filed by writer Marvin Wolfman against Marvel Characters, Inc.

I served as an expert witness in a 2004 lawsuit filed by Joanne Siegel and Laura Siegel Larson against Warner Bros. Entertainment, Inc., Time Warner, Inc. and DC Comics.

I served as an expert witness in a 2010 lawsuit filed by Marvel Characters, Inc. and its affiliates against the heirs of Jack Kirby.

## IV.    PUBLICATIONS

Books:

- *Comic Books and Other Necessities of Life* (TwoMorrows Publications, 2002)
- *Wertham Was Right!* (TwoMorrows Publications, 2003)
- *Mad Art* (Watson-Guptill Publishing, 2003)
- *Super-Heroes In My Pants* (TwoMorrows Publications, 2004)
- *Kirby: King of Comics* (Abrams, 2008)
- *Marvel Mini-Books* (Abrams, 2021)

Forewards to Books

- *Pogo Vol. 8* (Fantagraphics Books, 2022)
- *Marvel Mini-Books* (Abrams, 2021)
- *Fantastic Four #1, Panel by Panel* (Abrams, 2021)
- *Fourth World Omnibus* (DC, 2021)
- *Pogo Vol. 7* (Fantagraphics Books, 2020)
- *Pogo Vol. 6* (Fantagraphics Books, 2019)
- *Jack Kirby's Dingbat Love* (TwoMorrows, 2019)
- *Pogo Vol. 5* (Fantagraphics Books, 2018)
- *Pogo Vol. 4* (Fantagraphics Books, 2017)
- *Incredible Science-Fiction* (Dark Horse, 2017)
- *Pogo Vol. 3* (Fantagraphics Books, 2014)
- *Art of the Simon and Kirby Studio, The* (Abrams, 2014)
- *Doug Wildey's Rio: The Complete Saga* (IDW Publishing, 2014)
- *Creepy Presents Steve Ditko* (Dark Horse, 2013)
- *Pogo Vol. 2* (Fantagraphics Books, 2012)

Comic Books

- *Comics for Ukraine: Sunflower Seeds* (IDW Publishing, 2023)
- *Groo: Gods Against Groo #1* (Dark Horse, 2023)
- *Groo: Gods Against Groo #2* (Dark Horse, 2023)

- *Kamandi, The Last Boy On Earth Vol. 1* (DC, 2022)
- *New Gods Book Two: Advent of Darkness* (DC, 2022)
- *Groo Meets Tarzan* (Dark Horse, 2022)
- *Groo Meets Tarzan #1-4* (Dark Horse, 2021)
- *New Gods Book One: Bloodlines* (DC, 2021)
- *Weird Mystery Tales #1* (DC, 2020)
- *Garfield: Snack Pack Vol. 2* (KaBOOM!, 2019)
- *Garfield: Snack Pack Vol. 1* (KaBOOM!, 2018)
- *Garfield Original Graphic Novel: Trouble in Paradise* (KaBOOM!, 2018)
- *Garfield Original Graphic Novel: Search for Pooky* (KaBOOM!, 2018)
- *Jack Kirby 100th Celebration Collection* (DC, 2018)
- *Darkseid Special #1* (DC, 2017)
- *Grumpy Cat/Garfield Collection* (Dynamite Entertainment, 2017)
- *DC/Looney Tunes 100Page Spectacular* (DC, 2017)
- *Groo: Play of the Gods* (Dark Horse, 2016)
- *Groo: Fray of the Gods #1* (Dark Horse, 2016)
- *Superman & Bugs Bunny* (DC, 2016)
- *Groo: Friends and Foes Vol. 3* (Dark Horse, 2016)
- *Garfield* (KaBOOM!, 2016)
- *Garfield's Cheesy Holiday Special* (KaBOOM!, 2015)
- *Garfield Vol. 7* (KaBOOM!, 2015)
- *Garfield Vol. 6* (KaBOOM!, 2015)
- *Garfield Vol. 5* (KaBOOM!, 2014)
- *Hollywood Superstars* (About Comics, 2014)
- *Groo vs. Conan* (Dark Horse, 2014)
- *Groo vs. Conan #1-4* (Dark Horse, 2014)
- *Groo: Friends and Foes Collected Edition* (Dark Horse, 2014)
- *Groo: Friends and Foes Vol. 3* (Dark Horse, 2014)
- *Groo: Friends and Foes Vol. 2* (Dark Horse, 2014)
- *Groo: Friends and Foes Vol. 1* (Dark Horse, 2014)

- *Groo: Friends and Foes #1-12* (Dark Horse, 2014)
- *Garfield Vol. 4* (KaBOOM!, 2014)
- *Rocky and Bullwinkle #1-4* (2014, IDW Publishing)
- *Garfield Vol. 3* (KaBOOM!, 2014)
- *Garfield Vol. 2* (KaBOOM!, 2013)
- *Garfield Vol. 1* (KaBOOM!, 2013)
- *Solo Deluxe Edition* (DC, 2013)

## V.    ANALYSIS

### a.    Historical Background of the Comic Book Business and Marvel

1.    *The Comic Book Business was Extremely Volatile; Publishers Cut Costs Forcing Writers and Artists to Work as Freelancers with No Financial Security.*

From its beginnings in the 1930s to the 1960s and beyond, comic book publishing was very much a fly-by-night business that germinated during the Great Depression. The first comic books were merely reprints of contemporary newspaper comic strips, re-pasted into a comic book page format. When publishers could not acquire reprint rights to newspaper strips (or did not want to pay the fees for such), they purchased content from young, aspiring writers and artists. Comic book publishers did not see any lasting value in their product beyond monthly sales figures.

Little attention was paid to the copyrights and ownership of the newly created material. The comic books were of a disposable nature, printed on the cheapest paper via the least expensive process available. There was no expectation that it would ever be reprinted and little thought that the characters would be merchandized or exploited in other media. The writers and artists who created the material were mostly young, Depression-era kids who were desperate for work to put food on the family table. The industry appeared so shaky, and in some cases had such a bad reputation, that most regarded it as temporary employment until they could apply their talents for writing and/or drawing to something more prestigious, lucrative and stable. Even Stan Lee, who I further discuss below, did not put his real name on what he wrote or edited. He was

saving that for the career he hoped to have after he moved on from comics to something better.

At some companies, they worked on the premises as employees, paid by the hour or the week to write and draw stories, usually at long rows of desks that resembled a factory sweatshop. At others, the work was all freelance. These writers and artists worked at home and submitted their output to an editor who might or might not purchase it for publication on a per-page basis. The writers and artists were only paid if their material was accepted. They were not paid for their time, labor or services, their finished material was purchased by the page if the publisher liked and accepted it, in the publisher's sole discretion.

Both methods were used at different times at the company we now know as Marvel Comics, which was started by a man named Martin Goodman. During the 1940s, his comic book operation was usually referred to as Timely Comics ("Timely"). Goodman had a background in magazine distribution and, with borrowed funds, he set up his own company which at first published "pulp" magazines. They were cheaply-printed periodicals filled with short stories, usually adventure or romance pieces, sometimes both. It was not the success Goodman hoped for, so he began looking for other kinds of things to publish that might prove more lucrative. When he heard about the rising popularity of comic books—in particular, super-hero comic books—he decided to give that a try.

And so, in 1939, Timely Comics began with the publication of *Marvel Comics* No. 1, containing material he bought from an outside editorial service called Funnies, Inc. The book was a financial success and Goodman decided to start his own in-house comic book division, which he did by engaging Joe Simon, who was one of the creators of material for Funnies, Inc. Simon, in turn, suggested the hiring of Jack Kirby, an artist with whom he was then collaborating on freelance material sold to several publishers.

For Goodman, they produced many comics but the runaway best seller was Simon and Kirby's creation, *Captain America,* which they produced while on staff with Timely while simultaneously continuing to freelance for other publishers. Simon and Kirby produced ten issues of *Captain America*, along with other titles published by Timely. Their agreement with Goodman called for them to receive 25% of the profits on new

creations but they soon came to believe they were being cheated and in 1941 left to create material for publication by DC Comics.

Goodman then elevated a young man named Stanley Lieber, who had originally been hired as an office boy and apprentice writer. Lieber was the nephew of one of Goodman's business managers who soon married into the Goodman family, making Stan the publisher's relative. Under the pen name "Stan Lee," Lieber began writing stories for Timely and learning the editorial ropes from Simon and Kirby. When they left, his appointment to Timely's editorial position in 1941 was meant to be temporary, but apart from a brief time away for military service, Stan Lee (as he was soon known to all) remained in charge until well into the 1970s, and held other positions with the company even after that.

Goodman published every kind of comic book he could try out, including but not limited to westerns, romance, crime, war comics, horror stories, books featuring "funny animal" characters and superheroes. Many were designed to resemble something he'd heard was selling well for a competitor. Some books lasted a few years. Others were cancelled after a few issues. But until the debut of *Fantastic Four* in 1961, few comics had much longevity and almost none were merchandized or adapted into other media. Goodman was known throughout the business as a man who imitated what was selling for other publishers and often flooded the stands with knockoffs. When, for example, he learned that a company called EC Publications was enjoying success with three comics it was publishing of horror stories, Goodman quickly put out somewhere between sixty to seventy similar comics, most of which did not last more than a few years.

In the mid-1940s, Timely moved to large offices on the 14th floor of the Empire State Building. There, Timely maintained an in-house "bullpen" of staff artists creating comic book stories on salary. In late 1949, Goodman discovered a closet full of unused artwork, and as a result of this surplus of art, along with changes in New York employment tax laws, decided that firing the entire bullpen of artists and using up the surplus art would be financially beneficial. Goodman only retained production assistants and editors as employees. Artists formerly employed in the Timely "bullpen," such as Syd Shores, Mike Sekowsky, Joe Maneely, Dan DeCarlo, and Carl Burgos, suddenly found themselves freelance artists, working from home studios, creating comic book

characters and stories at their own expense, in the hopes of selling those creations to Timely.

In 1954, Fredric Wertham's book *Seduction of the Innocent* was among numerous public voices that accused comic books, particularly those featuring crime and horror stories, of poisoning the minds of America's youth. This sparked a number of Senate hearings, and the resulting public backlash and boycott brought the comic book business to the brink of ruin. Goodman did not cease publishing comic books, but wound up losing his distribution channels and had severely limited means to get his product to what remained of the marketplace. Almost overnight, he went from publishing 40-45 comics per month down to eight, resulting in another surplus of completed material. Goodman had Lee inform all the writers and artists (now freelancers) that, once again, he would not be buying any work from them.

By 1958, Timely, which by then was also going by the name Marvel Comics (and briefly Atlas Comics), had used up enough of its surplus inventory such that Stan Lee needed to slowly resume the purchase of freelance scripts and artwork at a low page rate.

By the decade's end, Marvel/Atlas had virtually no staff other than Stan Lee, who acted as both editor and art director in a cramped office on Madison Avenue, publishing only a handful of titles per month. The company typically split its output between Westerns, "teen" comics like *Millie the Model*, romance comics, and hybrid science fiction/monster comics.

  2.    *The "Marvel Method": Using Freelance Artists to Plot and Draw*
        *Comic Book Stories to Reduce Costs.*

When Marvel Comics began buying freelance artwork from artists once again, the main artists Lee turned to were Jack Kirby, Steve Ditko, Don Heck, and, on occasion, Gene Colan. Kirby and Colan were simultaneously selling work to DC Comics, Ditko was selling to Charlton Comics and Heck was freelancing outside the comic book business. All of these artists and several others had to quickly become accustomed to a relatively new way that Stan Lee wished to operate. It became known as the "Marvel Method," and was developed both to relieve the short-staffed Lee of his heavy workload and to take advantage of the artists' skills as storytellers.

Normally in the 1960s at a company like DC Comics, a detailed, panel-to-panel script would be handed to an artist to literally "fill in." The writer of the script would have little (usually no) contact with the artist. That writer would create the entire plot and indicate in his script what happened in each panel, what the artist was to draw in each panel, and what words would appear in the captions and the word balloons that contained each character's dialogue.  The artist contributed little to the plot, and what the characters said and did, and the artist certainly did not add new characters.

This was not the case at Marvel from the early 1960s on and during the relevant Period. Instead, under what he called the "Marvel Method," they deviated proudly from common industry practice of the time.  Lee would simply talk to the artists about potential story ideas. Sometimes Lee would come up with the basic idea but sometimes the artist would, and other times, the idea would be a collaborative effort. In any event, the artist would then plot a detailed story as well as illustrate the story in panels, plus suggest dialogue to be included in the balloons and descriptions to be included in the captions.

Following these informal meetings in person or over the phone, the artist would draw out the entire comic in pencil, working out the actual storyline and deciding what the action should be in each panel to tell that story.  If a situation seemed to require a new character, the artist would add in a new character.  Prior to the 1960s, by contrast such decisions at Marvel had traditionally been made by the writer of the comic book, not the artist, and throughout the 1960's, this continued to be the case for works published by other comic book companies such as DC Comics.

The artist would then bring or mail his creative material to Marvel and show it to Stan Lee, who made the decision whether Marvel would buy the artist's work or not. If Marvel accepted and purchased the artist's page, Lee would then write the dialogue in the "balloons" based on the artists' illustrated story, and suggestions.

As Stan Lee himself noted on many occasions, "plotting" with Ditko, Kirby and a few others artists, could often be accomplished in a matter of minutes, and in later years it might be done via a brief phone call with the artist telling Lee what he intended to provide for the next issue. With those who had proven themselves reliable, Lee would frequently offer only a bare-bones idea, or the name of a character, and sometimes not

even that. An artist would plot and illustrate a story, drawing out the idea, expanding on it as necessary and inventing new characters where needed. Ditko, for example, had a large chart in his studio which mapped out the future development of the character so he could introduce elements into current issues and then use those elements in issues many months down the line. The artist, who was rarely credited as anything but the artist, often wrote extensive margin notes, including suggested captions and dialogue, so that when Lee dialogued the balloons, he would know what story points the artist felt should be made in each panel and what the characters would likely say consistent with the story the artist had plotted. Under the Marvel Method, the artist, in essence, acted as both writer and artist of his works. Lee would then dialogue the balloons based on the artist's illustrated story, notes, suggestions and at times, a brief conversation.

This new and unusual breakdown of the roles of writer and artist, with the artist assuming much of what had traditionally been done by writers led to much confusion and debate within the comics community. Some artists working this way felt that they were co-writing the comics without pay or credit, and sometimes doing even more than merely "co-writing." To further complicate matters, the terminology became ambiguous with the "writer" sometimes being defined by some, including Lee, to denote only the composition of the dialogue and captions, excluding the invention of storylines or the creative decisions regarding what occurred in each panel—creative contributions normally attributed to a writer. This definition of "writer" permitted Lee or others to receive the full writer's page rate on any given work for just writing the captions and balloon dialogue of a comic book.

In the mid-1960s, to placate some artists' complaints, Marvel altered the standard form of their credits. Instead of saying, "Written by Stan Lee, drawn by Gene Colan," a credit might say, "A Lee-Colan Production" with no designation as to who had done what. Other artists, such as Steve Ditko, demanded and got a credit that acknowledged them as the primary source of the plots. For example, even though Ditko had been plotting *Amazing Spider-Man* stories for several years at that point, his credit for such first appeared in *Amazing Spider-Man* No. 26 as "Painstakingly Plotted and Drawn by Steve Ditko" and concurrently on Dr. Strange in *Strange Tales* No. 141 as "Plot and Artwork: Steve Ditko." Previously, he had been credited for art only.  The actual division

of labor did not change, just the credits. In recent years, reprints of Marvel comics produced in the 1960s have sometimes retroactively assigned a co-plotting credit to an artist like Kirby or Ditko.

Lee would compose the final captions and dialogue, not as Marvel's editor, but as a freelancer, and in such capacity worked from his home at least 2 of the 5 workdays per week, when he did not come into the office. Like most who were employed at Marvel in editorial or production roles, he did this work on his own time and was paid for it on a per-page basis, just like any freelancer.

Due to the financial precariousness of Timely/Atlas in 1958 and Lee's own formidable workload, it is unsurprising that Lee would rely heavily on the enormous creativity of freelance talent to generate comic books for publication, particularly the Creators.

3.    *Freelance Work was Purchased by and Assigned to Marvel*

Following the chaotic and depressed state of the comic book industry during the late 1950s, Atlas/Marvel and others rarely, if ever, had written contracts with freelancers in the 1960s, avoiding the financial commitments that would obviously entail. This was consistent with the custom and practice at the time in the comic book industry. To the best of my knowledge, no freelancers had contracts engaging them to create the works or otherwise regarding the material they had created and sold to Marvel from 1958 through 1971. For instance, the earliest contract produced by Marvel in the current cases is an assignment from Jack Kirby to Marvel executed on May 30, 1972, which coincides with my understanding of the historical record. Others, such as Roy Thomas, were first asked to sign written contracts starting in 1974.

Freelancers, like Steve Ditko, Jack Kirby, Don Heck, Gene Colan, John Buscema, Dick Ayers and many more worked on their own, usually at their homes or, as in Ditko's case, in a studio that he rented at his own expense. They supervised themselves, edited their own work, and did not create under the close direction or supervision of Marvel. Many freelancers, like Steve Ditko, were extremely independent. Some received only verbal plot points and when written plot outlines were provided, such documents were often merely suggestions for the artist, to use or disregard at his discretion. A document

entitled "Avengers Plot" written by Roy Thomas coincides with my understanding of the historical record (2021MARVEL-0071572–2021MARVEL0071575).

In addition, freelancers set their own hours and working conditions, paid their own overhead and all expenses associated with their creations, purchased their own art supplies, including paper, pencils, ink, pens, brushes, and other materials with which a comic book story is created. In creating their works, the artists took on the financial risk that Marvel might not approve and purchase their works. This shifting of the financial risk of creation is consistent with Marvel's desire to drastically reduce its overhead and financial commitments, commencing in the late 1950s. Marvel's only risk was that a certain comic book issue might not sell well, that is, the general risk of publication and exploitation. Such risk, however, is inherent to all publishers, whether the works they publish are created "on spec" or as works made for hire, as such is the nature of the publishing business.

Marvel and other publishers of the day did not pay for work which their editor(s) chose not to accept. This was fairly standard throughout the industry. In the early seventies, for example, I sold a great many scripts on a freelance basis to Western Publishing Company for its Gold Key Comics line. Western then had the license to produce and publish comic books featuring the Disney characters and the editor of that line might tell me, "I need twelve-page Mickey Mouse stories" or "I need six-page Goofy stories." I received no direction as to content, storylines or anything more than page count and which book my work, if accepted, might appear in. I would then write scripts "on spec" in my bedroom at home and submit them to this editor. Often, they were accepted as I wrote them. Sometimes, he would return the scripts to me with directions on how I might revise them to make them sellable to him. Sometimes, I would rewrite and he might or might not buy them. If he purchased them, I would be paid a flat $10 for each accepted page. That is, if it was a six-page story and I rewrote two pages of it and he accepted it, I would still only be paid for six pages.

And sometimes, a script was rejected. I still have in my files, scripts that I submitted to Western during this period which were rejected. Every once in while, I was able to place one or two somewhere else, often with substantial revision on my part. Western also produced and published comic books featuring Hanna-Barbera properties.

The editor at Western rejected two scripts I submitted for the *Scooby Doo* comic book and since that was then the only marketplace I knew of for *Scooby Doo* scripts, I thought I was stuck with them but a few years later, Marvel was publishing *Scooby Doo* comic books and the Hanna-Barbera studio was buying scripts for those comics and for others published by other companies in other countries. I was able to sell those two scripts which the editor at Western had rejected to Hanna-Barbera. And even more years later, I used plots and gags from scripts Western has rejected when I wrote for the *Garfield and Friends* cartoon show on CBS.

I never had any sort of staff position or salary from Western Publishing, nor did they own those scripts they had not purchased and paid me for.

Consistent with the custom and practice of the comic book industry in the Period, Marvel did not pay freelancers any sort of guaranteed salary, wage or fee for their services. Freelance artwork and plotting was purchased by the page on a piecework basis—a set amount for each page accepted for publication. If a page or story was rejected by Marvel, the freelancers were not compensated for their time or services and personally withstood the financial loss for it. If Marvel rejected a freelancer's pages, which he then redrew, the freelancer was only paid for the pages approved for purchase. The 1974 and 1975 contracts between Marvel and Roy Thomas and Marvel and Gene Colan, respectively, coincide with my understanding of Marvel's standard arrangement and that of the industry in general throughout the 1960s and most of the 1970s (2021MARVEL-0018310–2021MARVEL-0018318; 2021MARVEL-0018412–2021MARVEL-0018419). It was a simple purchase and assignment of all rights in the completed freelance material Marvel accepted and approved.

Freelancers essentially sold a product to comic book publishers, like Marvel. The page rate was fixed and did not depend on the amount of time the freelancer had been spent writing or illustrating the pages. Marvel, consistent with the custom and practice of other comic book publishers, did not withhold payroll taxes or any other form of taxes from the money it paid to freelancers, nor did freelancers receive any health benefits or health insurance, nor any other traditional employment benefits such as sick pay. Again, after teetering on the brink of ruin in the late 1950s, Marvel, during the 1960s through the

early 1970s, severely limited its financial commitments and exposure associated with the creation of the comic books it published.

During the Period, and until about 1978, comic book publishers also did not appear to be concerned with "work made for hire," as few publishers had engagement contracts with freelance writers and artists during this time, and those few who did, did not include any "work for hire" references in them. The contracts publishers had with freelancers, if any, up until approximately 1978, consisted of assignment-type language where the freelancer simply granted to the publisher all rights in the completed material the freelancer had created, and the publisher had accepted.

The situation at Marvel was consistent with this industry custom and practice. For example, Marvel, at some point in time in the early 1960s began placing legends with legal language on the back of its checks to freelancers, where the freelancer signed the check to cash it.  This practice continued throughout the Period. I have been informed by the Defendants' counsel that Marvel has produced such checks, with legends on the back, from 1974 and 1975, and by contrast checks from 1986 and 1987, which I have reviewed.

The 1974/1975 checks are to the freelance artist Dick Ayers.  Notably, the language on the back of even these 1974/1975 Marvel freelance checks is still language of purchase and assignment:  "By endorsement of this check, I, the payee, acknowledge full payment for my employment by Magazine Management Company, Inc. and for my assignment to it of any copyright, trademark and any other rights in or related to the material, and including my assignment of any rights to renewal copyright."

This is consistent with my understanding that the legends on the back of Marvel's checks to freelancers contained such assignment of all rights language until at least the late 1970s, when I'm informed the 1976 Copyright Act went into effect. It is my understanding that with the new copyright law's greater emphasis on "work for hire," in the early 1980s Marvel changed the language in the legends on the back of its freelance checks from that of a purchase and assignment to a "work for hire" acknowledgement. The 1986 checks produced by Marvel appear to confirm this and, unlike the purchase and assignment language of the 1974/1975 checks discussed above, contain the following language: "By acceptance and endorsement of this check, payee acknowledges, a) full payment for payee's employment by Marvel Entertainment Group, Inc., b) that all

payee's work has been within the scope of that employment, and c) that all payee's works are and shall be considered as works made for hire, the property of Marvel Entertainment Group, Inc." (2021MARVEL-0023720–2021MARVEL0023721).

Marvel had been bought by Perfect Film and Chemical Corporation in 1968, which changed its name to Cadence Industries in 1973. Because of Marvel's highly informal, if not haphazard, prior practices during the late 1950s and early 1960s when it had little to no infrastructure and was simply trying to survive, Cadence was concerned with first determining and then shoring up Marvel's IP assets, including the status of Marvel's warehouse(s) full of original artwork. Thus, Cadence/Marvel started demanding in the mid-1970s that artists sign agreements assigning to Marvel all previous work published by Marvel (2021MARVEL-0018413–2021MARVEL-0018419; 2021MARVEL-0034137–2021MARVEL-0034145).

Similarly, Cadence/Marvel strained to retroactively fit within the new Copyright Act's explicit work-for-hire provisions, by having freelancers sign "work-for-hire" releases in and around mid-1978—just after the Copyright Act of 1976 had taken effect—as to prior work long after the work had been created (2021MARVEL-0018443; 2021MARVEL-0034133; 2021MARVEL-0033712; 2021MARVEL-0034134; 2021MARVEL-0034135; 2021MARVEL-0034136). Cadence thereby tried to revise and transform prior freelance material purchased by Marvel by the page into works made for hire, obviously, to hold on to what had become valuable intellectual property.

Sometimes such revisionism was blatant. For example, in the early 1980s, Marvel ran a competition for aspiring artists and writers, which was open for entry to the public. One entrant, Randy Schueller—an amateur and previously unknown writer/artist—on spec submitted a story wherein Spider-Man had a stealthy black costume instead of his usual and red, black, and blue. A few months after Schueller's submission, then Marvel editor-in-chief, Jim Shooter, wrote to Schueller on August 3, 1982, offering to buy the story for $220 and told him to sign a "Work-made-for-hire Agreement" (DITKO-0246). Schueller signed the agreement on August 9, 1982, which is the same form agreement Marvel's had other freelancers sign in and around 1978.  As with the 1978 documents, Schueller's "agreement" retroactively provided that "all work … which have been or are in the future created … [were] to be considered a work made for hire" (2021MARVEL-

0017800), as if to transmorph Schuller's work which by its very nature had obviously been created by him "on spec." .

In the Period (and until approximately 1978), the custom and practice in the comic book industry, including at Marvel, was for the publisher to simply purchase from the freelancer at a page rate those completed pages the publisher chose to accept in its sole discretion. The publisher could, and at times, did reject freelance pages and in that instance would not purchase and pay for such rejected pages. Given this and all of the above, it is extremely doubtful that either Marvel, Stan Lee, or pure freelancers such as Steve Ditko, Larry Lieber, Gene Colan, Don Heck, and Don Rico, had any cause to believe their freelance material, created at home on their own steam and own dime, and sold by the page to Marvel only if accepted was "work made for hire." already owned by the publisher from the moment of the material's creation. All indicia in the industry and at Marvel was of a simple purchase by the publisher and grant to the publisher of the freelance pages it accepted for publication. Marvel's practice of limiting its financial exposure by simply buying all rights to completed pages it approved for publication is a paradigmatic example of how comic book publishers throughout the industry, getting by with the slimmest of margins, were operating.

### b.    Creation of Certain Comics by the Creators

I have been asked to provide an analysis of some of the famous works created or co-created during the Period by the Creators at issue in the present actions. This list, by no means exhaustive, is of properties which fueled Marvel's renaissance. In each case, the hero is surrounded by a supporting cast of friends and foes, which the Creators also contributed. Even elements such as Thor's hammer or extensions of Iron Man's armor were created by a freelancer.

### 1.    *Larry Lieber*

Stan Lee's brother, Larry Lieber, was a significant participant, most notably, in the creation of Thor, Ant-Man, and Iron Man, three of the essential characters of what would eventually be called "The Marvel Age of Comics."

The Mighty Thor first appeared in 1962 in *Journey into Mystery* No. 83. *Journey Into Mystery, Tales of Suspense, Tales to Astonish, Strange Tales* and *Amazing Adventures* were all anthology titles that had previously featured non-series fantasy

stories with only the occasional recurring characters and no costumed heroes such as Marvel would soon be known for.  This kind of comic book was declining in sales so they began inserting these strips featuring ongoing, costumed super-heroes to try and reverse that trend.  The plan was successful.  Sales went up on each of these books, the non-series fantasy tales were dropped and, for example, the *Journey Into Mystery* comic featured Thor material (or related material) and the book was eventually renamed *The Mighty Thor*.

That first Thor story in No, 86  displayed no credits, but there is universal agreement that it was the work of Stan Lee, Larry Lieber, and Jack Kirby. Lee and Lieber were credited for, respectively, plot and script for that work and the nine subsequent issues. All ten of these established the bedrock of the feature including the characters of Odin and Loki, as well as Thor's earthly identity as Dr. Don Blake, as well as Blake's nurse, Jane Foster. Lieber helped create and name these characters, and came up the unusual name of Thor's signature weapon, the Uru Hammer!

Just as Thor was added to change the falling sales of *Journey Into Mystery*, Iron Man was added to *Tales of Suspense* as of issue No. 39 and Ant-Man was added to *Tales to Astonish* starting with issue No. 35 which expanded on an earlier story in *Tales to Astonish* No. 27

The first Iron Man story was credited to Stan Lee (plot), Larry Lieber (script), and Don Heck (art). Marvel later acknowledged the participation of Jack Kirby in the plot and initial design of the character. Again, Lieber took the basic idea and fleshed it all out, adding characters, naming characters, and devising enemies for Iron Man to fight. Don Heck further fleshed out the storyline and designed the character's non-costumed identity as Tony Stark and his friends, Pepper Potts and Happy Hogan. And again, in subsequent stories—some drawn by Heck, others by Kirby or Ditko—Lieber contributed to the creation of additional supporting characters and villains.

The genesis of Ant-Man began with that story in *Tales to Astonish* No. 27. In "The Man in the Ant Hill," scientist Henry "Hank" Pym shrunk to the size of an art for a nightmarish adventure. Eight issues later, Pym returned and donned the costume and name of Ant-Man, becoming another superhero in Marvel's then-new line of such characters. Both first stories were credited to Stan Lee (plot), Larry Lieber (script), and

Jack Kirby (art) with Marvel later acknowledging Kirby's contributions to the design and story.

The three major Marvel superheroes scripted at inception by Larry Lieber—Ant-Man, Iron Man, and Thor—also formed the nucleus of *The Avengers*, one of Marvel's most popular franchises.


2.    *Steve Ditko*

In 1962, as Marvel cast about for new superhero ideas, Jack Kirby and Stan Lee worked on a character named Spider-Man, which Kirby said was based on an idea that he had developed with Joe Simon in the mid-1950s. At some point, it was decided to toss their early development of a character by that name and start over in a brand-new direction. Kirby insisted he was never paid for the pages he had drawn of that first version that was rejected by Marvel.

Ditko devised a new costume and a new direction was charted for a very different Spider-Man character. Ditko wrote on several occasions that it was all worked out without Stan Lee ever writing an actual script, like those Ditko had illustrated for other publishers. That first Spider-Man story introduced not only Peter Parker (aka Spider-Man) but also his Aunt May and a rival at school, Flash Thompson—the first two members of what would eventually grow into a large supporting cast of friends and foes.

In later interviews and essays, Lee often said that Martin Goodman did not think the new character would sell but the origin tale appeared anyway in issue No. 15 of a Goodman comic book called *Amazing Fantasy*, which had previously been entitled *Amazing Adult Fantasy* and before that, *Amazing Adventures*. It had been plunging in sales and legend has it that Goodman had decided to cancel the book and that Spider-Man was inserted, as a kind of experiment, into what Lee and Ditko knew would be the final issue. But a more likely scenario—supported by artifacts like a blurb in *Amazing Fantasy* No. 15 urging readers to pick up *Amazing Fantasy* No. 16—was that Lee continued to purchase Spider-Man material from Ditko for at least that next two issues of *Amazing Fantasy* before the decision was made to make *Amazing Fantasy* No. 15 the last issue.

Months later, after its success became known, Spider-Man got its own title and an *Amazing Spider-Man* comic was launched at first using the leftover material intended for *Amazing Fantasy* prior to its cancelation, supplemented and continued with new material by Lee and Ditko. In short order, the cast swelled with supporting characters in the life of Peter Parker like J. Jonah Jameson and Mary Jane Watson, and Spider-Man foes like Dr. Octopus, The Sandman, The Green Goblin, Kraven the Hunter, The Vulture, The Scorpion and many, many more. All these and many others were co-created by Ditko, and firmly established well before Ditko left the comic, and stopped creating and selling work to Marvel, in 1966.

Ditko also created, plotted and drew the first story of the supernatural magician character, Doctor Strange, which appeared in *Strange Tales* No. 110. According to Ditko, and verified by Lee in a letter he wrote to the fanzine *The Comic Reader*, published in *The Comic Reader* #16 ("Twas Steve's idea"), Ditko originated the character, flowing from concepts he had been playing with for years. Ditko plotted and drew on spec a five-page story introducing the character which he presented to Stan Lee. Had Lee not decided to purchase Ditko's story, Ditko likely would have been able to sell it to Charlton, another company to which he sold freelance material. The world of Dr. Strange was strikingly different from other Marvel series of the time but Lee went for it and many more tales of Dr. Strange followed. Again, a host of supporting characters and an entire mythology of the Dr. Strange character were developed in stories by Ditko and Lee before Ditko stopped selling works to Marvel in 1966.

        3.    *Don Heck*

Don Heck was one of Marvel's mainstay artists beginning long before the introduction of the Marvel superheroes. At one time or another, he had worked on issues of most of their comics, often issues that introduced new characters and/or concepts. The two outstanding contributions by Heck where he drew characters who later became very successful and widely recognizable because of their appearances in comics and other media. Examples include, Iron Man (covered earlier) and The Black Widow (covered below).  He was also a key artist in the first four dozen issues of *The Avengers*, the series built around Thor, Iron Man and Ant-Man, all characters that Heck had illustrated in their early solo adventures.

4.    *Don Rico*

Don Rico had a long history working with Timely, Atlas, and/or Marvel. Rico was at various times a writer, an artist, and an editor.

By the 1960s, he had largely put comic books behind him, moving to Los Angeles from New York, where Marvel was located, and into screenwriting, novels, and fine woodcut art exhibited in galleries. In late 1963, a chance encounter with Stan Lee led to Rico selling a few freelance scripts to Marvel, all but one of which was credited to Rico's pseudonym or pen name: "N. Korok." Rico told me and others that he used this pen name because he did not want the publishers of his novels to know he was selling his work cheaply, as freelancers were when supplying work to comic book publishers back then.

In *Tales of Suspense* No. 52, "N. Korok" wrote an Iron Man story introducing for the first time the character of Natasha Romanoff, aka The Black Widow. Artwork for the story, including the first visualization of the character, was created by Don Heck. According to Rico, he based the Black Widow character on his ex-wife, who was Russian, and though Heck had never seen Rico's ex, the result was a fortuitous resemblance.

5.    *Gene Colan*

Like Don Heck, Gene Colan was one of Marvel's most prolific freelance artists and he too drew most of its major comics at one time or another. As a result, he designed many new characters and contributed to many new concepts introduced into the issues he drew. The three most popular properties he worked on from their start were Captain Marvel, The Guardians of the Galaxy, and Blade.

Captain Marvel utilized the name of the then-dormant superhero published by Fawcett Publications in the 1940s and early 1950s. At one point, their Captain Marvel was said to be the best-selling comic book in the world and that prompted a lawsuit against Fawcett from the company now known as DC Comics, arguing that Captain Marvel plagiarized Superman. The lawsuit was settled in 1953 with Fawcett paying a hefty amount to DC and agreeing to never publish the comic again.

In 1966, a small publisher named Myron Fass sought to exploit the famous name, bringing forth an entirely new character named Captain Marvel. This outraged Martin Goodman, who felt it infringed on his branding, so he ordered the creation of a Marvel

22

character by that name. The first appearance of Marvel's Captain Marvel was in *Marvel Super-Heroes* No. 12 published in 1967. The story which launched the character was written by Stan Lee and drawn by Gene Colan, who under the "Marvel Method," contributed to the plotting and writing.

*Marvel Super-Heroes* was a comic which Marvel was then using either to introduce new properties. The Guardians of the Galaxy was first published in in *Marvel Super-Heroes* No. 18. Though it would later turn into an important property for Marvel, for a long time this first story was the only one published. The story was credited to Arnold Drake and the artwork to Gene Colan.

Blade first appeared in the Marvel comic *Tomb of Dracula* No. 10 written by Marv Wolfman and drawn by Gene Colan. Initially, a supporting character in that comic, Blade soon graduated to his own comic book and to appearances in other media.

### c.    Return of Original Artwork to Freelance Artists

From the 1940s until the 1970s, Marvel and its predecessors gave little thought to the value of the freelance artwork they had purchased for publication. Much of the artwork was put in storage, some was thrown out, other pages were given away to fans as souvenirs. Much of it began turning up on the collectors' market, suggesting that someone in the office was smuggling it out and reselling it.

The return of artwork became an issue in the 1970s, when artists saw their work resold for large amounts of money at conventions. Many artists complained and in response, DC Comics decided that publishers had no legal claim to the artwork, and so it and most other companies began to return the artwork to the artists who had drawn it. In an open letter to the public, DC Comics maintained that, as was customary for periodicals, they were only paying for the right to reproduce the artwork and that the ownership of the actual physical artwork belonged to the artist. Marvel initially refused to return original artwork but eventually changed its position in the mid-1970s. It did this for a number of reasons.

One was a concern that the company might owe substantial sales taxes on the artwork to the State of New York. As early as the 1950s, comic book companies such as Western Publishing (aka Gold Key Comics) had paid its artists in California a state sales tax when purchasing their artwork. The artists collected this tax and forwarded it to the

State of California, as they were required by law to do. In the early 1980s, some New York artists inquired of their state tax officials as to whether, since no tax was paid or collected on their work, there was a legal transfer of ownership of the physical pages. The response, which was generally along the lines of "We'll have to look into that" frightened some in management at Marvel. The fear was that they might be assessed a substantial amount of current and overdue sales taxes for years and years of original artwork it had purchased.

Also, some at Marvel were concerned that, if the artwork was a corporate asset as the company sometimes asserted, Marvel/Cadence had a fiduciary duty to its shareholders to investigate the disappearance of artwork, and to perhaps prosecute any employees who were involved in its turning up on the open market. The characterization of the artwork as a corporate asset might also mean that the company was shirking its fiduciary responsibility by not having it properly insured. To do that would involve an expensive inventory and even more expensive insurance policies. An inventory could also raise questions about the arbitrary value that had been assigned to the artwork over the years.

Originally, in the mid-1970s, Marvel only agreed to return artwork from current issues and refused to return artwork from the past, particularly work from the 1960s, when the most significant characters were created. Then in the mid-1980s, Marvel implemented a policy to return past artwork to artists provided they sign legal releases stating that Marvel owned the copyrights to the artwork and re-characterizing the artwork created years as having been done as "work-for-hire." In need of income, artists mostly routinely signed these releases without the benefit of legal counsel, though some, like Jack Kirby, protested Marvel's re-characterization of their works.

## VI.   **CONCLUSIONS**

Due to the perilous financial condition of the comic book industry in the late 1950s, during the relevant Period, writers and artists, such as the Creators, created works as independent freelancers and, after completion, sold their creations to publishers such as Marvel on a per-page basis. Each freelancer had an established page rate, but was paid for only those completed pages the publisher, in its sole discretion, accepted and approved for publication, irregardless of the freelancer's time, effort, or expense creating

the material. Whether a freelancer spent an hour creating a page or ten hours, he was paid the same page rate for the publisher's purchase of those completed pages it chose to accept. If the work was rejected, the freelancer received nothing for it. This applied to virtually all writers and artists selling what they created in their own studios and homes to comic book publishers of the day, including Marvel. At Marvel, it even applied to editors, assistant editors, like Stan Lee and Roy Thomas, and other personnel who received salaries for the editing or production work they did in the company's office but who also did writing and/or artwork at home in the evenings or days off from the office. Working on their own time and dime, they too were treated as freelancers when it came to the creation of comic book stories.

Freelancers took on all of the financial risk of such creation and had little financial security. The publishers, including Marvel, bore only the risk of publication, i.e., that a particular issue of a comic book would sell well. The freelancers worked from their own facilities (usually at home), paid for their own materials and set their own hours. They did not receive any health benefits, health insurance, sick pay, vacation pay, severance pay or any other form of employment security until the mid-to-late 1970s. The publisher did not withhold payroll taxes or any other form of taxes from their checks.

Years after the success of key Marvel characters, the company, under its new corporate parents, Perfect Film/Cadence, attempted to "clean up" Marvel's ownership of what had become extremely successful comic book franchises by rewriting history. The explicit "work for hire" provisions of the 1976 Copyright Act created tremendous insecurity in the comic book industry, including at Marvel/Cadence, which thus attempted to re-label everything Marvel had published decades earlier as "work made for hire," even though such purchased material had theretofore never been treated as such by either Marvel or the freelancers. The example of Randy Schueller offers a poignant example of this. Schueller created the Spider-Man story on spec, yet months later, Marvel editor-in-chief Jim Shooter required Schueller to sign an agreement, stating retroactively that Schueller had created the black-costume Spider-Man story as a "work made for hire." I believe that Marvel is engaging in the same revisionist history today in response to the freelancers and their heirs availing themselves of their right of termination under the Copyright Act.

Respectfully submitted,

Mark Evanier