# EXHIBIT 2

## REBUTTAL EXPERT REPORT OF MARK EVANIER

### I.     INTRODUCTION

I have been informed that Marvel Characters, Inc. has designated Paul Levitz as an expert in the cases concerning Nanci Solo and Erik Colan, Keith A. Dettwiler, Michele Hart-Rico and Buz Donato F. Rico III, Patrick S. Ditko, and Larry Lieber's ("Defendants") service of notices of termination to recover, respectively, Gene Colan, Don Heck, Don Rico, Steve Ditko, and Larry Lieber's ("Creators") copyrights in works they each created that were purchased and published by Marvel or its alleged predecessors between 1962 and 1975 (the "Period"). Unless otherwise specified, my discussion below refers to this relevant Period.

To assist the Court and jury in making their determinations, and to help place the subject matter of the current actions in their true historical context, I have been asked to review and evaluate the report ("Report" or "Lev. Rep.") submitted by my colleague, Paul Levitz, whom I've known for decades and consider a friend. Set forth below are my analysis and opinions. As described in my report, I have significant personal knowledge of the comic book industry from my personal relationships, research, writing, including conducting hundreds of interviews of numerous different freelance writers and artists who created comic book material published by Marvel, DC Comics and other entities in the relevant Period. My knowledge includes, without limitation, facts learned from my professional and personal relationships with numerous individuals working both as freelancers and on staff with each of these publishers in the Period, and my research and writing on the history of the comic book industry and my other professional endeavors in this field.

At the outset, I note that Mr. Levitz's first stated contact with Marvel was in 1969 and he began freelancing at DC Comics in 1972, Lev. Rep. at 1-3. Indeed, most of Mr. Levitz's experiences with Marvel came well after the 1960s and the Period in question.

As my rebuttal report is based on my current knowledge and information, I reserve the right to supplement or revise this report in the event new information later becomes available to me.

I am not receiving any payment of money or other form of compensation for this report or my opinions.

## II.    ANALYSIS

### a.    Points of Agreement

Having reviewed and considered the analysis and opinions in the Report, as well as the majority of the materials cited in Appendix C thereof, I find that I agree with several of Mr. Levitz's opinions. The points on which Mr. Levitz and I agree are as follows:

1.    I agree with Mr. Levitz's opinion that Marvel's method of creating comics during the Period was an exception to the practice of most other publishers, including DC. Lev. Rep. at 12. I therefore, however, disagree with his conclusion that Marvel's method of creating comics fit within the industry "custom and practice," which I explain in greater detail below.

2.    I agree with Mr. Levitz's observation that freelance writers and artists during the Period, including at Marvel, were not paid for work that was rejected by the publishers. Lev. Rep. at 20, 23.

3.    I agree with Mr. Levitz's opinion that, due to the low profit margins in comic book publishing, Marvel, like other comic book publishers, had no employment or engagement agreements with freelance writers/artists of any sort in the Period in order to keep its financial commitments and overhead down and to increase profitability. Lev. Rep. at 16.

4.    I agree with Mr. Levitz's opinion that publishers bore the financial risk of publication, that is, that a work they published might not be successful, as this is a risk inherent in being a publisher in every industry. Lev. Rep. at 21-22. I also agree with Mr. Levitz that Marvel would not pay freelance writers/artists for rejected material that Marvel did not accept for publication in its discretion (Lev. Rep. at 20, 23), and thus freelancers bore the financial risk of creating their material, a risk inherent to creating artistic works on spec, i.e., without guaranteed compensation.

5.    I agree with Mr. Levitz that Marvel, like all publishers in all industries, had control over the content they chose to publish, and that once a

publisher bought creative material from a freelance writer/artist, the publisher/purchaser owned all rights to that material and could naturally do with it as it chose. Lev. Rep. at 20. I disagree, however, that Marvel, aside from their purchasing power, had actual control over the creators of the content it acquired or their particular creative process, as discussed further below.

b.     **Points of Disagreement**

In general, I disagree that there was an established "custom or practice" in the comic book industry with respect to the *creation* by freelancers of comic book material for potential publication. And to the extent there was, it was not followed at Marvel given the "Marvel Method," named after the unique way they treated the creation of a comic book, as stated and testified to by Stan Lee. And interestingly, even within the fledgling Marvel itself—which often functioned in a loose unstructured manner—there were inconsistencies between how Marvel worked with different freelance artists and writers regarding their creation of comic book stories (2021MARVEL-0071290–2021MARVEL-0071341; 2021THOMAS-0000570–2021THOMAS-0000571; 2021THOMAS-0000608–2021THOMAS-0000610; 2021MARVEL-0122729–2021MARVEL-0122792).

I agree that in the relevant Period there was an established custom and practice throughout the comic book business, including at Marvel, that only after a freelance artist or writer had already created their original material and submitted it to the publisher, the publisher bought only those pages it accepted in its sole discretion at that freelancer's page rate. Lev. Rep. at 20, 23. In this sense, the payment was for a product, pages of material already created by the freelancer, not for the freelancer's time or creative services (KIRBY-4165–KIRBY-4170; KIRBY-4171–KIRBY-4177; KIRBY-4178–KIRBY-4183; KIRBY-4184–KIRBY-4189; KIRBY-4190–KIRBY-4197; KIRBY-4198–KIRBY-4202; KIRBY-4203–KIRBY-4208). It was likewise an established industry custom and practice, that the publisher would not pay for those freelance pages or product it rejected in its sole discretion or thought should be revised (2021MARVEL-0019177–2021MARVEL-0019183; 2021MARVEL-0018412–2021MARVEL-0018419).

There was also an established custom and practice regarding the assemblage, production, and publication of comic books after freelance creative material was accepted

and purchased by a publisher. Many of these customs and practices were also common to the publishing industry as a whole. For example, publishers of novels or of magazine articles, employ editors who make subject matter suggestions or otherwise help guide the creative process, edit and make revisions to submitted material, have publishing deadlines, choose which genres of content they wish to publish and always take the financial risk that a publication will be profitable (RICO-0018–RICO-0024; RICO-0029–RICO-0032; RICO-0033–RICO-0036; RICO-0037; RICO-0038; RICO-0039–RICO-0042; RICO-0043; RICO-0044; RICO-0045; RICO-0046; RICO-0047). With respect to comic book publishing, aside from those processes indelible to publishing generally, there were fewer consistencies among the various comic book publishers during the Period, though certainly the mechanical operation of assembling, printing, and distributing the comic books was similar.

Marvel, in the 1960s—which was microscopic in comparison to the behemoth international corporation it is today—was struggling financially with slim margins and very few employees. Mr. Levitz describes these slim profit margins throughout the comic book business. As the comic book market was in a period of flux and triage from the major downturn that began in the 1950s, it is unsurprising, as acknowledged by Mr. Levitz, that Marvel avoided any firm employment or engagement agreements (and the financial commitment that entails) with the writers and artists who created comic book stories in the relevant Period. Lev. Rep. at 24 ("Indeed, it was uncommon for publishers to enter into written agreements with contributors [i.e., freelancers] at all during the [] Period, and publishers very rarely deviated from this practice.").

The copyrights to "Marvel" comic books were registered with the Copyright Office and owned by a series of unrelated shell corporations with no corporate affiliation to Marvel or to each other, including Atlas Magazines, Inc., Canam Publishers Sales Corp., Non-Pareil Publishing Corp., Vista Publications, Inc., and Marvel Comics, Inc. at issue in these cases. These shell companies had no employees, no actual offices or business activities. Most importantly, these shell companies—which Marvel later claimed in its copyright renewal registrations of its comic books (including those in question here) to be the "authors" of freelancers' creative material as "works made for hire" (e.g., 2021MARVEL-0005845–2021MARVEL-0005846; 2021MARVEL-0005849–

2021MARVEL-0005850; 2021MARVEL-0006045–2021MARVEL-0006046) —had *no interaction* whatsoever with the freelance writers/artists who created the original material in question, as testified to by Roy Thomas in these litigations.

I am informed that even Roy Thomas, who was *on staff* at Marvel in the 1960s as an Associate Editor and later in 1972-1974 as Editor in Chief, testified in these cases that he did not know anything about the shell corporations, which he thought were just names on the "indicia" of the comic books' inside covers. In any event, Martin Goodman's own testimony and the documents drafted to prepare the shell corporations for sale to Perfect Film and Chemical, shows that each shell company was unaffiliated with and unconnected to any other shell company or to Magazine Management Company (e.g., 2021MARVEL-006902–2021MARVEL-0069704). Therefore, Mr. Levitz's statement that "[i]t was understood in the industry that Marvel was operated as a number of corporations owned and controlled by Martin Goodman, principally through his company, Magazine Management" would appear incorrect. Lev. Rep. at 10 n.8. Mr. Levitz may not to have reviewed any of the corporate documents or deposition testimony of Martin Goodman produced by Marvel in these litigations.

This looseness, use of multiple shell companies, and their uninvolvement in the creative business they purported to be in was unique to Marvel during the 1960s until all the shell companies and Magazine Management were taken over by Perfect Film and Chemical in 1968. Perfect Film and Chemical was a more established entity that attempted, although unsuccessfully, to formalize and organize the loose and often haphazard internal workings of "Marvel." As Roy Thomas further noted in an interview and in this case, even into the 1970s, Perfect Film and Chemical (which was later renamed Cadence Industries) tried, but eventually gave up its attempt to organize Marvel's loose methods and practices (2021MARVEL-0071290–2021MARVEL-0071341; 2021THOMAS-0000570–2021THOMAS-0000571; 2021MARVEL-0122729–2021MARVEL-0122792).

Mr. Levitz's first stated contact with "Marvel" was in 1969 and he began freelancing at DC Comics in 1972, years after these shell companies and Magazine Management Company had been taken over by Perfect Film and Chemical. Lev. Rep. at 1-3. Mr. Levitz has asserted that he has "significant personal knowledge of all these

entities" (*id*. at 10), but in fact it appears that he had little or no contact with Magazine Management or the other "Marvel" shell companies—and certainly no "business relationships" with them or any individuals who freelanced for them—which were the particular entities involved in publishing the bulk of the works in question in these cases. Again, mostof Mr. Levitz's experiences with Marvel came well after the 1960s and the relevant Period.

        1.    *Marvel's Method regarding the Creation of Comic Books by Freelancers was Unlike that of Other Publishers During the Period.*

        I noted several inconsistencies in my colleague's Report which contradict the opinions he expressed. For example, in Section V(A) of the Report, Mr. Levitz opines that "[t]here was an established industry custom and practice by which comics were created during the [] Period, and Marvel's practices were consistent with that custom and practice." However, in Section V(A)(2), Mr. Levitz explained, in depth, how Marvel's process for publishing comics was a "departure from [the general] practice." On its face, Mr. Levitz's repeated conclusions that Marvel's practices were "consistent with industry custom and practices," is not supported, and indeed, is contradicted by his own analysis.

        As explained in Section V(a)(2) of my report, the "Marvel Method" was the predominate way material was generated at Marvel during the Period, according to Stan Lee and many others who were present at the time. Lee has testified and stated numerous times that the Marvel Method was a departure from the usual way comics were created during the Period. To the extent there was a custom and practice of comic book creation during the Period, Marvel's "Method" was certainly not consistent with it.

        Marvel was unique in the way it viewed and approached the creation of a comic book, taking various aspects of writing (such as the creation and development of characters, story plotting, and pacing) as practiced at other companies and at Marvel in earlier days and suggesting that this be left up to freelance artists, as comic books are primarily a visual medium. This was never done at DC during the sixties. The writer wrote a complete script, designating how many panels would appear on each page, what would be depicted in those panels, what the characters in those panels would say, what the captions would say, even designating the sound effects that would ultimately be

lettered in those panels. With very rare exceptions at DC, artists did none of that. At Marvel, they did much of that.

As Mr. Levitz noted in his Report, Marvel had a unique approach to the freelance creation of comic book stories by freelancers, one that was so specific to them that it was called the "Marvel [M]ethod." Lev. Rep. at 12. I do not see how, during the time Period specific to the matter before us, a working situation practiced at and distinguished by the name of one company can be considered consistent with any sort of industry "custom" or "standard," especially since it did not exist at other comic book publishers in the Period.

Even within Marvel, there were inconsistencies to its Method. When Stan Lee worked with certain artists—and Steve Ditko was one of the best examples of this—Ditko was given very little, or no, input from the writer (as Lee was usually credited) before he did the pencil art to a comic book story. Ditko also wrote detailed notes describing what was happening in each panel to guide Lee's dialoguing the balloons and writing of the book's captions. No artist at DC Comics, to my knowledge (and none was identified in Mr. Levitz's Report) ever did that. The other artists involved in this matter—Don Heck and Gene Colan—were also given far less input than some other artists who drew comics Marvel published. Lee himself has explained that the amount of input from Marvel also varied from project to project depending on who the writer would be, how familiar both that writer and the artist were with each other, and the particular book and how experienced each was with the "Marvel Method."

2.    *Freelancers Created Material on Spec and Bore the Financial Risk of Creation.*

I agree with Mr. Levitz's opinion that publishers bore the financial risk of publication, that is, that a work they published might not be profitable. Lev. Rep. at 21-22. This risk, however, is one that is inherent to publishing in general, and is not unique to comic books or the relevant Period.

Mr. Levitz also correctly observed that Marvel would not pay freelance writers/artists for submitted material that Marvel rejected. Lev. Rep. at 20, 23. This comports with my knowledge of the custom and practice at Marvel and throughout the comic book industry, and with the sworn testimony of Joe Sinnott, James "Jim" Steranko, Richard "Dick" Ayers, Gene Colan, and Neal Adams, comprising some of the most

prominent comic book writers and artists creating in the Period (KIRBY-4165–KIRBY-4170; KIRBY-4171–KIRBY-4177; KIRBY-4178–KIRBY-4183; KIRBY-4184–KIRBY-4189; KIRBY-4203–KIRBY-4208). Thus, as explained in Section V(a)(3) of my report, it was freelancers who bore the financial risk of creation of their works, a risk unique to working "on spec" as opposed to the employment of an independent contractor for guaranteed compensation.

I therefore noted another inconsistency in Mr. Levitz's Report where he opined that work submitted to Marvel was not done "on spec" simply because freelancers were invited to submit stories and were paid for those pages that Marvel accepted in its sole discretion. Lev. Rep. at 16-19. In attempting to draw a distinction between comic book publishing and other industries, he explained that "spec work for publishers outside of the comics industry meant greater uncertainty and frequent inability to monetize work that may not be accepted by any publisher[.]" *Id*. at 23-24. But this uncertainty coincides with his description of how freelance comic book creators were in fact paid—"contributors were generally paid on a per-page rate and [] their work was subject to rejection by the publisher" (Lev. Rep. at 23)—and with the opinions in Section V(a)(3) of my report. In other words, comic book creators who sold their work to Marvel, like all those working "on spec," bore the risk of creation, given Marvel's unfettered ability to reject, and not pay for creative material generated by freelancers on their own steam and at their own expense. Because Marvel purposefully kept its options open, with no actual employment of freelancers and no guarantee that Marvel would buy their pages, the freelancer necessarily created such material on speculation, assuming the risk that Marvel could (and indeed, periodically did) reject their pages, at their discretion.

For example, Joe Orlando, after three issues of *Daredevil*, decided to sell to other publishers because, in his view, Marvel rejected and requested that he redraw too many pages before buying them. Joe told me and others that he had to draw more than 30 pages in order to get paid for the 22 pages that Marvel published in each *Daredevil* issue. As another example, I'm aware that the immensely talented artist Jack Kirby drew a five-page story of the inchoate "Spider-Man" character which Stan Lee, rejected, and my understanding was that Kirby was not paid for this rejected material (e.g., DITKO-0189–DITKO-0234). I would estimate that Kirby, over the course of working with Marvel on a

freelance basis in the 1960's, had several dozens of pages rejected by the publisher without compensation.

When pages were rejected by Marvel, Marvel did not pay for them and often did not retain them. For example, according to his daughter, Nanci Solo, Gene Colan was so angered by Marvel's rejection of his work that he used such rejected pages to pick up the family dog's feces in the yard.

Although the "Marvel Method" by which freelancers created comic book material differed from the practice of other comic book publishers in the Period, the speculative nature of freelance work at Marvel was consistent with industry custom and practice. For instance, in the early 1970s, I was asked to submit to Warren Publishing, stories for its horror anthologies and stories featuring its *Vampirella* character, by Forrest J Ackerman, the editor of one of its non-comic magazines, who took submissions for Warren's comics as well. I was asked to submit completed scripts, such as was the norm then in the industry, by editors at DC Comics, Western Publishing and Charlton Comics and other comic book publishers. The editor of Warren's horror anthologies was to read whatever I submitted and decide to purchase or not purchase what I wrote. Because its page rates were so low, I declined to submit to Warren and to Charlton. To the best of my knowledge, this practice was also true of Harvey Comics and Archie Comics. For example, the publisher of Archie Comics, John Goldwater, told me to write up whatever stories I chose featuring Archie, Jughead, Betty, and Veronica and other characters that appeared in the comics his company published, and from there, his editor would decide whether to buy them or not.

Mr. Levitz describes writers coming in to "pitch" an editor but says, "[g]enerally, no significant work was done by writers in preparation for these pitches." Lev. Rep. at 11. I respectfully disagree. A writer who walks into a pitch session without extensive prep is like a salesman who pays a sales call with nothing to sell. Coming up with new storylines and fresh ideas and characters were all common practice for comic book writers and to some of us, the most important and demanding part of the process.

That said, many sales by writers did not (and in some cases, still do not) involve an in-person pitch session with an editor. For example, in the late 1960s, I was invited to submit scripts and story ideas/outlines by two editors at DC (Mort Weisinger and Jack

Miller) and one at Charlton Comics (Dick Giordano). That is, to come up with and write stories "on spec" that had a beginning, middle, and end.  Many writers share my feeling that this was and is the hardest part. For Mort Weisinger, I wound up writing three entire stories that he rejected before he said he would buy my fourth submission but then ultimately did not because he was no longer assigned to edit the comic for which I had written it.

The "pitching" Levitz describes as standard to the industry certainly was not the practice at Western Publishing, a company to which I sold many scripts for comics based on the properties of Disney, Warner Bros., Hanna-Barbera and others. Even though the editor in that case was local to me and I often visited the editor's office, it was only to hand in material and to find out, for example, that he was in need of 6-page *Bugs Bunny* stories or 12-page *Mickey Mouse* stories. We engaged in no pitching or plotting sessions as Mr. Levitz describes. I occasionally submitted outlines, but more often, perhaps 80% of the time, wrote and submitted complete stories which the editor would buy or not buy. I, of course, was paid nothing for the time and energy I expended on the stories the editor chose not to buy.

Notwithstanding the differences in the "Marvel Method," and whether a particular story had been pitched in advance or not at Marvel, the essentially speculative nature of freelance work was the same as it was throughout the comic book industry in the Period. Mr. Levitz's detailed descriptions of the trials and tribulations of publishing and distributing comic books in the Period after freelance content had been created and purchased by a publisher would not appear particularly germane, except perhaps to explain why comic book publishers, including Marvel, avoided any employment contracts with freelancers guaranteeing compensation for their labors, as acknowledged by Mr. Levitz. Lev. Rep. at 24.

3.    *Marvel had No "Right" to Control Creators or their Creative Process.*

Marvel had no "right" to control freelancers in the Period. Instead, what it had was purchasing power over freelancers who, after the drastic decline of the comic book business in the late 1950s, were no longer employed. I agree with Mr. Levitz that it was very rare for comic book publishers, including Marvel to enter into written agreements

with freelance writers and artists in the Period (Lev. Rep.24) and certainly none whereby Marvel engaged a freelance writer/artist such that it had a "right" to control the freelancer, his creative process or method for creating original comic book material. Roy Thomas testified, and documents here show that, even though Thomas was on staff as an Associate Editor, and freelanced as a writer, he had no contract with Marvel until 1974, and was one of the first few who did. As Marvel purposefully avoided engagement agreements and the financial commitments contracts entailed, the freelancers were not obligated to Marvel to perform services and Marvel had no enforceable obligation to them. Marvel had the ability to purchase or not purchase the work created by freelancers on their own volition, at their own expense, and in their own homes or private studios. But, at the point of sale, the freelancer's creative process was already finished.

With respect to editing a freelancer's material, Mr. Levitz explained how, after a freelance artist submitted work to a publisher, there might be times when the editor would ask the artist to make changes to it or, in some instances, have another artist make the changes. I am also aware of this practice, but it is important to understand two attributes of these practices.

When the publisher asks a freelancer to make changes, the freelancer had no duty or obligation to do so (again there were no contracts during most of the Period) but did so to make a sale. As such, the inference from Mr. Levitz's Report that an editor could "require" a freelancer to change his material is flawed. Lev. Rep. at 12, 14, 20. An editor could *request* that changes to be made but could not compel a freelancer to do anything. At most, the editor could decline to buy the work if a freelancer declined to make request the changes. As with any ordinary commercial transaction, the purchaser (editor/ publisher) could buy or not buy, and the seller (freelance artist/writer) could sell/not sell the work, with neither side obliged to proceed with the sale. Given that employment contracts between Marvel and any freelance writer/artist were exceedingly rare in the Period, I cannot see how Marvel could "require" anything of these creators who were free agents. And moreover, if such changes were made by the freelancer to tailor his work to sell it, he was only paid for the revised pages that were accepted, not the original pages he had created that were rejected.

11

Second, after the publisher purchased a freelancer's pages, it *owned* all rights to the material and obviously was free to do with it as it pleased, including having another artist or a staff member make changes to it at times. Such practices evidence only control over what the publisher, including Marvel, chose to purchase and publish. Many creators, such as Steve Ditko and Jim Steranko, for example, refused to make changes to their work, and thus, any changes Marvel wanted were either ignored by the artist, or had to be made after the artist had sold their work to Marvel. There is nothing extraordinary or significant about that. For example, someone can buy artwork from a gallery or an artist, take it home, and, as its new owner, alter it if he so chooses. The new owner has edited or changed the purchased material but had no *right* to control the artist's creation of it. The same applies to a freelance writer's script. The statement in Mr. Levitz's Report that "the editor could rewrite the material themselves at will without consulting the writer" (Lev. Rep. 12) omits an important point. An editor of course had the right and authority to modify material after the publisher had purchased it, but not before.

I further disagree with Mr. Levitz's elevation of the role of a comic book "inker" to a co-creator of a comic book's essential artwork drawn in pencil by artists such as Steve Ditko, Don Heck and Gene Colan. While the inker's skill could well affect the quality of the comic book publication, inking was far more an aspect of the physical production of a comic book. As such, I do not believe that any Marvel inker ever received a creator or co-creator credit on a single Marvel comic (aside from those instances when the artist-penciller happened to "ink" his own artwork.

I agree with Mr. Levitz's opinion that some comic book publishers would review work throughout the creative process. Lev. Rep. at 19. However, I disagree with any suggestion that Marvel was consistently one of these publishers. In fact, when Marvel used writers to write stories, instead of the Marvel Method (where the artist was expected to plot the story), some freelance writers would mail their freelance scripts directly to the artist to draw, bypassing the publisher and editor completely. Indeed, Roy Thomas has said in interviews and testified that, when he was Editor in Chief from 1972 to 1974, he was so busy with the business side of Marvel, that he was often unable to review even the final versions of comic books before they were published, let alone monitor each step of the creative process. Thomas has also indicated that Marvel, during the Period, was

disorganized and had few consistent methods of operation, when it came to its involvement in the creation of original material by freelance writers/artists. 2021MARVEL-0071290–2021MARVEL-0071341; 2021MARVEL-0122729–2021MARVEL-0122792. Because Marvel itself had no consistent custom or practice during the Period with respect to the *creation* of the material it subsequently bought from freelancers, it would be incorrect to opine, as Mr. Levitz has, that Marvel's internally inconsistent creative practices were consistent with the industry's customs and practices.

I am aware that the earliest fourteen stories of *Thor* in *Journey Into Mystery* were worked on by Jack Kirby, Al Hartley, or Joe Sinnott as referenced in the Report. Lev. Rep. at 19. While this round-robin of artists was unusual, as many writers/artists had long runs on certain stories and characters, particularly ones created by them (e.g., Steve Ditko on *Spider-Man* and *Dr. Strange*), it serves to show that such freelance artists, whose participation was purely voluntary, were free to decline to work on any project they wished, since Marvel had no binding engagement or contract with freelancers for most of the Period. And in many cases, if an artist was too busy creating other stories to sell to other publishers, or did not identify with a Marvel character, he could and would refuse to create other works offered to him by Marvel. For instance, Alex Toth, one of the most respected artists in the field, moved on after only one story for *X-Men* and one short back-up tale for Marvel's "cowboy" comics. As discussed above, Joe Orlando, frustrated with Marvel's periodic rejection of certain *Daredevil* pages he submitted, decided to sell his works to other publishers. Joe's successor on *Daredevil*, the award-winning artist Wallace Wood, also passed on further Marvel projects for similar reasons after eight issues of *Daredevil*.

The fact that freelance writers/artists could refuse work demonstrates that the repeated term "assignment" in Mr. Levitz's Report is used loosely and really means a reject-able invitation from Marvel to create material for potential publication, if it were accepted and purchased, at Marvel's discretion. It is true that many freelancers would create original material and ultimately sell it to Marvel under such circumstances, but that did not change the true nature of their relationship.

I also take exception with the assertion that freelance writers were only submitting stories for "anthology" titles and his distinguishing these from the works at issue in this

13

current matter. Lev. Rep. 13. As one example, *Ant-Man* debuted in a Marvel anthology book, *Tales to Astonish*. The character of Henry "Hank" Pym first appeared in issue #27 and then later transformed into the costumed *Ant-Man* (and a continuing series) in issue #35.

I further find Mr. Levitz's repeated "assembly line" metaphor curious. While any illustrated publication, like the comic books in these lawsuits, require, by definition, input from different parties at various stages (i.e., an artist or a writer and artist creates an original illustrated story, told in panels, which is then lettered, inked, colored, printed, bound, and distributed), when it comes to the freelance writer and artist's creation of the original story, there is little merit in the analogy to an assembly line, in which factory employees with salaries or guaranteed hourly wages repeatedly complete their same task over and over until the product is complete and they clock out. Whereas the physical production and publication of a comic book, *after* a freelancer's creative material is accepted for publication and purchased by Marvel might have some assembly line characteristics, the freelancer's creative process and their speculative relationship with Marvel did not.

The assembly line metaphor is inconsistent with Mr. Levitz descriptions of how Marvel actually produced comics. In his Report, Mr. Levitz points out, for example, that in some instances, a writer/artist would have an idea for a story or character and pitch it to Marvel, and in other cases, Martin Goodman would suggest something, or Stan Lee would write a plot outline (and be paid for this as a freelance writer, not as part of his Editor salary), in yet other cases, a freelancer would write a script describing the characters and each piece of the story, in others, an artist would plot and draw the story, suggesting the dialogue and captions, and in still others, a freelance creator would come up with the idea, write, plot, and draw the story in its entirety. While the assembly line metaphor may be apt for publishers like DC or even Marvel in the 1940s and 1950s, it is not an apt descriptor of Marvel during the Period.

It might also be worth noting that while comic book publishers, including Marvel, have often acknowledged the writer and pencil artist of a new comic or character as the co-creators of that comic or character, no publisher to my knowledge, including Marvel, has ever listed any other member of this "assembly line" as a creator. Inkers do not

14

receive creator credits.  Letterers do not.  Colorists do not.  Production artists do not.
That clearly sets the writer and penciler apart from the other members of the alleged
"assembly line."

       4.    *Marvel Sought to Capitalize on Creators' Names to Sell and Promote Comics.*

Prior to the 1960s, it was uncommon for a comic book publisher to attribute credit
to those who had created the work. However, in the 1960s, Marvel began to do so, and
freelance creators insisted their names be attached to their publications. Stan Lee, in
particular, regardless of the degree to which he contributed to a work, was known to put
his name on most everything Marvel published. Lee, as both an Editor-in-Chief and a
writer, self-appointed his own credits at his discretion and did so to enhance his own
reputation and to receive all, or a portion of, the writer's share of the page-rate.

I disagree with Mr. Levitz's statement that Marvel did not use freelance creators'
names to promote and sell comics the way other publishers would (e.g., with novelists).
Lev. Rep. at 18-19. When I was thirteen years old and reading comics, I knew and valued
who had created which Marvel stories from their credits, discussions in the letter pages,
and Stan Lee's promoting them in his Bullpen Bulletins house ad pages.  By giving the
freelance creators catchy nicknames (e.g., Jack "*King*" Kirby, *Debonaire* Don Heck,
*Laughin'* Larry Lieber, *Genial* Gene Colan, etc.), and at times publishing their photos.
Marvel boosted the creators' recognition and celebrity among its readers to maintain their
loyalty and enhance sales (2021MARVEL-0124878–2021MARVEL-0125015). After
Steve Ditko (and later, Jack Kirby) stopped selling to Marvel and instead worked with
competing companies, those publishers promoted their names because they had built up
major followings among the readers of Marvel comics.  I therefore disagree with Mr.
Levitz's opinion that Marvel did not exploit the identity of freelance creators, as it is
inconsistent with the historical facts and just looking at the Marvel comics themselves.

       5.   *Freelancers Sold and Assigned Their Material to Marvel.*

Mr. Levitz stated that it was industry custom and practice for comic book
publishers to own "all rights" to the material they published, and that Marvel exploited
such rights here and abroad. Lev. Rep. at 25-26. Mr. Levitz also emphasized that since
Marvel owned all rights to the freelance material it bought, the freelancers usually did not

15

attempt to exploit their creations in other media, whereas Marvel did. *Id*. While largely true, all of this is completely consistent with Marvel's purchase and the freelancers' assignment of all rights in their material after it had been created. It is not surprising that Marvel exploited the rights it bought or that freelance creators did not try to exploit the rights to the material they sold. Marvel's ownership of all rights in the material sold and assigned to it by freelancers, including the Creators here, is expected and unremarkable.

Mr. Levitz seems to have overlooked that even the legends on the back of Marvel's checks to a freelance artist or writer in the relevant Period "acknowledged" payment for the freelancer's "assignments" to Marvel of all rights to his work, including the *freelancer's* "copyright." Even as late as 1974 and 1975, Marvel's checks still contained this pure assignment language (KIRBY-4139–KIRBY-4164 (e.g., "By endorsement of this check, I, the payee, acknowledge full payment for my employment by Magazine Management Company, Inc. and for my assignment to it of any copyright, trademark and any other rights in or related to the material, and including my assignment of any rights to renewal copyright.")). Appendix "C" to Mr. Levitz's Report which lists the materials he considered does not include any actual check legends which he appeared not to have reviewed in rendering his opinions about them. And as acknowledged by Mr. Levitz, it was only in the late 1970s, in apparent reaction to the 1976 Copyright Act's detailed "work for hire" requirements, that Marvel began putting legends with "work-made-for-hire" language on the back of its checks to freelancers, and began including after-the-fact acknowledgements as to all prior work in releases Marvel forced freelancers to sign if they wanted their original artwork returned to them (e.g., 2021 MARVEL-0054636; 2021MARVEL-0054634; 2021MARVEL-0054635). Although neither I nor Mr. Levitz are lawyers, I might agree that these "work for hire" acknowledgements in the late 1970s could qualify as "belt and suspenders," but prior to that revisionism in the late seventies, Marvel's explicit check legends in the Period only held up the "pants" of an assignment, consistent with Marvel's discretionary post-creation purchases of freelance material.

It was also common practice in the publishing industry during the Period for publishers who wanted to be considered legal "authors" of "works-made-for hire" to state so clearly and to do so in writing. (RICO-0018–RICO-0024; RICO-0025). For example,

Lancer Books sent Don Rico a publishing contract for a piece he wrote in 1966 which provided that "[Lancer Books] shall be deemed the Author of the Work … in view of the fact that you are our employee for hire" (RICO-0018–RICO-0024). This Lancer contract used no "assignment" language. And notably, Don Rico vehemently rejected it for attempting to deprive him of his authorial status and rights (RICO-0025).

In contrast, as explained above and acknowledged by Mr. Levitz (Lev. Rep. at 24), there were almost no written contracts between Marvel and freelance writers/artists until around 1974. But, even when more contracts began to sporadically appear, they merely made explicit that the freelancer's work was being "assigned" to Marvel, not that the works were being done on a "work-made-for-hire" basis, owned by Marvel at inception as their "author." As stated, such contracts further made explicit that Marvel could reject any freelance material and choose not to buy it, consistent with the custom and practice at Marvel and throughout the comic book industry in the Period. The 1974/1975 contracts between Marvel and Gene Colan and between Marvel and Roy Thomas are prime examples of this (2021MARVEL-0019177–2021MARVEL-0019183; 2021MARVEL-0018412–2021MARVEL-0018419). Marvel did not use any such "work-for-hire" language until the late 1970s, after the relevant Period.

## III.   CONCLUSION

As described above, several of my colleague Paul Levitz's opinions are inconsistent with his analysis and/or the evidence presented in these litigations. After careful consideration of Mr. Levitz's Report, nothing in it has caused me to change any of the opinions or analysis in my initial report.


Respectfully submitted,

*Mark Eva*

Mark Evanier

17